**ORIGINAL**

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

**JAN 1 2 2007**

Stephan Harris, Clerk
Cheyenne

Patrick J. Crank
Attorney General

Jay A. Jerde
Deputy Attorney General

Robert A. Nicholas
Senior Assistant Attorney General
123 Capitol Building
Cheyenne, Wyoming 82002
Telephone: (307) 777-3406
Facsimile: (307) 777-3542
E-Mail: bnicho@state.wv.us

Attorneys for Petitioner State of Wyoming

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| STATE OF WYOMING | ) COMPLAINT FOR |
| | ) DECLARATORY |
| Plaintiff, | ) JUDGMENT AND |
| | ) INJUNCTIVE RELIEF |
| vs. | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| AGRICULTURE; UNITED STATES | ) |
| FOREST SERVICE; MIKE JOHANNS, in | ) Case. No. $O 7 C V 17 D$ |
| his official capacity as the Secretary of | ) |
| Agriculture; and DALE N. BOSWORTH, in his | ) |
| official capacity as the Chief Foresterof the | ) |
| USDA Forest Service; | ) |
| | ) |
| Defendants. | ) |
| | ) |

Receipt # $CHY cc0^{998}$
Summons: ___✓___ issued
_____ not issued

## INTRODUCTION

1.      In the last year of President Clinton's administration, at the direction of the President, the United States Forest Service (USFS) and the United States Department of Agriculture (USDA) railroaded through a new administrative rule affecting 58.5 million acres of roadless area within our National Forests. The promulgation of the 2001 Roadless Area Conservation Rule (66 Fed. Reg. 3244-3273, (January 12, 2001)) (Roadless Rule), and other related actions, were conducted surreptitiously to ostensibly augment the President's environmental legacy at the cost of ignoring the environmental laws of the United States. The blatant disregard for public participation, reasoned decision making and obvious environmental consequences resonates throughout the rule making process and related agency actions.

2.      The Defendants' acts were in complete disregard of the rights of the State of Wyoming (Wyoming), as well as other interested states and parties that unsuccessfully attempted to reign in the out-come driven agendas of the President's administration and Defendants. Wyoming seeks relief (again) from this Court to correct the wrongs committed by the Defendants on behalf of an administration more interested in legacies than public participation and open, transparent administrative processes.

### PRIOR LAWSUIT CHALLENGING ROADLESS RULE

3.      Wyoming filed a complaint very similar to this complaint on May 18, 2001, in this Court, civil docket no. 01-CV-086-B. *See Wyoming v. United States Dep't Agric.*, 277 F. Supp. 2d

1197 (D. Wyo. 2003). This complaint is being filed to preserve Wyoming's right to challenge the Roadless Rule, necessitated by the convoluted history of the Roadless Rule and the prior lawsuit. On July 14, 2003, the United States District Court for the District of Wyoming, in civil docket no. 01-CV-086-B, found that the same Federal Defendants violated various environmental laws in the enactment of the Roadless Rule and enjoined implementation of the Rule. *Wyoming v. United States Dep't Agric.*, 277 F. Supp. 2d at 1239. That judgment was dismissed without prejudice by Judge Brimmer on January 3, 2006, at the directive of the Tenth Circuit Court of Appeals, after the appellate court found the matter to be moot because of a subsequent, superceding roadless rule (2005 Roadless Rule) promulgated by the USGA in May, 2005 (*see* 70 Fed. Reg. 25654 (May 13, 2005). *Wyoming v. United States Dep't of Agric.*, 414 F.3d 1207 (10th Cir. 2005).

4.      The 2005 Roadless Rule was recently set aside by the United States District Court for Northern California and the 2001 Roadless Rule, which is the subject matter of this case and civil docket no. 01-CV-086-B was re-instated. *Calif. v. U. S. Dep't of Agric.*, Case No. C05-03505 (N.D. Calif. 9/19/06). Wyoming then filed a Motion For Relief From Judgment or Order Pursuant to Federal Rule of Procedure 60(b) in this Court, civil docket no. 01-CV-086-B on September 22, 2006, based on the re-activation of the 2001 Roadless Rule by the California court. A hearing on that motion is currently set for February 26, 2007. *Wyoming v. United States Dep't Agric.* 01-CV-086, Notice (January 9, 2007).

5.     This Complaint is being filed by Wyoming in order to preserve Wyoming's right to challenge the Roadless Rule promulgated by the above Defendants and meet the requisite six year statute of limitations, in the event Wyoming District Court does not grant Wyoming's motion under Rule 60(b) or otherwise recall its mandate, or if the Tenth Circuit chooses not to allow re-opening the case or otherwise does not review the matter.   The filing of this Complaint is not intended, in anyway, to jeopardize Wyoming's Motion For Relief From Judgment or Order Pursuant to Federal Rule of Civil Procedure 60(b) filed in civil docket no. 01-CV-86B. Granting Wyoming's Rule 60(b) motion and subsequent review by the Tenth Circuit would make further prosecution of this Complaint unnecessary.

## JURISDICTION AND VENUE

6.     This lawsuit requests judicial review of final agency actions taken by the Defendants (or their predecessors in interest).  Defendants' actions, which are of monumental scope, unlawfully abrogate statutorily-prescribed forest management and planning decisions on over 58 million acres of National Forest lands.

7.     Wyoming's boundaries encompass all or a significant portion of the  Medicine Bow National Forest, the Bridger - Teton National Forest, the Bighorn National Forest, and the Shoshone National Forest.  Wyoming's boundaries also contain smaller portions of the Black Hills National Forest, the Wasatch - Cache National Forest, the Ashley National Forest, the Targhee National Forest and the Caribou National Forest.

8.     Defendants are attempting to unlawfully alter the entire regulatory framework for planning in the National Forests by adopting a rigid, narrow, and single-focus policy of *non*management in violation of Federal Law and Defendants' own regulations. Defendants' actions not only fail to address, but actually exacerbate, pervasive National Forest health problems and catastrophic wildfire risks. Defendants' actions also compromise the maintenance of diverse wildlife habitat and the health of essential watersheds.

9.     This is an action for declaratory judgment, injunctive relief and administrative review of agency action. Wyoming requests the Court to declare unlawful, enjoin implementation of, and set aside the promulgation and adoption of the 2001 Roadless Rule. *See* 36 C.F.R. §§ 294.10-294.14 (2001).

10.    Wyoming seeks an Order from this Court declaring that Defendants' actions, in adopting the Roadless Rule violated the following:

> A.     National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* (1969);
>
> B.     National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.* (1976);
>
> C.     The Wilderness Act, 16 U.S.C. § 1131, *et seq.* (1964); and the Wyoming Wilderness Act of 1984 ("WWA"), Pub. L. 98-550, October 30, 1984;
>
> D.     Multiple Use and Sustained Yield Act ("MUSYA"), 16 U.S.C. § 528 *et seq.* (1960); and,

H.      Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq.* (1966).

11.     Wyoming seeks an injunction barring the implementation of the Roadless Rule and any accompanying and related rules, regulations and policies.

12.     Wyoming seeks an Order from this Court mandating that the Defendants comply with the foregoing statutory and regulatory provisions.

13.     Finally, Wyoming seeks to recover its costs and reasonable attorney fees pursuant to applicable statutes and rules.

14.     This action arises under the NEPA, NFMA, the Wilderness Act and WWA, MUSYA, and the APA, as well as the implementing regulations related to each.

15.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), § 1361 (action to compel an officer of the United States to perform his duty), § 2201 (declaratory relief), and § 2202 (injunctive relief).   Judicial review is also sought pursuant to § 10 of the APA, 5 U.S.C. §§ 701-706.  United States District Court Local Rule 83.7.2 applies only to the APA claim, and does not apply to the remaining claims which request relief outside the purview of the APA because facts are alleged regarding actions of the Defendants beyond those contained within the administrative record.

16.     This Court has the power to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

17.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (e).

## PARTIES

18.     Wyoming, is a sovereign State of the United States and brings this action in its own right and on behalf of its citizens and others who desire to share in the majesty of Wyoming's National Forests.   There are approximately 9,247,000 acres of National Forest System land in Wyoming.   National Forests make up approximately 8,688,000 acres of that land, while the remaining approximate 559,000 acres are within the Thunder Basin National Grassland.   The Medicine Bow National Forest, the Bridger - Teton National Forest, the Bighorn National Forest, and the Shoshone National Forest are located within the boundaries of Wyoming.   Wyoming's boundaries also contain smaller portions of the Black Hills National Forest, the Wasatch - Cache National Forest, the Ashley National Forest, the Targhee National Forest and the Caribou National Forest.

19.     Pursuant to Article 18, § 1 of the Wyoming Constitution, the State of Wyoming accepted those lands that were granted to it by the United States.   Those lands, which are referred to as "Wyoming School land" were dedicated to the State for educational purposes, for public buildings and institutions and for other objects subject to those conditions and limitations that have been or may be imposed by Congress in making such grants or donations.

20.     The Wyoming School lands that are negatively impacted by Defendants' actions are situated within the boundaries of Wyoming and are subject to the management of Wyoming State officials.   Pursuant to Article 18, § 3 of the Wyoming Constitution, the Governor, Secretary of State,

State Treasurer, State Auditor, and Superintendent of Public Instruction constitute a "board of land commissioners." That Board, under the direction of the legislature and as limited by the Constitution, has the power to direct, control, lease and dispose of the Wyoming School lands which were granted, or may be hereafter granted, for the support and benefit of public schools.

21.     At least five sections of Wyoming School land will be affected by the Roadless Actions that are the subject of the current action. Additional lands owned or administered by the State of Wyoming, such as those owned or administered by the Wyoming Game and Fish Department, will also be affected by Defendants' improper and unlawful actions. These School lands and other State lands are interspersed throughout, or are contiguous to and directly impacted by, federal lands that are the subject of Defendants' improper and illegal actions. Defendants' actions will result in a funding deficit to the State of Wyoming related to the loss of access to or restricted access to these lands. Many of the citizens of the State of Wyoming own lands for which access will be restricted or denied as a result of Defendants' actions.

22.     Defendant USDA is the department of the executive branch that is responsible for overseeing the activities of the USFS, the agency charged with the administration of the National Forests.

23.     Defendant USFS is charged with the administration the Medicine Bow National Forest, the Bridger - Teton National Forest, the Bighorn National Forest, the Shoshone National

Forest, the Black Hills National Forest, the Wasatch - Cache National Forest, the Ashley National Forest, the Targhee National Forest and the Caribou National Forest in Wyoming.

24.     Defendant Mike Johanns is the Secretary of Agriculture and is sued in his official capacity for the actions of his predecessor, former Secretary of Agriculture Daniel R. Glickman, who signed the challenged Roadless Rule. *See* 66 Fed. Reg. 3273 (2001); 65 Fed. Reg. 67581 (2000). The USFS is an agency of the USDA and is subject to the direction and control of Defendant Johanns in his official capacity.

25.     Defendant Dale N. Bosworth is the Chief of the USFS and is sued in his official capacity for the actions of his predecessor, former Chief Michael Dombeck. Defendant Bosworth is responsible for operations and activities of the USFS on National Forest System lands.

## STATEMENT OF FACTS

26.     In his last year in office, President William J. Clinton and the USFS (under the direction of then-Chief Michael P. Dombeck) announced numerous major and far-reaching interrelated and interdependent roadless actions that were intended to dramatically alter the rules managing America's natural resources in general, and the State of Wyoming's natural resources more specifically.

27.     Under the Clinton administration, Defendants (or their predecessors) embarked on an unprecedented and illegal scheme to permanently prevent road and trail construction and reconstruction in National Forests and to restrict public access to the National Forests. This illegal

scheme will hereafter be referred to as the "Clinton Roadless Initiative." In order to implement the Clinton Roadless Initiative, Defendants initiated regulatory proceedings to adopt the Roadless Rule and modifications to National Forest Management Act Planning Regulations (the "Planning Regulations") (*see* 36 C.F.R. § 294 *et seq.*), the Forest Transportation System Final Administrative Policy ("Transportation Policy"), and the National Forest System Road Management Rule (Road Management Rule") (*see* 36 C.F.R. § 212 *et seq.*).

Clinton Roadless Initiative

28.     The Roadless Rule affects approximately 3.25 million acres of National Forest lands within the State of Wyoming. That acreage accounts for approximately 37 percent of Wyoming's National Forest lands. The Clinton Roadless Initiative, including the Planning Regulations, Transportation Policy and Road Management Rule, as initiated by Defendants, impacted all of the National Forest lands within the State of Wyoming – a total of approximately 8,688,000 acres. The Clinton Roadless Initiative impacts at least 3,200 acres of Wyoming School land. The Clinton Roadless Initiative also impacts thousands of acres of non-school section Wyoming State lands and thousands of acres of privately-owned lands.

29.     In furtherance of the Clinton Roadless Initiative, on October 13, 1999, after a one-hour notification to affected Governors, President Clinton announced his administration's "Roadless Initiative," which was designed to halt construction and reconstruction of roads and trails on millions of acres of National Forest land. Six days later (October 19, 1999), the USFS published its Notice

of Intent (NOI) pursuant to NEPA, to prepare an Environmental Impact Statement ("EIS") for a proposed and final rule to implement President Clinton's October 13, 1999 directive. Despite the monumental breadth of the proposed federal action, the USFS permitted only 60 days for public comment and steadfastly refused to extend this scoping period. An extension of the public comment period was officially requested by Governors of affected States and members of Congress. In rejecting their call for an extension, the USFS refused to explain why additional comment time could not be granted. The USFS then rushed to complete, prior to December 20, 1999, over 180 public meetings across the nation concerning the rule making. The meetings in Wyoming were held only a short time before the comment period ran out – on December 13, 1999 in Casper and Cody; December 14th in Riverton and Sheridan; and December 15th in Jackson and Laramie.

30.     The USFS's frenzied scoping process was plagued with problems, including inadequate notice and opportunity to comment at meetings. Informed public comment was impossible since the information provided during the development of the Draft Environmental Impact Statement (DEIS) and the Final Environmental Impact Statement (FEIS) was confusing, inadequate, and based on decades-old "Roadless Area Review and Evaluation II" ("RARE II") data assembled during the Carter Administration. The USFS personnel who participated in the meetings lacked sufficient information regarding the areas that would be impacted by the rule making. For example, no state maps of areas under consideration for regulations were made available until January 18, 2000, nearly one month *after* the NEPA scoping process and attendant public comment

period had ended. This "oversight" occurred despite repeated attempts by Governors and members of Congress to obtain detailed maps of the affected areas. When finally provided, the maps were functionally useless since they were rife with error and did not provide sufficient information or detail to determine the specific areas to be encompassed within the Roadless Initiative. The maps did not identify each individual inventoried roadless area and did not provide the basic information necessary to make an informed decision. Such lack of information effectively precluded the State of Wyoming and its citizens from meaningful participation in the NEPA process.

31.    Wyoming, through its Governor, requested that the State be granted Cooperative Agency status pursuant to NEPA and the directive issued by the Council of Environmental Quality. Wyoming's request, as well as that submitted by other western states governors, was never acknowledged by Defendants. As a result, Wyoming was summarily and intentionally barred from meaningful partnership in the process.

32.    On May 9, 2000, the USFS released its DEIS for the Roadless Rule. The 700-page draft was riddled with errors, inconsistencies, and ambiguities. The draft failed to analyze adequately the environmental impacts of all land impacted by the Proposed Rule. The DEIS provided no information particular to any individual roadless area, providing instead only state maps and summaries of very limited data on a State or Forest Service Region basis.

33.    The USFS failed and refused to analyze the numerous reasonable and appropriate alternatives to the Proposed Rule that were suggested by the Plaintiff and other interested parties during the scoping process.

34.    On May 9, 2000, the USFS released the Proposed Rule, which appeared in the Federal Register the following day. 65 Fed. Reg. 30276 (May 10, 2000). The Proposed Rule identified over 54 million acres of "Inventoried Roadless Areas," which are mapped areas identified during the 1977 "RARE II" project and during subsequent periodic updates. The Proposed Rule declared that at least 43 million acres of land would be immediately subject to prohibitions on road construction and reconstruction upon issuance of the Final Rule. 65 Fed. Reg. 30276, 30288. The Proposed Rule discussed regulating unidentified portions of 95.2 million *additional* acres of non-inventoried, "unroaded areas where conservation of roadless characteristics may be desirable." 65 Fed. Reg. 30276, 30288. The Proposed Rule outlined numerous characteristics to guide local Forest Service officials to identify these additional areas that would be subject to the prohibitions on road construction and reconstruction at the time that the Land and Resource Management Plan for each National Forest was revised. The Proposed Rule did not prohibit timber harvesting on the regulated areas.

35.    The Proposed Rule set July 17, 2000 as the deadline for accepting public comments on the Proposed Roadless Rule. 65 Fed. Reg. 30276. In total, the public was allowed only 69 days from the release of the Proposed Rule and DEIS to the close of the comment period for a proposed

regulation that would immediately prohibit road construction and reconstruction on at least 43 million acres of land, and would potentially regulate unidentified portions of an additional 95.2 million acres.

36.    Given the size and scope of the Proposed Rule, numerous commenters requested an extension of the comment period. Despite substantial public response, Defendants denied all such requests. Despite the severe time constraints imposed by Defendants, Wyoming and other interested parties submitted comments, many of which identified serious problems with, and alternatives to, the Proposed Rule and DEIS.

37.    The FEIS was published approximately six months later in November, 2000. 65 Fed. Reg. 67514-01 (November 9, 2000). On January 12, 2001, the USFS published the Final Rule and Record of Decision that would implement the key element of the Clinton Roadless Initiative. 66 Fed. Reg. 3244-01 (January 12, 2001). The FEIS demonstrates that the USFS essentially ignored all comments it received. The FEIS made no effort to analyze the environmental impacts of the Roadless Rule on any specific parcels of land. Instead, the FEIS presented yet another vague and broad analysis based upon generalizations instead of thoughtful, deliberate, and site-specific analyses. The lack of specificity in the FEIS precluded the objective evaluation of the effects that alternative solutions may have on the environment. The FEIS also failed to consider numerous reasonable alternatives suggested by Wyoming and other commenters.

38.    Without warning or notice, and without allowing Wyoming to comment, the scope of land to be affected by the Roadless Rule, and the nature of the prohibitions to be imposed, shifted dramatically from the DEIS to the FEIS. The size of the inventoried roadless areas also changed – adding 4.2 million more acres of Inventoried Roadless Areas to the total set forth in the DEIS.

39.    The DEIS stated that Inventoried Roadless Areas accounted for 54.3 million acres of land. The FEIS stated that Inventoried Roadless Areas totaled 58.5 million acres of land. In the six months between issuing the DEIS and the FEIS, the USFS "discovered" millions of acres of Inventoried Roadless Areas that it did not previously recognize and "lost" hundreds of thousands of acres in other places. Forty-five of the National Forests listed have more Inventoried Roadless Area in the FEIS than reported in the DEIS, and twelve of the National Forests have less Inventoried Roadless Area than reported in the DEIS. In total, the FEIS provided for the regulation of approximately 4.2 million additional acres of non-inventoried unidentified "uncrowded areas where conservation of roadless characteristics may be desirable." 65 Fed. Reg. 30,277, 30,288. At no time was the public allowed to comment on the inclusion of these lands.

40.    The "Inventoried Roadless Area Acreage" for Wyoming as set forth in the DEIS was 3,218,000 acres. That inventory for Wyoming in the FEIS was 3,257,000, an increase of 39,000 acres. Neither Wyoming nor its citizens were allowed to comment on the inclusion of these additional lands.

41.     Under the approach used in the DEIS, the "unroaded" land could have "unclassified roads," which it defined as "[r]oads not intended to be a part of, and not managed as part of, the forest transportation system such as temporary roads, unplanned roads, off-road vehicle tracks, and abandoned highways." The DEIS excluded from the immediate prohibitions on road construction and reconstruction portions of Inventoried Roadless Areas where classified roads had been constructed since the area was inventoried in 1977.

42.     Substantial confusion emanated from the definitions used by Defendants due to a lack of adequate maps. When such maps were finally provided, they lacked the specific detail needed to evaluate the proposal.

43.     The FEIS, by contrast, proposed to expand the ban to all Inventoried Roadless Areas, regardless of whether classified roads had been constructed since the area was inventoried and despite the lack of maps sufficient or adequate to make this determination.

44.     While the Proposed Rule did not prohibit all timber harvesting, the preferred alternative in the FEIS limited timber harvesting in Inventoried Roadless Areas to "stewardship" purposes.

45.     The Roadless Rule bans construction of new roads and reconstruction of old roads in the Inventoried Roadless Areas. The sheer magnitude of this proposal cannot be overstated. The National Forest System contains 192 million acres of land. Of this, 42 million acres (22%) are currently preserved in wilderness or natural areas where road construction and timber management

are prohibited. The Roadless Rule bans road construction and reconstruction on another 58.5 million acres (31%). Accordingly, with the addition of the affected Roadless Rule acreage, more than 50% of the National Forest System land base has been completely withdrawn from its Congressionally-mandated multiple use.

46.     The Roadless Rule established two broad prohibitions that apply to "inventoried roadless areas" throughout the 58.5 million acres of the National Forest System (under the definition to be found in 36 C.F.R. § 294.11 (2000)). First, § 294.12(a) established a general rule that a "road may not be constructed or reconstructed in inventoried roadless areas of the National Forest System," subject to the narrow exceptions described in § 194.12(b). Second, § 294.13(a) established a general rule that "[t]imber may not be cut, sold, or removed in inventoried roadless area," except in the "infrequent" circumstances described in § 294.13(b).

47.     Despite the unrivaled scope of the Clinton Roadless Initiative and the Roadless Rule, the NEPA process was purposely compressed for the very purpose of limiting public involvement and participation. Forest Chief Michael Dombeck specifically instructed his staff to expedite the NEPA procedures. That hasty agenda was not only noted, but actually condemned by the Honorable Edward J. Lodge, United States District Court Judge for the District of Idaho, in an initial challenge to the Roadless Rule. In a February 18, 2000 Order he wrote: "The sheer magnitude of this governmental action involving 40 to 60 million acres nationwide that precipitated 500,000 comments in sixty days is the best evidence the Forest Service should proceed with caution. Time is not of the

essence on an issue that has been studied for over 30 years." *State of Idaho et al. v. United States Forest Service*, Case No. CV99-611-N-EJL (February 18, 2000) (emphasis in original).

48.     In their rush to implement the Clinton Roadless Initiative, including promulgation of the Roadless Rule, before the end of the Clinton administration, Defendants issued a NOI, prepared a DEIS, a Proposed Rule, a FEIS and a Final Rule implementing the Roadless Rule in just over one year. In so doing, Defendants violated numerous statutes and existing rules that were designed to safeguard the environment and that govern the use of the National Forests. Defendants also attempted to illegally usurp Congress' authority by creating *de facto* wilderness areas – a power specifically reserved to Congress under the Wilderness Act.

49.     As part of the Clinton Roadless Initiative, the Secretary of the USFS adopted the new Planning Regulations that provide the procedural and substantive constraints that govern the preparation and content of the Forest Plans required by the NFMA. *See* 36 C.F.R. §§ 219.1 and 219.35 (2000). The Planning Regulations comprehensively control, steer and dictate all decision making at both the National Forest level and at the site-specific (or Forest specific) level.

50.     The new Planning Regulations adopted by the USFS subordinated all uses of the National Forests to the principle of "ecological sustainability," 36 C.F.R. § 219.2(a) (2000). Thus, in direct contrast to prior regulations and the congressional mandate as found in the NFMA and the MUSYA, the revised Planning Regulations define "ecological sustainability" as the single most important criterion in formulating land management policy, relegating social and economic

sustainability to lower tiers for consideration: "The first priority for stewardship of the national forests and grasslands is to maintain or restore ecological sustainability to provide a sustainable flow of uses, values, products, and services from these lands." 36 C.F.R. §219.19 (2000). The Planning Regulations fundamentally changed the mission of the U.S. Forest Service from multiple use to primary use. This change was a clear attempt to repeal public law by regulation and further augment the Clinton Roadless Initiative. (The incoming Bush administration tabled the "ecological sustainability" language in 2001 because of its questionable legal validity.)

51. On January 28, 1998, the USFS published an Advanced Notice of Proposed Rulemaking (ANPR) on management of the forest transportation system, and announced its intent to establish an 18-month moratorium on construction and reconstruction of roads in "roadless areas." The proposed definition of "roadless areas" was expanded from those that are 5,000 acres and larger (in the then-existing rules and regulations) to include areas 1,000 acres and larger, as well as smaller areas that are adjacent to other "unroaded areas," such as those designated as Wilderness or National Parks.

52. The immediate effect of the ANPR was to implement the Clinton Roadless Initiative by creating a *de facto* moratorium on road building areas as local managers curtailed road building plans in anticipation of imminent implementation of the moratorium.

53. On February 12, 1999, the USFS published a "Final Interim Rule" starting the clock on an "official" 18-month moratorium on "roadless area" entry. The alleged purpose of the

moratorium was to provide time for the agency to develop a revised road management policy and address the issues of public use, demand, expectations, and funding surrounding the National Forest Transportation System. Under the Final Interim Rule, the 18-month moratorium was scheduled to end in August, 2000, or upon publication of a final road management policy, whichever first occurred.

54.     Although the 18-month moratorium was initially codified at 36 C.F.R. § 212.13 (1999), the USFS subsequently classified the Transportation Policy as a final administrative policy, rather than as a rule. Therefore, it was not codified in the Code of Federal Regulations, but instead was implemented by amendments to the Forest Service Manual § 7712.16.

55.     Implementation of the Transportation Policy was part and parcel of the overall scheme of the Clinton administration to railroad through new rules, regulations and policies contrary to the laws of the United States and the procedures established by Congress to ensure an open process and allow for maximum public involvement and input before adopting new laws.

56.     On March 3, 2000, the USFS published a proposed rule describing a new policy for road management within the National Forest System. The final Road Management Rule was published on January 12, 2001. The Road Management Rule and Transportation Policy were closely related.

57.     The Road Management Rule revised the regulations for development, use, maintenance and management of the National Forest transportation system. This Rule provided that

any roads added to the National Forest System must be "needed" for National Forest System resource management and use, and that unneeded roads are to be decommissioned. This Rule prohibited the construction of roads unless and until the local USFS official demonstrates a compelling need for the road, conducts a "science-based" roads analysis, and prepares an EIS for any proposed road.

58.    The Road Management Rule represented a significant shift in road management policy for the National Forest System.    The policy emphasis on funding limitations, decommissioning of "unneeded" roads, maintenance of the "minimum road system needed," and road management for the protection of "roadless values" does more to promote Clinton's Roadless Initiative than it does to support management of a road system adequate to meet forest management and statutorily-imposed objectives.

## CLAIMS FOR RELIEF

59.    The Clinton Roadless Initiative, including the Roadless Rule, the Planning Regulations, Transportation Policy, and the Road Management Rule were interrelated, interdependent and cumulative. Despite that relationship, the Forest Service failed and refused to describe the interrelated and cumulative nature of these many rule makings and regional planning efforts to the public. Therefore, public comments on any one individual issue were based on an incomplete cumulative scheme.    The USFS failed to assess and document the cumulative environmental, social and economic effects of the various new rules and plans.    Hence, the

cumulative effect of the Clinton Roadless Initiative and its effect upon individual forest plans, the environment, the State of Wyoming, and the public remained undisclosed and undiscussed.

60.     The foregoing interrelated and cumulative actions imposed a dramatically new framework for National Forest System planning. Despite those dramatic changes to the National Forest System planning, the Defendants insisted upon pushing forward with the rule and policy changes concurrently, but separately, thereby diminishing the ability of Wyoming and its citizens to address and respond to each rule or action in a meaningful way.

61.     While the general public, local governments, and Wyoming were forced to provide comments on an unprecedented number of rule makings and draft plans within a short period of time, the USFS personnel at the local level were poorly equipped to fully inform the public of the details related to each of the rules and initiatives described above.

62.     The Defendants' treatment of Wyoming and its citizens is unjustified and contrary to law. Wyoming has a special interest in the management of the National Forest lands within its borders and in the Wyoming School lands dedicated to education. Wyoming also has a special interest in the protection of access to public and private lands for its citizens, including those disabled and less-abled individuals who have been and will be denied access as a result of Clinton Roadless Initiative and particularly the Roadless Rule.

63.    States are the Forest Service's partners in management of the public lands. The State of Wyoming has a sovereign interest, and indeed in many cases primacy, in natural resource management within its borders.

64.    The Clinton Roadless Initiative is vague and superficial both in content and analysis. The comments submitted by Wyoming were ignored by the Defendants.

65.    Defendants' improper promulgation of the Roadless Rule has and will continue to cause immediate and irreparable harm to Wyoming. Access to Wyoming's School lands and other lands that are intermingled with or contiguous to the National Forest lands will be limited. The potential to develop recreation, education, or historic opportunities on these State lands will be negatively impacted. The Roadless Rule will deny the reasonable right of access to State School lands, State lands owned and administered by particular State agencies, such as the Game and Fish Department, and private lands within Wyoming. Wyoming's timber-dependent communities will be devastated by implementation of the Roadless Rule. The Roadless Rule will cause a dramatic and unreasonable and in some cases, terminal, decline in forest health by increasing the risk of catastrophic fire, insect infestations, and disease in both the National Forests themselves and nearby State and private lands.

66.    The Roadless Rule was rushed through the NEPA process and is in violation of Federal law and other agency regulations, and may have numerous unforeseeable and potentially devastating impacts upon the State of Wyoming and its citizens.

## COUNT I: Violation of the National Environmental Policy Act

67.     Plaintiff repeats and incorporates by reference the allegations of Paragraphs 1 through 66 of this Complaint.

68.     The National Environmental Policy Act, 42 U.S.C. § 4321, establishes a national policy to "prevent or eliminate damage to the environment and biosphere." NEPA recognizes "the critical importance of restoring and maintaining environmental quality," declares that the federal government has a continuing responsibility to use "all practicable means" to minimize environmental degradation, and directs that "to the fullest extent possible . . . the policies, regulations and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter." 42 U.S.C. §§ 4331(a) and 4332(1). NEPA further recognizes the right of each person to enjoy a healthful environment. 42 U.S.C. § 4331(c).

69.     The Council for Environmental Quality ("CEQ") NEPA Regulations (*see* 40 C.F.R. § 1501.2), which are binding on the USFS, establish a complex system to ensure that the government considers the environmental impacts of its actions *before* taking those actions. This system requires notice to and comments from an informed public and other affected parties who provide the government with information about the potential environmental impacts the actions may have.

70.     NEPA requires "responsible [federal] officials" to prepare an Environmental Impact Statement ("EIS") on proposals for legislation and "other major Federal actions significantly

affecting the quality of the human environment." Under NEPA, an agency must prepare an EIS when an action may have a significant environmental effect.  42 U.S.C. § 4332.

71.     Federal agencies are required to begin the scoping process as soon as they determine that they will prepare an EIS.  40 C.F.R. § 1501.7.  Under these regulations, federal agencies must invite the *meaningful participation* of interested agencies.  This requirement expressly includes the appropriate States and State agencies.  The purpose of the scoping process is to identify those issues that the agency should address in the EIS.  A failure to conduct the scoping process in a manner that includes all interested parties and identifies all relevant issues is a violation of NEPA.

72.     NEPA requires agencies to include a discussion of "alternatives to the proposed action" in the EIS.  42 U.S.C. § 4332(2)(C)(iii).  NEPA also requires the agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E). CEQ NEPA regulations also require that agencies consider "reasonable alternatives not within the jurisdiction of the lead agency," together with the "no-action" alternative.  40 C.F.R. § 1502.14

73.     When an agency undertakes a major federal action that constitutes an irretrievable commitment of resources, it is required to prepare a detailed EIS relating to its intention to act upon each particular site that will be impacted.  In addition, the EIS must "succinctly describe the environment of the area(s) to be affected by the alternatives under consideration."  40 C.F.R. §

1502.15. Furthermore, the EIS must describe the direct and indirect environmental effects of the regulation. 40 C.F.R. § 1508.8.

74.     CEQ NEPA regulations mandate that agencies "make diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6. Each agency "shall . . . [r]equest comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected." 40 C.F.R. § 1503.1(a)(4). In addition, an agency's final EIS must make meaningful reference to all responsible opposing viewpoints.

75.     NEPA requires that a Supplemental Environmental Impact Statement ("SEIS") be prepared whenever "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii). An SEIS may also be prepared when "the purposes of the Act will be furthered by doing so." *Id.* Although requested by the State of Wyoming after the catastrophic fires of the year 2000, Defendants did not issue an SEIS related to Roadless Rule or any other administrative action discussed in this Complaint.

76.     The occurrence, magnitude and impact of those forest fires constituted "significant new circumstances" requiring Defendants to issue an SEIS to evaluate the proposed Roadless Actions. The year-2000 catastrophic forest fires provided "information relevant to environmental concerns and bearing on the proposed action or its impacts." Despite recognizing that the Roadless Rule could exacerbate the incidence of forest fires, Defendants refused to analyze the year-2000

forest fires and issue an SEIS related to the Roadless Actions. That refusal was in direct violation of NEPA.

77.     Wyoming and its citizens are entitled under NEPA to have the Defendants analyze reasonable alternatives, conduct a meaningful and complete notice and comment period, and to fully analyze cumulative impacts before they make decisions affecting the environment. Defendants have denied Wyoming and its citizens these entitlements and protections afforded by NEPA.

78.     Defendants' arbitrary and capricious refusal to follow the mandates of NEPA has injured, and will continue to injure, Wyoming's interest in its School and other State lands, its interest in the protection and health of the National Forest lands within its borders, and its interests in the protection of the property interests of its citizens. Wyoming has a real and concrete interest in the management of its School and other State lands and the National Forests within its boundaries to protect forest health and to secure maximum long-term sustainable financial return. Wyoming has a real and concrete interest in the management of its School and other State lands and National Forests to prevent the harm that will result from the implementation of the Roadless Rule.

79.     Defendants' arbitrary and capricious actions in enacting the Roadless Rule, and such actions will cause real and immediate injury to Wyoming's School and other State lands and the National Forests within its borders as well as to privately-owned lands. The Roadless Rule will result in a decline in forest health as will be evidenced by catastrophic forest fires, disease outbreaks, and insect infestation all to the detriment of Wyoming's interest and rights. Such injury would not

have occurred but for Defendants' decision to ignore the mandates of NEPA and impose the Roadless Rule in violation of Wyoming's rights and interests.

80.     Wyoming and other States made numerous attempts to obtain additional time to evaluate the potential impact and implications of the Roadless Rule. The USFS refused to grant any extension of time for Wyoming to provide comments. The USFS then refused to explain why additional time could not be granted.

81.     Wyoming has made numerous attempts to obtain information concerning the location of uninventoried unroaded areas and other areas impacted by the Roadless Rule. Wyoming repeatedly requested a map identifying uninventoried unroaded areas managed by the USFS within the State of Wyoming. The USFS refused to comply with Wyoming's requests. The USFS's refusal to sufficiently identify areas that may be subject to management prevented Wyoming or its citizens from meaningfully participating in the NEPA process.

82.     Wyoming and its citizens have suffered irreparable injury as a result of the Forest Service's arbitrary and capricious refusal to provide Wyoming and its citizens with an opportunity for meaningful participation in the NEPA process including, but not limited to, the Forest Service ignoring Wyoming's request for cooperating agency status.

83.     The uninventoried unroaded areas that are managed through the Roadless Rule impairs access to and use of Wyoming School and other State lands and the private lands of citizens within Wyoming.

84.     The unlawful implementation of the Roadless Rules prevents the USFS from moving forward with planning of projects within Wyoming necessary to restore forest health. The potentially serious impact on the health of the National Forest System, intermingled or contiguous Wyoming School and other State lands, and private lands within Wyoming, represents irreparable injury suffered by Wyoming and its citizens.

85.     NEPA regulations promulgated by CEQ require that when two or more proposed federal actions may "have cumulatively significant impacts [they] should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2).

86.     The Clinton Roadless Initiative addressed separate but interrelated and interdependent components of the administration's roadless scheme. The Roadless Rule prohibits road construction and non-stewardship timber harvest within inventoried roadless areas. The Planning Regulations provided procedures for future designations of unroaded areas in which road construction and other activities may be prohibited or restricted. The Transportation Policy and Road Management Rule provided for increased decommissioning of existing roads, and impose onerous burdens on the construction of new roads, thereby creating more areas that may be suitable for designation as being "unroaded". Taken together, the Clinton Roadless Initiative had the cumulative effect of increasing the number of acres that will be designated as unroaded, resulting in the prohibition and restriction of traditional multiple-use management necessary to maintain the health of the National Forest System and adjacent State and private lands.

87.     Defendants violated NEPA by segmenting the various aspects of the Clinton Roadless Initiative and thus failed to consider and articulate to the public the cumulative impacts of the related actions.  By segmenting the rule-making processes that relate to roadless and unroaded areas, the Defendants avoided their obligations under NEPA to fully analyze and disclose the combined and cumulative impacts of the Roadless Rule, revisions to the Planning Regulations, the Transportation Policy, and the Road Management Rule. Defendants' actions were arbitrary, capricious, and contrary to Federal Law.

88.     Wyoming and its citizens have suffered and will continue to suffer irreparable injury as a result of Defendants' actions which resulted in denying Wyoming and its citizens their right to meaningfully participate in the process.

89.     Defendants failed to analyze a reasonable range of alternatives.  Defendants pre-determined the outcome of the alternative analysis by failing to consider a broader range of alternatives.  40 C.F.R. 1502.14 states that the "alternatives" section is the "heart" of any environmental impact statement. Defendants ignored any alternative that did not comport with the pre-determined result the Clinton administration directed. The alternatives assessed by Defendants ( or their predecessors) pre-determined the outcome of the alternative analysis and were designed to justify a decision already made.

90.     The year-2000 fire season will be recorded as one of the worst catastrophic fire seasons in the past fifty years in the United States.  More than 10,000 square miles burned.  Many

of those lands are in the National Forests, including those National Forests within the State of Wyoming. Those fires burned over one-half of the annual lumber production of the United States. The USFS has issued a document entitled, "Protecting People and Sustaining Resources in Fire-Adapted Ecosystems – a Cohesive Strategy." That document addresses the urgent need to respond to hazardous fuel conditions in many parts of the National Forest System, as well as the need to prevent other areas from becoming at risk for catastrophic fire.

91.    The potential fire hazards associated with, and exacerbated by, the Roadless Rule should have been analyzed and studied by the Defendants. Despite the fact that the year-2000 fire season was one of the worst in history, despite the USFS's own studies and reports describing an urgent need to respond to hazardous fuel conditions, and despite Wyoming's request that Defendants supplement the EIS to address this matter, Defendants refused to issue a SEIS to address this new information.

92.    Defendants' refusal to issue an SEIS was arbitrary and capricious and in violation of NEPA. Wyoming and its citizens have suffered and will continue to suffer irreparable injury as a result of Defendants' refusal to consider the year-2000 fire season and issue an SEIS.

93.    Defendants' actions in adopting and implementing the Roadless Rule was arbitrary and capricious, an abuse of discretion and not in accordance with NEPA. These actions have caused, and will continue to cause, immediate, direct, adverse, and irreversible harm to the State of Wyoming and its citizens.

## **COUNT II: Violation of the National Forest Management Act**

94.     Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through

93 of this Complaint.

95.     In 1976, Congress passed the National Forest Management Act, 16 U.S.C. §§ 1600-

1614, requiring the Forest Service to conduct strategic planning for the management of the National

Forests. NFMA directs the Forest Service to develop Land and Resource Management Plans

("LRMP") for each National Forest or group of National Forests, with public participation in the

"development, review, and revision" of each Plan. 16 U.S.C. § 1604. NFMA's planning provisions

incorporate the multiple-use mandate of the MUSYA and provide that:

> In developing, maintaining, and revising plans for units of the National Forest System
> pursuant to this section, the Secretary shall assure that such plans –
>
> (1)     provide for multiple use and sustained yield of the products and services
> obtained therefrom in accordance with the Multiple Use Sustained-Yield Act of 1960
> [16 U.S.C.A.   §§ 528-531], and, in particular, include coordination of outdoor
> recreation, range, timber, watershed, wildlife and fish, and wilderness; and
>
> (2)     determine forest management systems, harvesting levels, and procedures in
> the light of all of the uses set forth in subsection (c)(1) of this section, the definition
> of the terms 'multiple use' and 'sustained yield' as provided in the Multiple Use
> Sustained-Yield Act of 1960, and the availability of lands and their suitability for
> resource management.

16 U.S.C. § 1604(e).

96.     NFMA also requires the USFS to adopt regulations that "set out the process and

development and revisions" of LRMPs to ensure consistency with NEPA (42 U.S.C. § 4321, *et seq.*),

and to "specify guidelines for land management plans." 16 U.S.C. §§ 1604(g)(1) and (3). These regulations are set forth at 36 C.F.R. § 219.

97.     Under NFMA, the Forest Plan is the focal point for managing each National Forest. All "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent" with the Forest Plan. 16 U.S.C. § 1604(i). If a proposed resource plan or use would be inconsistent with the governing Forest Plan, NFMA requires analysis of a proposed plan amendment and the opportunity for public comment before the amendment could be adopted and before the resource plan could be implemented. 16 U.S.C. §§ 1604(d) and (f)(4). "The Secretary shall provide for public participation in the development, review, and revision of land management plans . . . ." 16 U.S.C. § 1604(d) (emphasis added).

98.     A Forest Plan allocates lands to a specific set of multiple uses and essentially provides the zoning regulations for each management area. NFMA requires that there be "one integrated plan for each unit of the National Forest System" which "incorporate[s] in one document . . . all of the features required" by NFMA. 16 U.S.C. § 1604(f)(1). These features include the "multiple use" coordination between outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness. 16 U.S.C. § 1604(e)(1).

99.     In furtherance of Congress' intent that a Forest Plan be the governing document for management of each National Forest, NFMA only allows the implementation of resource plans and activities that are consistent with the governing Forest Management Plan. 16 U.S.C. § 1604(i).

100. The Roadless Rule violates NFMA by circumventing the requirement that each individual National Forest make land management decisions in coordination with State and local governments and an informed public.

101. NFMA restricts the implementation of resource plans and actions to those that have been determined to be "consistent" with the governing Forest Plan. 16 U.S.C. § 1604(i).

102. The Roadless Rule and accompanying regulations and policies adopted to implement the Clinton Roadless Initiative violate 16 U.S.C. § 1604(i) because they are inconsistent with the governing Forest Plans for the respective National Forests within Wyoming.

103. NFMA provides that "a significant change" in a Forest Plan is subject to the provisions of 16 U.S.C. § 1604(e) and (f) governing the development of Forest Plans, and is also subject to "public involvement comparable to that required" by 16 U.S.C. § 1604(d) for Plan development.

104. The Roadless Rule constitutes a "significant" change to existing Forest Management Plans. The Roadless Rule, in changing or limiting existing active management in the National Forests in Wyoming, drastically alters the status quo, prevents the implementation of the current Land and Resource Management Plans, and dramatically impacts the National Forest lands and the Wyoming School lands. In developing and adopting the Roadless Rule, Defendants refused to allow "public involvement comparable to that required" by 16 U.S.C. § 1604(d).

105.    Defendants unlawfully adopted the Roadless Rule without complying with the procedures for significant Forest Plan amendment as required by 16 U.S.C. § 1604(f)(4) and the Forest Service's implementing regulations and directives.

106.    NFMA provides that a Forest Plan shall be "one integrated plan" that incorporates in "one document . . . all of the features required" on multiple use direction, and contain "maps and descriptive documents" on the activities allowed in each Forest management area.  16 U.S.C. § 1604(f).

107.    NFMA provides that the Forest Plan "determine[s] forest management system [and timber] harvesting levels" and that the Forest Plan must include the "planned timber sale program" the agency intends to offer.  16 U.S.C. § 1604(e)(2) and (f)(2).

108.    The Roadless Rule reduces the expected timber sale levels from the levels projected in Forest Plans, in violation of NFMA's requirements that such information be set forth in the Forest Plan for each National Forest.

109.    Congress concluded in the NFMA that it was "unwise to legislate national prescriptions" for all National Forests because of the "wide range of climatic conditions, topography, geologic and soil types," and different perspectives on appropriate land uses in a particular National Forest.  S. Rep. No. 893, 94th Cong., 26 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6685.  The Forest Service itself acknowledged and repeated Congress' conclusions by stating that "we do not believe it is desirable or practical to legislate national prescriptions" due to the "wide range of climatic

conditions, topography, geologic and soil types, vegetative covers, and wildlife." S. Rep. No. 893, 94th Cong., 46 (1976) *reprinted in* 1976 U.S.C.C.A.N. 6705. Although Defendants may not have "legislated" a national prescription, by adoption and imposition of the Clinton Roadless Initiative, they have definitely "regulated" such an outcome. Contrary to NFMA's design, and the Forest's Service's stated policy, the Roadless Rule imposes a "one-size-fits-all" mandate or a "national prescription."

110.    The permanent ban on road construction in thirty-one percent (31%) of the National Forest System, and constraints on road construction placed on other lands, violate the requirement that the Forest Service carry forward in time "the installation of a proper system of transportation to service the National Forest System . . . to meet anticipated needs on an economical and environmentally sound basis. . . ." 16 U.S.C. § 1608(a).

111.    The Defendants' actions in preparing, adopting and implementing the Roadless Rule and other rules and policies was arbitrary and capricious, an abuse of discretion, and in direct violation of NFMA. As a result, the USFS is attempting to implement unlawful Forest Management Plans. Such actions have caused and will continue to cause immediate, direct, adverse and irreversible harm to the State of Wyoming and its citizens.

## COUNT III: Violation of the Wilderness Act and the Wyoming Wilderness Act

112.    Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 111 of this Complaint.

113.    The Wilderness Act, 16 U.S.C. § 1131, *et seq.*, is designed to preserve in perpetuity those unroaded federal lands that are "untrammeled by man" that *Congress* has chosen to designate as components of the National Wilderness Preservation System. The Wilderness Act requires the Forest Service to adopt a process for reviewing administratively-designated "wild" areas for possible recommendation to *Congress* for designation as Wilderness Areas, and for providing interim protection to such lands until *Congress* makes the decision as to whether a particular area should be designated as "wilderness" pursuant to the Wilderness Act. *See* 16 U.S.C. § 1132.

114.    The Wilderness Act reserves to Congress the *exclusive* authority to create and designate "wilderness" areas. While the Executive Branch recommends to Congress areas to be considered for the "wilderness" designation, such lands are designated as "wilderness" "only if so provided by an Act of Congress." 16 U.S.C. § 1132(b). According to 16 U.S.C. § 1131(a), "no Federal lands shall be designated as "wilderness areas" except as provided for in this chapter or by a subsequent Act."

115.    The Act defines wilderness areas as:

underdeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

16 U.S.C. § 1131(c).

116.    Once land is designated as "Wilderness", commercial enterprise and permanent or

temporary roads generally are prohibited. "A wilderness, in contrast to those areas where man and

his own works dominate the landscape, is hereby recognized as an area where the earth and its

community of life are untrammeled by man, where man himself is a visitor who does not remain."

16 U.S.C. § 1131(c).

117.    After Congress designates in a particular Statewide Wilderness Act the specific

roadless areas that will become part of the Wilderness System, it includes language "releasing" all

other National Forest lands in that State for the multiple-use management provided for in the Forest

Plans and as mandated by MUSYA.

118.    The Wyoming Wilderness Act of 1984, 98 Stat. 2807, designated one-million acres

of Wilderness areas in Wyoming. The WWA then released the remaining National Forest lands in

Wyoming for multiple use management in accordance with each specific Forest Management Plan,

and other national forest management laws. WWA § 401(b)(3), 98 Stat. at 2811-12.

> [A]reas in the State of Wyoming reviewed in such final environmental statement or
> referred to in subsection (d) and not designated wilderness or wilderness study upon
> enactment of this Act shall be managed for multiple use in accordance with land
> management plans pursuant to section 6 of the Forest and Rangeland Renewable
> Resources Planning Act of 1974 as amended by the National Forest Management Act
> of 1976: *Provided*, That such areas need not be managed for the purpose of
> protecting their suitability for wilderness designation prior to or during any revision
> of the initial land management plans[.]

*Id.*

119. Roadless areas within the National Forest System were legally eliminated in Wyoming with few exceptions when Congress enacted the WWA in 1984. The USDA is prohibited from evaluating other National Forest lands within Wyoming's borders without the express permission of Congress: "unless expressly authorized by Congress, the Department of Agriculture shall not conduct any further statewide roadless area review and evaluation of National Forest System lands in the State of Wyoming for the purpose of determining their suitability for inclusion in the National Wilderness Preservation System." WWA § 401(b)(5), 98 Stat. at 2811-2812.

120. The WWA also prohibits the creation of buffer zones: "Congress does not intend that the designation of wilderness areas in the State of Wyoming lead to the creation of protective perimeters or buffer zones around each wilderness area. The fact that nonwilderness activities or uses can be seen or heard from within any wilderness area shall not, of itself, preclude such activities or uses up to the boundary of the wilderness area." WWA § 504, 98 Stat. at 2813.

121. Defendants' actions violate the WWA's prohibitions against buffer zones by constraining road-related actions in a buffer zone consisting of any "contiguous unroaded areas of more than 1,000 acres that are contiguous to . . . Congressionally designated wilderness areas." Forest Service Manual § 7712.16a.2.

122. No component of the Roadless Rule recognizes the exemption afforded by the WWA. Defendants have attempted to circumvent the WWA.

123.    The Roadless Rule mandates management of inventoried roadless areas as *de facto* wilderness areas, without an act of Congress, in violation of the Wilderness Act and the WWA.

124.    Defendants' conduct in adopting and implementing the Roadless Rule and other Clinton Roadless Initiatives was arbitrary and capricious, an abuse of discretion and not in accordance with the Wilderness Act or the WWA. These actions have caused and will continue to cause immediate, direct, adverse and irreversible harm to Wyoming and its citizens.

## COUNT IV: Violation of Multiple Use Sustained Yield Act

125.    Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 124 of this Complaint.

126.    Congress has directed that the National Forest System be actively managed under sustained yield principles for the purpose of achieving a wide variety of multiple uses. The Multiple-Use Sustained-Yield Act of 1960 provides that National Forests "shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. The allowed multiple uses were restated in the NFMA to be "outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e).

127.    MUSYA and NFMA envision and prescribe active management of National Forest resources. MUSYA directs management of "national forests for multiple use and sustained yield of the several products and services obtained therefrom." 16 U.S.C. § 529.

128.     The "multiple use" standard requires the Forest Service to manage the various National Forest resources to maximize their combined utility, without impairment of the land's productivity. "Multiple use" entails the "harmonious and coordinated management of the various resources," and requires that the Secretary manage forest resources "in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions. . . ." 16 U.S.C. § 531(a). The "sustained yield" standard requires the Forest Service to maintain at least a regular periodic output from the renewable Forest resources without impairment of the land's productivity. "Sustained yield" refers to "achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land." 16 U.S.C. § 531(b).

129.     The fulfillment of MUSYA's harmonious and coordinated management imperatives, which require balanced application of multiple-use and sustained-yield mandates, is compromised in our National Forests because of poor forest health and high susceptibility to catastrophic wildfires. In the year 2000, approximately 95 million acres (seventy-five  percent) of National Forest lands carried moderate to high risks to ecosystem health from uncharacteristic wildfire effects, and an additional 24 million acres were at high risk of tree mortality from insects and disease. Roadless Area Conservation Final Environmental Impact Statement (2000) ("Roadless EIS") at 3-81 to 83,

119. In addition to these inherent risks to fire adapted ecosystems, poor forest health has also put hundreds of neighboring communities at risk.

130. Adoption of the Roadless Rule conflicts with the active management contemplated and mandated by the MUSYA and the NFMA and will exacerbate, rather than ameliorate, the forest health crisis on national forest lands. The Roadless Rule and other Clinton Roadless Initiatives arbitrarily and unlawfully failed to address the forest health crisis on National Forest lands and will "increase . . . the risk from uncharacteristic wildland fire or insect or disease as a result of reduced opportunities for forest health treatments." 66 Fed.Reg. 3268.

131. Congress intended that most roads constructed for timber harvest and forest health reasons be temporary. 16 U.S.C. § 1608(b). Defendants have unlawfully and arbitrarily ignored that alternative and have adopted a general ban on roads in over 58 million acres of the National Forest System.

132. MUSYA provides that "[i]n the administration of the national forests due consideration shall be given to the relative values of the various resources in particular areas." 16 U.S.C. § 529. MUSYA's legislative history shows that "[o]ne of the basic concepts of multiple use is that all of the resources in general are entitled to equal consideration," and that "[i]n practice, the priority of the resource use will vary by locality and case by case." H.R. Rep. No. 1551 (1960) *reprinted in* 1960 U.S.C.C.A.N. 2377. The Roadless Rule violates these principles by taking fifty-percent of the National Forest land base out of consideration.

133. The Roadless Rule, in requiring as a blanket matter that unroaded characteristics be maintained in all inventoried roadless areas, violate the MUSYA directives that locally-desired uses, and the relative values of allowing other uses in each roadless area, be considered.

134. Defendants have violated MUSYA by failing to provide a roadless area-by-area analysis of resource values and by failing to consider local economic and environmental conditions.

135. Defendants' actions in adopting and implementing the Roadless Rule are arbitrary and capricious, an abuse of discretion and not in accordance with MUSYA. These actions have caused, and will continue to cause, immediate, direct, adverse, and irreversible harm to the State of Wyoming and its citizens.

## **COUNT V: Violation of the Administrative Procedures Act**

136. Plaintiffs repeat and incorporate by reference the allegations of Paragraphs 1 through 135 of this Complaint.

137. Under the Administrative Procedures Act, an agency action must be held unlawful and set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. §§ 706(2)(A) and (c).

138. The Roadless Rule is "arbitrary, capricious, an abuse of discretion [and] otherwise not in accordance with law" and is "in excess of statutory jurisdiction [and] authority" for the reasons described above, and must be set aside.

139.    The APA requires that the Federal Register "notice of proposed rule making . . . shall include . . . either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). Two relevant aspects of the Roadless Rule were not adequately noticed in the proposed rules.

(a)    The Roadless Rule "adds a new prohibition on timber harvesting" 36 C.F.R. § 294.13 that was not adequately noticed in the proposed rule.

(b)    The Roadless Rule applies to those "inventoried roadless areas" identified on maps contained in the final EIS "dated November 2000." 36 C.F.R. § 294.11. The controlling maps, which were made available only after the public comment period closed, increased the covered acreage without notice from the 54.3 million acres noticed in the proposed rules (65 Fed. Reg. 30,276 (2000)) to the 58.5 million acres covered by the final rules.

137.    The challenged actions are arbitrary agency actions because the decisions were not "based on a consideration of the relevant factors" and because there is no "rational connection between the facts found and the choice made." *Motor Vehicle Manufacturers Association v. State Farm Mutual*, 463 U.S. 29, 43 (1983). For example:

(a)    The Roadless Rule arbitrarily fails to address the forest health crisis on national forest lands; and implementation will in fact exacerbate that crisis;

(b)    The Roadless Rule is arbitrarily premised on the view that timber harvesting and roads inevitably threaten forest health and ecosystems. *E.g.*, 66 Fed. Reg. 3244-47 (preamble to

Roadless Rule). Not only is this view unsupported by hard data, but the Forest Service found, to the contrary, that it was necessary to include provisions *allowing* timber harvesting and road access *to protect forest health.* *E.g.*, 36 C.F.R. §§ 294.12(b)(1) and 294.13(b)(1);

(c)     The Roadless Rule arbitrarily imposes significant economic costs on the government as well as on stakeholders, including lost employment and lost income, without providing clearly overriding benefits. For example: (1) a reduction in timber jobs and income; (2) job and income losses in minerals industry, and losses from reduced access to energy sources and strategic minerals; (3) costs of the stand-alone roads analyses required under the roads policy; and (4) limited cost savings from reduction in road construction. For costs and reduced income effects of hundreds of millions of dollars annually, the Roadless Rule achieves a minimal cost savings to the Forest Service.

140.     The Forest Service has arbitrarily asserted that "legal access [to private property] would not be affected" by the challenged actions. EA at E2; *see* 66 Fed. Reg. 3253. However, the Roadless Rule will unquestionably make it more difficult and costly to maintain or obtain access to private inholdings.

141.     Defendants' actions in violating the APA were arbitrary and capricious and an abuse of discretion. These actions have caused and will continue to cause immediate, direct, adverse and irreversible harm to the State of Wyoming and its citizens.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1. Adjudge and declare that the challenged Roadless Rule is arbitrary, capricious, an abuse of discretion, and unlawful pursuant to NEPA, NFMA, the Wilderness Act and the WWA, MUSYA, and the APA, and other laws and regulations, and that Defendants have acted beyond the scope of their legal authority in adopting those actions;

2. Enjoin and restrain Defendants, their agents, employees, successors, and all persons acting in concert or participating with them, from enforcing or implementing, and requiring others to enforce or implement, the Roadless Rule and related rules and policies;

3. Grant relief under the APA and hold unlawful and set aside the Roadless Rule;

4. Grant such other and further relief as the Court deems just and proper, including an award of attorney's fees and costs.

Respectfully submitted this 12th day of January, 2007.

Patrick Crank
Attorney General
Jay Jerde
Deputy Attorney General
Robert A. Nicholas
Senior Assistant Attorney General
123 Capitol Building
Cheyenne, Wyoming 82001
Telephone: (307) 777-6946
Facsimile: (307) 777-3542