**ORIGINAL**

James S. Angell, WY Bar # 6-4086
Andrew E. Hartsig
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO 80202
Tel: (303) 623-9466 Fax: (303) 623-8083
Email: jangell@earthjustice.org
        ahartsig@earthjustice.org

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

SEP 24 2007

Stephen Harris, Clerk
Cheyenne

Douglas L. Honnold
Timothy J. Preso
Earthjustice
209 South Willson Avenue
Bozeman, MT 59715-4630
Tel: (406) 586-9699 Fax: (406) 586-9695
Email: dhonnold@earthjustice.org
        tpreso@earthjustice.org

Attorneys for Defendant-Intervenors

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| STATE OF WYOMING, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 07-CV-17-B |
| | ) | |
| vs. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | **OPPOSITION BRIEF OF** |
| AGRICULTURE, et al., | ) | **DEFENDANT-INTERVENORS** |
| | ) | **WYOMING OUTDOOR** |
| Defendants, | ) | **COUNCIL, ET AL.** |
| and | ) | |
| | ) | |
| WYOMING OUTDOOR COUNCIL, et al., | ) | |
| | ) | |
| Defendant-Intervenors. | | |

## INTRODUCTION

This is not the first time this Court has considered a challenge by the State of Wyoming to the Roadless Area Conservation Rule (Roadless Rule). In 2003, this Court agreed with Wyoming that the Forest Service's adoption of the Roadless Rule violated the National Environmental Policy Act (NEPA) and the Wilderness Act of 1964.[1] Wyoming v. U.S. Dep't of Agric., 277 F. Supp. 2d 1197 (D. Wyo. 2003). Now Wyoming has come back to this Court with a new complaint that offers the same legal challenges to the same federal rule. The context in which the State brings its new lawsuit, though, is quite different: in the intervening years the Tenth Circuit has vacated this Court's earlier ruling and a district court issued a mandatory injunction – still in effect – that requires the Forest Service to implement and comply with the Roadless Rule.

Despite these changed circumstances, Wyoming appears to view a second victory in this Court as a fait accompli, choosing to simply reiterate its earlier rhetoric-strewn arguments without bothering to correct the inaccuracies pointed out to the State in the course of the earlier Tenth Circuit briefing. In so doing, the State also fails to confront today's changed legal and equitable landscape. See Brief for State of Wyoming as Amicus Curiae Opposing Remedy Requested by Plaintiffs at 7, California ex rel. Lockyer v. U.S. Dep't of Agric., 49 F. Supp. 2d 874 (N.D. Cal. 2006) (arguing to California court that a reinstated Roadless Rule "would almost certainly be enjoined" by this Court and that a different result is "inconceivable").

---

[1] That opinion was vacated by the Tenth Circuit in 2005, and this Court and the Tenth Circuit each recently rejected the State's efforts to revive that earlier case. See text infra at 11, 13.

Wyoming's complacency notwithstanding, there are sound reasons for this Court to take a fresh look at the record and legal issues presented by this case. This Court's 2003 opinion included substantial discussion of legal issues concerning NEPA and, in particular, the Wilderness Act that had not been addressed to any depth by Wyoming's merits briefing. As a result, this Court lacked the benefit of a full development in the parties' briefing of the legal issues before it. In this brief, Defendant-Intervenors Wyoming Outdoor Council et al. ("WOC") provide that more in-depth development of those issues. WOC respectfully requests that this Court reconsider its prior ruling in light of WOC's arguments, and that it reach a different conclusion this time.

A fresh review also is appropriate because the legal playing field has shifted significantly since 2003. As the Tenth Circuit pointed out in its recent order denying Wyoming's motion to reinstate the 2003 ruling, this Court is not writing on a blank legal slate, but rather must take into account the fact that the Forest Service is now under a mandatory injunction to implement the Roadless Rule. See App. 9:1713-14 (Tenth Circuit Order).[2] The Tenth Circuit emphasized that this Court must now consider the impact of the California court's injunction on Wyoming's remedial request, as well as on the scope of any injunction that may be issued by this Court. See 9:1714. These considerations alone warrant a different outcome than in the earlier case.

Wyoming's bid for a quick reissuance of this Court's 2003 ruling should be rebuffed. This case involves landmark legal protections for nearly fifty million acres of the most

---

[2] For the Court's convenience, WOC has provided appendices containing copies of the record documents and other legal pleadings and orders cited in this brief. WOC cites to the Appendix by volume and page number. For example, a citation to page 100 in volume 3 of the Appendix would appear as "App. 3:100."

ecologically significant National Forest lands in the nation. Given the stakes, a fresh and careful review is warranted. And given the arguments below, a different outcome should be the result.

## STATEMENT OF FACTS

### I.    THE NEED FOR THE ROADLESS RULE

The roadless areas at issue in this case are pristine portions of the National Forests as yet untouched by roadbuilding, logging, or other development. These wildlands are critical to our nation's ecological health. See generally App. 6:833-36; App. 6:895-99. Roadless areas provide habitat and refuge to numerous sensitive and imperiled species. California condors, the grizzly bears and wolves of the Yellowstone area, native salmon and trout in the Pacific Northwest, migratory songbirds of the Appalachian hardwoods, and myriad other species rely on roadless areas to survive. See App. 7:1052-61; App. 7:1071-76; App. 8:1340-57.

Roadless areas serve human populations as well. When Americans turn on the tap in hundreds of communities across the country, the clean water they receive originates in roadless areas. See App. 6:833; App. 6:941-45. Roadless areas also provide abundant opportunities for hiking, camping, picnicking, wildlife viewing, hunting, fishing, cross-country skiing, mountain biking, canoeing, and solitude, among many other things. See App. 6:836; App. 6:897.

The importance of roadless areas has grown as National Forests have become increasingly developed. Before the Roadless Rule, decisions regarding whether to develop roadless areas were left to individual National Forests. But, as the Forest Service realized, "[w]hile individual decisions to build roads may achieve local management objectives, collectively they may result in a continued net loss of the quality and quantity of inventoried

3

roadless areas nationally." App. 6:847; see also 66 Fed. Reg. 3244, 3246 (Jan. 12, 2001) (noting

development of 2.8 million roadless acres in the last twenty years). Another product of this

localized decision-making has been the piecemeal development of a largely unmaintained

network of some 380,000 miles of road in the National Forest System – eight times more road

than is in the nation's entire interstate highway system. See App. 6:913;

http://www.fhwa.dot.gov/reports/routefinder/index.cfm (last visited September 18, 2007).

 This vast road system presents exorbitant fiscal and ecological costs. The Forest Service

estimates its nationwide road maintenance and repair backlog at more than $8.4 billion – and

growing. See App. 6:837; 66 Fed. Reg. at 3246 ("the cost of fixing deteriorating roads increases

exponentially every year"). Roads and associated logging cause soil erosion and compaction,

loss of ground cover and soil productivity, increased landslides and water runoff, and reduced

water and air quality. App. 6:936. Road construction and maintenance spread invasive non-

native plants that disrupt entire ecosystems. App. 7:1066-68. The increased human access that

results from roadbuilding also increases fire risk; human-caused wildfires are five times more

likely in roaded than unroaded areas. App. 6:1008. As these and other costs of roadless area

development have come to light, projects that would develop such areas have sparked increasing

controversy and litigation. See, e.g., 66 Fed. Reg. at 3246; Utah Envtl. Cong. v. Bosworth, 372

F.3d 1219 (10th Cir. 2004) (successful challenge to a project including prescribed burning in a

roadless area); Smith v. U.S. Forest Serv., 33 F.3d 1072 (9th Cir. 1994) (finding deficiencies in

Forest Service's environmental analysis of logging project in Washington roadless area).

4

## II.    THE DEVELOPMENT OF THE ROADLESS RULE

In response to the issues described above, the Forest Service temporarily suspended road-building in roadless areas in 1999 to preserve the status quo while the agency considered more long-term management approaches.  64 Fed. Reg. 7290 (Feb. 12, 1999).  This roadbuilding moratorium drew 119,000 public comments, "many of which mentioned the need for 'permanent protection' of inventoried roadless areas."  App. 6:838.[3]

Acknowledging public sentiment and the growing body of information demonstrating that roadless areas are "some of the last, best, unprotected wildland anywhere in our nation," President Clinton in October 1999 directed the Forest Service to develop options for permanently protecting remaining roadless areas.  App. 2:350-51.  Soon thereafter, the Forest Service announced it was considering adopting a regulation to protect National Forest roadless areas, and sought preliminary input on the appropriate scope of its investigation.  See 64 Fed. Reg. 56,306 (Oct. 19, 1999) (Notice of Intent to Prepare an EIS).  Over the ensuing 60-day "scoping" period, the agency conducted 187 public meetings – seven in Wyoming – and accepted more than 517,000 public comments, each an unprecedented number.  App. 6:839.  The Forest Service also set up a website containing information about the roadless initiative and solicited public comments by e-mail and facsimile.  See App. 2:250-262 (sample information from website).

The Forest Service undertook equally comprehensive efforts to respond to the 517,000 comments generated by the NOI.  See 66 Fed. Reg. at 3248.  The agency organized a Content

---

[3] This Court rejected a timber industry challenge to the roadbuilding moratorium.  See Wyo. Timber Indus. Ass'n v. U.S. Forest Serv., 80 F. Supp. 2d 1245 (D.Wyo. 2000), appeal dismissed as moot, No. 00-8016, 2001 WL 274684 (10th Cir. Mar. 20, 2001).

Analysis Enterprise Team that read, coded, analyzed, and summarized the scoping comments, see App. 3:562; App. 2:424-26; see also, e.g., App. 2:306-35 (summary of scoping comments), provided detailed information on them, and ultimately described the comments in the Draft EIS (DEIS) on the Roadless Rule. See App. 3:563-66. Among those commenting was the State of Wyoming and several of its agencies. While the Governor's office sharply denied the need for a roadless area protection regulation, several of the State's agencies applauded the idea, including the Wyoming Department of Game and Fish. See App. 2:268-70; App. 2:413-15; 3:509; App. 3:510-12.

After analyzing the public comments, the Forest Service published a draft Roadless Rule and associated DEIS. See generally 65 Fed. Reg. 30,276 (May 10, 2000).[4] The draft Rule proposed to immediately prohibit road construction and reconstruction in roadless portions of "inventoried" roadless areas in the lower-48 states. See id. at 30,288.[5] In addition, the draft Rule proposed planning criteria to guide local forest planning decisions in unroaded areas outside inventoried roadless areas. Id.[6] The DEIS included an entire volume of maps showing the areas in each state that would be affected by the Rule. See generally App. Vol. 5.[7]

---

[4] The Forest Service provided the public with maps of inventoried roadless areas in January, 2000, four months before the release of the DEIS. See www.roadless.fs.fed.us/timeline/index (timeline of promulgation process) (last visited July 16, 2007). The Service also presented maps during the scoping hearings. See infra at 35.

[5] Though the draft proposed Rule did not include logging restrictions, the DEIS analyzed alternative rules that did include such restrictions. See infra at 15 (describing alternatives).

[6] In drafting the Roadless Rule, the Forest Service distinguished between inventoried roadless areas subject to the Roadless Rule's prohibition on road-building and other "unroaded" areas. Inventoried roadless areas are "[u]ndeveloped areas typically exceeding 5,000 acres that met the minimum requirements for wilderness consideration under the Wilderness Act and that were inventoried during the

The Forest Service followed its issuance of the draft rule and DEIS with the most

extensive public outreach effort ever undertaken in an administrative rulemaking. The agency:

- Distributed 50,000 copies of the DEIS summary and 43,000 copies of the DEIS to the public;

- Sent copies of the DEIS and summary to 10,500 public libraries;

- Made the documents available at all Forest Service offices;

- Posted copies on its Roadless Rule Internet site, www.roadless.fs.fed.us;

- Provided a 69-day comment period, 50% longer than required by law;

- Held more than 600 public meetings across the country;

- Accepted comments in a variety of formats including written letter, e-mail, and facsimile;

- Provided a toll-free hotline with meeting information, document-ordering information, and voicemail to record and respond to questions; and

- Met separately with tribal officials, elected leaders, and other interested groups.

App. 9:1698-1701; 66 Fed. Reg. at 3248. By the close of the process, the agency had received

approximately 1.2 million written public comments on the draft Roadless Rule and DEIS, 97%

---

Forest Service's Roadless Area Review and Evaluation (RARE II) process, subsequent assessments, or forest planning." App. 8:1400. "Unroaded areas" are smaller, uninventoried roadless areas that are still large enough "to protect the inherent characteristics associated with [their] roadless condition." App. 8:1407.

[7] The DEIS contained state-by-state maps of all National Forest roadless areas. See App. Vol. 5. For each state, the DEIS provided a map showing the roadless areas within the state's boundaries, followed by individual maps of each National Forest within that state that depict the roadless areas within their boundaries. The maps also used different shadings to depict those portions of inventoried roadless areas allocated to development, conservation, or recommended wilderness under pre-Roadless Rule management, and gave the acreages for each allocation. Id. As the Ninth Circuit rightly concluded, "the maps within the DEIS and FEIS in context gave reasonable notice of the roadless areas that would be affected by the rule." Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1117 (9th Cir. 2002).

of which supported the draft rule or favored even stronger protections. See App. 6:839; App. 2:417-20.

The Forest Service's Final EIS (FEIS), issued in November 2000, responded to the public's strong preference for protection of roadless areas. The Service broadened the "preferred alternative" to prohibit commercial logging as well as roadbuilding in inventoried roadless areas, and applied its prohibitions to Alaska's Tongass National Forest beginning in April 2004, rather than leaving that issue to a later decision-making process. See App. 6:831. The agency's responsiveness to public comment also is reflected in its decision to eliminate alternatives that would offer criteria to guide forest-specific decisions regarding whether to impose additional protections on roadless areas – a process and set of criteria the public found confusing. App. 6:848. In addition, to eliminate confusion over treatment of the small percentage of inventoried roadless lands that had been roaded since the last inventory, the Forest Service proposed to extend the Roadless Rule's prohibitions throughout inventoried roadless areas. See App. 6:859 n.3.[8]

The Forest Service published its final Roadless Rule in January 2001. The final Rule generally prohibits roadbuilding and logging within inventoried roadless areas. 36 C.F.R. § 294.12 & .13 (2001). Significantly, the final Rule includes several exceptions that leave the

---

[8] In the FEIS, the Forest Service corrected the roadless area boundaries on some maps, updated its analysis by incorporating inventory information provided by individual National Forests, and included in its inventory those lands already covered by special protective designations. See App. 6:877; App. 2:389-411 (describing changes between the DEIS and FEIS). Nearly 90% of the additional acreage was comprised of lands covered by special protective designations where new roadbuilding already was prohibited. Compare App. 3:557 with App. 6:894.

8

agency considerable management flexibility to build roads and allow logging when necessary.

The Rule:

- Closes no existing roads or trails, 66 Fed. Reg. at 3251;

- Explicitly preserves state and private landowners' rights of access to their lands across otherwise protected roadless areas, and provides for the construction and reconstruction of roads in such areas "pursuant to reserved or outstanding rights, or as provided for by statute or treaty," 36 C.F.R. § 294.12(b)(3);

- Preserves local Forest Service officials' discretion to authorize road construction needed for public health and safety, environmental clean-ups, prevention of irreparable resource damage from an existing road, remediation of traffic hazards, implementation of the Federal Aid Highway system, and extension or renewal of a pre-existing mineral lease, See 36 C.F.R. § 294.12(b);

- Allows for logging incidental to other activities, or for personal (e.g., firewood) or administrative use, or in areas still inventoried as roadless but substantially altered by past roadbuilding and logging, See 36 C.F.R. § 294.13(b); and

- Allows cutting and removal of "small diameter timber" to reduce the risk of uncharacteristically intense fires. 36 C.F.R. § 294.13(b)(1)(ii).

## III.    LEGAL CHALLENGES TO THE ROADLESS RULE

The Roadless Rule was challenged in nine lawsuits around the nation.[9]  The first to be

adjudicated was a consolidated case in the District of Idaho in which the district court issued a

---

[9] The instant case is the sole live challenge: (1) the consolidated Idaho case – Kootenai Tribe of Idaho v. Veneman, No. CV01-10-N-EJL, and Idaho v. U.S. Forest Serv., No. CV01-11-N-EJL - was dismissed on February 3, 2006; (2) on July 5, 2005, the two cases filed in the District of Columbia – Communities for a Great Nw. v. Bush, No. 00-CV-01394-GK, and Am. Forest & Paper Ass'n v. Johanns, No. 01-CV-00871-GK - were dismissed; (3) a challenge to the Rule by the State of Alaska was dismissed when the Forest Service agreed to exempt the Tongass National Forest in Alaska from the Rule. 68 Fed. Reg. 75,136 (Dec. 30, 2003); (4) two consolidated challenges to the Rule in North Dakota – Billings County v. Johanns, No. 01-045 and N.D. v. Johanns, No. 01-087 - were dismissed on March 20, 2007 after the plaintiffs and federal defendants reached a settlement; (5) the State of Utah's challenge – Utah v. U.S. Forest Serv., No. 2:01cv0277 – was administratively closed on December 14, 2004; and (6) the Tenth Circuit refused to revive Wyoming's original challenge, see infra at 13.

9

preliminary injunction against the Rule on May 10, 2001. <u>Kootenai Tribe of Idaho v. Veneman</u>,

142 F. Supp. 2d 1231 (D. Idaho 2001). Although the Forest Service did not appeal the Idaho

decision, defendant-intervenor conservation organizations – several of which are intervenors

here – appealed and, on December 12, 2002, the Ninth Circuit reversed the Idaho court's ruling

in every respect. <u>Kootenai Tribe</u>, 313 F.3d 1094. In doing so, the Ninth Circuit rejected many of

the claims at issue here. The court rejected the arguments that: (1) the "scoping" process for the

Rule was inadequate because the Forest Service had not provided adequate maps, <u>id.</u> at 1116-17;

(2) the Forest Service's NEPA analysis had not considered a reasonable range of alternatives, <u>id.</u>

at 1120-23; (3) the Forest Service was required to prepare a supplemental NEPA document for

the Roadless Rule, <u>id.</u> at 1117-18; and (4) the NEPA analysis did not adequately consider the

cumulative impacts of the Roadless Rule, <u>id.</u> at 1123.

Shortly after the Ninth Circuit's decision vacating the Idaho court's preliminary

injunction, this Court issued <u>Wyoming v. U.S. Dep't of Agric.</u>, 277 F. Supp. 2d 1197 (D. Wyo.

2003), in which it concluded the Forest Service's adoption of the Roadless Rule violated NEPA

and the Wilderness Act. <u>Id.</u> at 1239. Although the State of Wyoming was the sole plaintiff and

it alleged only that the Roadless Rule injured its interests within Wyoming, this Court

permanently enjoined the implementation of the Roadless Rule nationwide. <u>Id.</u> at 1238-39.

As in the Ninth Circuit, the Forest Service did not appeal. WOC did, however, and

argued its appeal on May 4, 2005. The day after the argument, the Forest Service announced its

adoption of the "State Petitions Rule," which repealed and replaced the Roadless Rule. 70 Fed.

Reg. 25,654 (May 13, 2005). At Wyoming's request, and over WOC's objections, the Tenth

Circuit dismissed WOC's appeal as moot. <u>Wyoming v. U.S. Dep't of Agric.</u>, 414 F.3d 1207,

1212-13 (10th Cir. 2005). In addition to remanding the case for dismissal without prejudice, the

Tenth Circuit vacated this court's several prior decisions in the case. <u>Id.</u> at 1213.

On August 30, 2005, California, Oregon, and New Mexico filed a lawsuit in the Northern

District of California challenging the State Petitions Rule. [10]  Thereafter, a coalition of twenty

conservation organizations, including six of the eight Defendant-Intervenors here, filed their own

lawsuit challenging the State Petitions Rule. <u>See</u> <u>California ex rel. Lockyer v. U.S. Dep't of</u>

<u>Agric.</u>, 459 F. Supp. 2d 874, 879 (N.D. Cal. 2006). The two cases were briefed and heard

together and, on October 11, 2006, the court issued a final amended ruling that invalidated the

State Petitions Rule and reinstated the Roadless Rule. <u>Id.</u> at 919.[11]  The California court

concluded the Forest Service's failure to undertake <u>any</u> environmental analysis violated NEPA.

<u>Id.</u> at 895-909. The Court also found that the Forest Service violated the Endangered Species

Act by failing to consult with expert federal biological agencies on the impact of repealing the

Roadless Rule on imperiled species. <u>Id.</u> at 909-12.

After finding these legal violations, the California court addressed the question of

remedy, holding that:

> Plaintiffs have shown that the enactment of the State Petitions Rule has already
> caused irreparable injury in the form of road construction and other activities in
> connection with phosphate mining in the roadless area within the Caribou-
> Targhee National Forest. Further, as noted above, more projects in roadless areas

---

[10] The State of Washington later joined these states as a plaintiff. A pair of additional states, including
Montana, supported the plaintiff states' efforts in an amicus brief.

[11] The California court's decision was issued by Magistrate LaPorte, who, by agreement of the parties,
decided the merits of the case with direct appeal to the Ninth Circuit.

that would have been forbidden under the Roadless Rule are now imminent.

Id. at 914. The California court consequently set aside the State Petitions Rule, reinstated the 2001 Roadless Rule, and enjoined the Forest Service "from taking any further action contrary to the Roadless Rule without undertaking environmental analysis consistent with this opinion." Id. at 919.[12] The court later detailed how its injunction applied to specific projects that would violate the Roadless Rule, including oil and gas development projects. App. 9:1703-04 (California court's final injunction order).[13]

Two days after the California district court issued its initial opinion and order, the State of Wyoming filed a motion under Fed. R. Civ. P. 60(b)(6), asking this Court to revive its 2003 merits decision and injunction. This Court denied Wyoming's motion on June 7, 2007. See Wyoming v. U.S. Dep't of Agric., No. 01-CV-86-B (D. Wyo. June 7, 2007). Wyoming's subsequent motion – endorsed by WOC – asking the Tenth Circuit to reinstate this Court's earlier decision and revive the appeal was denied by that court on July 5, 2007. App. 9:1711-14. With Wyoming's initial challenge having run its course, the State now relies on the instant case, which it filed in January 2007, as the vehicle for its challenge to the Roadless Rule.

_____

[12] While the California court generally reinstated the Roadless Rule, it rejected the conservation group plaintiffs' request that the Forest Service be ordered to apply the Roadless Rule to the Tongass National Forest, which had been exempted from the Rule in 2003. California ex rel. Lockyer, 459 F. Supp. 2d at 916-17.

[13] Wyoming participated in the California case by filing an amicus brief opposing reinstatement of the Roadless Rule and any injunction. See California ex rel. Lockyer, 459 F. Supp. 2d at 879.

## ARGUMENT[14]

### I.    THE ADOPTION OF THE ROADLESS RULE DID NOT VIOLATE ANY STATUTORY MANDATE.

#### A.    Standard Of Review

This Court's review of Wyoming's claims is governed by the Administrative Procedure Act, which requires that a court uphold agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this deferential standard of review, the Forest Service's decision "is entitled to a presumption of regularity," Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574 (10th Cir. 1994), and "[t]he court is not empowered to substitute its judgment for that of the agency." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971). The sole question for this Court is whether the agency "examined the relevant data and articulated a rational connection between the facts found and the decision made." Olenhouse, 42 F.3d at 1574 (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)).

---

[14] In addition to the Roadless Rule, Wyoming's complaint appears to challenge the Roads Management Rule and Transportation Policy. See Complaint for Declaratory Judgment and Injunctive Relief at ¶ 87 (filed Jan. 12, 2007); State of Wyoming's Supplemental Brief in Support of Declaratory Judgment and Injunctive Relief (Filed August 16, 2007) ("Wyoming Br.") (explaining that complaint in this case is "nearly identical" to the complaint filed in the State's 2001 challenge to the Roadless Rule). WOC demonstrated in its prior briefing – and this Court agreed, Wyoming, 277 F. Supp. 2d at 1213-14 – that the State lacks standing to challenge these rules. See Wyoming Outdoor Council et al.'s Response to State of Wyoming's Opening Brief for Declaratory Judgment and Injunctive Relief at 18-20, No. 01-CV 086B (filed Dec. 20, 2002) (incorporated by reference). Furthermore, Wyoming waived any challenge to those initiatives by failing to present any arguments regarding them in its merits brief. See Boone v. Carlsbad Bancorporation, Inc., 972 F.2d 1545, 1554 n.6 (10th Cir. 1992).

13

**B.    The Forest Service Did Not Violate NEPA.**

The development of the Roadless Rule was the subject of extensive and unprecedented public involvement, including hundreds of public meetings, thousands of pages of environmental analysis, and more than 1.6 million public comments. Wyoming's claim that the Roadless Rule violated NEPA defies the deferential standard of review, gives short shrift to the administrative record, and is radically out of step with the case law. The Ninth Circuit rightly rejected these NEPA claims, and this Court should do the same.

**1.    The Forest Service Considered A Reasonable Range Of Alternatives.**

"NEPA requires an EIS to include discussion of 'alternatives to the proposed action.'" Lee v. U.S. Air Force, 354 F.3d 1229, 1237 (10th Cir. 2004) (quoting 42 U.S.C. § 4332(2)(C)(iii)). However, "it is clear an agency need not independently evaluate alternatives it determines in good faith to be ineffective as a means to achieving the desired ends." Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp. (AWARE), 153 F.3d 1122, 1130 (10th Cir. 1998).

The Forest Service complied with NEPA's alternatives requirement by analyzing a full range of alternatives that would satisfy the agency's legitimate goal of protecting roadless areas. The Forest Service's Final Roadless Rule EIS considered in detail three separate action alternatives as well as the required "no action" alternative. App. 6:860 (no-action alternative). The action alternatives included: (1) Alternative 2, prohibiting road construction and reconstruction within inventoried roadless areas, but not restricting logging, App. 6:860-61; (2) Alternative 3, prohibiting road construction and reconstruction within inventoried roadless areas,

and prohibiting logging except for specified stewardship purposes, App. 6:861; and (3)

Alternative 4, prohibiting road construction and reconstruction and logging within inventoried

roadless areas, App. 6:862.[15] The Forest Service also gave detailed consideration to four

alternatives specific to Alaska's Tongass National Forest, App. 6:864-66, and considered, but

eliminated from detailed study, six other categories of alternatives, including alternative

designations for inventoried roadless areas, different prohibitions for such areas, applying the

rule to smaller uninventoried roadless areas, and exempting road construction for fire and insect

and disease treatments. App. 6:869-76. As the administrative record demonstrates, the Forest

Service rigorously explored alternatives to the Roadless Rule. See Kootenai Tribe, 313 F.3d at

1120-23 (upholding Roadless Rule alternatives analysis).

As the Forest Service explained, a broad prohibition on road construction in inventoried

roadless areas was integral to the agency's overall rulemaking purpose. The agency faced an

$8.4-billion backlog in maintenance of its existing road network, App. 3:560, and a growing

body of evidence establishing the critical ecological value of National Forest roadless areas. See

App. 3:558-60. The agency also received approximately 119,000 public comments on its interim

roadbuilding moratorium, many of which recommended permanent protection for roadless areas.

---

[15] While these three action alternatives generally prohibited roadbuilding, there were marked differences in the amount of logging that could take place under each. For example, unlike Alternative 4, Alternative 2 would permit "[b]oth even-aged and uneven-aged silviculture management," and such "[l]ogging is likely to include the use of ground-based equipment (for example, tractors and forwarders), cable systems, and helicopter." App. 6:861. The Forest Service calculated that Alternative 2 would yield 38.5 million more board feet of National Forest logging annually than Alternative 4. Compare App. 7:1193 (Table 3-59) with App. 7:1194 (Table 3-61). This difference is more than 25% of the total logging volume (147 million board feet) that the Forest Service anticipated annually from roadless areas absent a Roadless Rule. See App. 7:1192.

15

See App. 3:561. Recognizing the need for a national response, President Clinton directed the

Forest Service to develop regulations "to provide appropriate long-term protection for most or all

of these currently inventoried 'roadless' areas." App. 2:351. Accordingly, the Forest Service set

out "to immediately stop activities that have the greatest likelihood of degrading desirable

characteristics of inventoried roadless areas." App. 3:567.

Wyoming declares that the Forest Service's adoption of the Roadless Rule was arbitrary

and capricious because there is "nothing in the administrative record that explains" the Forest

Service's allegedly "conclusory determination" that roadbuilding degrades the ecological

characteristics of inventoried roadless areas. Wyoming Br. at 27. Wyoming's argument

completely ignores the compelling fiscal justification for the Roadless Rule. See App. 3:560

(agency faced $8.4-billion maintenance backlog for existing road network). As the Forest

Service pointed out when it adopted the Rule, "[i]t makes little fiscal or environmental sense to

build additional roads in inventoried roadless areas that have irretrievable values at risk when the

agency is struggling to maintain its existing extensive road system." 66 Fed. Reg. 3246 (Jan. 12,

2001) (citing FEIS).

The argument ignores as well the voluminous support in the Roadless Rule EIS for the

Forest Service's conclusion that the degradation of roadless areas could not be effectively

addressed without sharply limiting road construction. As the EIS demonstrates, roadbuilding

occurs nationwide, exhibits "the greatest likelihood of altering landscapes," frequently causes

"substantial landscape fragmentation and adverse changes to native plant and animal

communities," and threatens an "immediate, irretrievable, and long-term loss of roadless

16

characteristics." App. 6:848. Moreover, road construction is "the primary human-caused source of soil and water disturbances in forested environments," App. 6:936; roads "contribute more sediment to streams than any other land management activity," App. 7:1057; recovery of natural water flows "after road building takes much longer than after forest harvest," App. 6:940; roads "are major contributors to forest fragmentation" and the associated disturbance of wildlife habitat, App. 6:1023; "the presence of roads in an area is associated with negative effects for both terrestrial and aquatic ecosystems," App. 6:1042; roads are "avenues for invasion by nonnative invasive plant species that frequently compete with or displace native vegetation," App. 7:1066; and roads cause numerous adverse impacts on threatened and endangered wildlife species, including habitat loss, loss of connectivity with other habitats, displacement, and access for poaching and illegal collection, App. 7:1073-74.

As the foregoing demonstrates, the Roadless Rule EIS presented a vast accumulation of scientific evidence supporting the Forest Service's judgment in this case – a judgment that also reflects basic common sense: because the Forest Service sought to protect the values of roadless areas, banning road construction is a logical and obvious component of any regulation to achieve this goal. This decision, based on the Forest Service's expert scientific analysis of the deleterious impacts of National Forest roads, is entitled to this Court's deference. See, e.g., Wyoming v. United States, 279 F.3d 1214, 1240 (10th Cir. 2002) ("deference to agency action is appropriate where that action implicates scientific and technical judgments within the scope of agency expertise" (quotation omitted)).

17

Wyoming complains the Forest Service omitted alternatives that did not ban road construction and reconstruction. Wyoming Br. at 29. This argument fails for several reasons. First, it ignores the EIS's No-Action alternative, which provides for the continuation of the status quo under which roadbuilding and logging were allowed under existing forest plans. See App. 860 (No-Action alternative); Wyoming, 277 F. Supp. 2d at 1226 (this Court recognizing in its earlier decision that a roadbuilding alternative had been "the environmental status quo for decades"); Custer County Action Ass'n v. Garvey, 256 F.3d 1024, 1040 (10th Cir. 2001) (purpose of no-action alternative is to "compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo").

Second, even if this Court ignores the no-action alternative – which it should not – Wyoming is incorrect in suggesting the Forest Service made a "predetermined decision to prohibit all road construction or re-construction and all timber harvesting in roadless areas" that prevented the agency from considering any alternative with exemptions for hazardous fuel treatments and the like. See Wyoming Br. at 30-31. Wyoming's sweeping rhetoric concerning the Forest Service's determination to eliminate all timber harvest ignores the fact the DEIS's proposed draft Rule contained no timber harvest restrictions whatsoever. See App. 3:554. Furthermore, the Draft EIS did consider permitting roads in roadless areas where they were dictated by an overriding consideration or did not threaten widespread development of roadless lands – namely, to protect public health and safety, to respond to pollution, to effectuate existing rights, treaties, and statutes, and to avoid irreparable resource damage caused by existing roads. See App. 6:858-59. In response to public comment, the Final EIS considered three new

18

exceptions to the general roadbuilding prohibition addressing road safety improvement, state highway projects, and roads for mineral leasing. See App. 6:863. The State's claim that such exemptions were never considered is baseless.

Third, to the extent the State is arguing the Forest Service's action alternatives should have included a roadbuilding alternative, its complaint lies with the Forest Service's determination of the purpose and need for the Roadless Rule. However, agencies enjoy "considerable discretion to define the purpose and need of a project." Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1066 (9th Cir. 1998). Consequently, an agency's selection of the purpose and need for a project must be sustained so long as it was reasonable. See id. at 1066-67; All Indian Pueblo Council v. U.S., 975 F.2d 1437, 1445 (10th Cir. 1992) (rejecting attack on agency's refusal to consider energy conservation alternative to new power line development because it "largely challenges a matter within the agency's policy making discretion"); Wyoming, 279 F.3d at 1240 (deference due agency's expert scientific views). Here the mountain of evidence in the Forest Service's EIS documenting the harms caused by roadbuilding in inventoried roadless areas demonstrates the reasonableness of the agency's purpose. See supra at 4-5; infra 16-17 (describing fiscal and ecological harms associated with roadbuilding in roadless areas). As the Ninth Circuit concluded upon reviewing this same EIS analysis, "the Forest Service could reasonably conclude that only a near total ban on road construction in roadless areas could satisfy its policy objectives." Kootenai Tribe, 313 F.3d at 1123. Given this reasonable purpose, the Forest Service was not required to consider, apart from

the no-action alternative, roadbuilding alternatives that would "be ineffective as a means to achieving the desired ends." AWARE, 153 F.3d at 1130.

The Roadless Rule EIS's alternatives analysis, given the agency's purpose and objective, was no narrower than many others that have passed muster before the Tenth Circuit. See, e.g., Greater Yellowstone Coal. v. Flowers, 359 F.3d 1257, 1278 (10th Cir. 2004) (accepting alternatives analysis for ranch development where, "by the time [NEPA documents] were prepared, it was largely recognized that" developer's proposal "was the only alternative considered that would satisfy ... the project's purpose"); Lee v. U.S. Air Force, 354 F.3d 1229, 1238-40 (10th Cir. 2004) (upholding EIS that rejected consideration of alternative locations for military training facility); Citizen's Comm. To Save Our Canyons v. U.S. Forest Serv., 297 F.3d 1012, 1031-32 (10th Cir. 2002) (approving analysis of alternatives to construction of large mountaintop building that rejected consideration of smaller or off-site alternatives); Colo. Envtl. Coal. v. Dombeck, 185 F.3d 1162, 1174-76 (10th Cir. 1999) (approving NEPA analysis that rejected consideration of alternative that fell below minimum threshold of skiable terrain for a resort expansion); AWARE, 153 F.3d at 1130 (affirming agency's rejection of mass transit alternatives to highway construction project). Wyoming's attack on the FEIS's range of alternatives is impossible to square with this case law.[16]

---

[16] Wyoming ignores the mass of Tenth Circuit case law concerning NEPA's alternatives requirement and primarily relies instead on a Ninth Circuit case, California v. Block, 690 F.2d 753 (9th Cir. 1982). Wyoming Br. at 29. Wyoming's reliance on Block is badly misplaced. The issue in Block was whether the Forest Service looked at an adequate range of alternatives when it was deciding how to allocate wilderness between development and preservation. Block, 690 F.3d at 767. All of the alternatives assumed that at least 37% of the areas should be developed. In carrying out its analysis, the Ninth Circuit looked to whether the agency ignored alternatives that would have been responsive to the "underlying

By demanding that the Forest Service explore additional alternatives that would not serve the agency's reasonable purpose and need in this case, Wyoming asks this Court to require a more searching alternatives analysis for the Roadless Rule – a project that fundamentally preserves the environment – than the Tenth Circuit and others have demanded for projects that significantly harm the environment. The Tenth Circuit has rejected such an approach. As the court explained, when, as here, "an agency makes an informed decision that the environmental impact will be small, a view which [the Court is] required to accord deference, … a less extensive search for reasonable alternatives is required." Greater Yellowstone Coal., 359 F.3d at 1278 (internal quotations, alteration, and citation omitted) (emphasis added); see also App. 8:1298 (Forest Service concluding the Roadless Rule makes no irreversible or irretrievable commitments of resources, but instead preserves roadless areas – and all options for their management – for future generations). Cf. Sierra Club v. Hodel, 848 F.2d 1068, 1093 (10th Cir. 1988) (requiring agencies to perform NEPA's "hard look before committing themselves irretrievably to a given course of action, so that the action can be shaped to account for environmental values") (emphasis added). As the Ninth Circuit stated:

> [G]iven that the conservation and preventative goals of the Forest Service in promulgating the Roadless Rule are entirely consistent with the policy objectives

---

environmental policy," by which the court meant the action's purpose and need. Id. Because there was "no justification" for the 37% cut-off used by the agency, and because more protective alternatives would have fit within the purpose and need, the Ninth Circuit rejected the Forest Service's range of alternatives as impermissibly narrow. Id. at 767-769. If it is going to have a cut-off, the court explained, it must be justified in the record. Id. at 768-769. Block does not help Wyoming because, in the instant case, the prohibition on roadbuilding is consonant with the purpose and need in the Roadless Rule EIS. Furthermore, unlike the artificial 37% cut-off in Block, there is ample fiscal and ecological justification in the record for the Forest Service's conclusion that only a general roadbuilding prohibition is necessary to meet the Rule's purpose. See text supra at 3-4, 16-17.

of NEPA, as well as with the Forest Service's own mission, it would turn NEPA on its head to interpret the statute to require that the Forest Service conduct in-depth analyses of environmentally damaging alternatives that are inconsistent with the Forest Service's conservation policy objectives.

Kootenai Tribe, 313 F.3d at 1122 (footnotes omitted).[17]

### 2.    The Forest Service Adequately Considered The Cumulative Impacts Of The Roadless Rule.

NEPA's regulations require that agencies consider the "cumulative impacts of 'past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.'" Colo. Envtl. Coal., 185 F.3d at 1176 (quoting 40 C.F.R. § 1508.7). Wyoming's claim that the Forest Service violated this regulation when it adopted the Roadless Rule must be rejected. Wyoming Br. at 32-34. The cumulative impacts regulation does not require agencies to do the impossible. See Utahns for Better Transp. v. U.S Dep't of Transp., 305 F.3d 1152, 1176 (10th Cir. 2002) ("Agencies only have a duty to discuss in the FEIS impacts that are reasonably foreseeable."). Nor, under Tenth Circuit precedent, does it require agencies to consider the cumulative impacts of actions with

---

[17] Wyoming complains the Forest Service did not consider new alternatives to the Roadless Rule after the agency shifted proposed procedural aspects of roadless area management to new forest planning regulations, rather than including them in the Roadless Rule itself. Wyoming Br. at 31. However, the Forest Service never intended the procedures discussed in the Draft Roadless Rule EIS to function as alternatives to the prohibitions of the Roadless Rule; they were designed to supplement the Roadless Rule by permitting consideration of "appropriate additional management protection for inventoried roadless areas." App. 2:569a (emphasis added). Thus, there was no reason why shifting these procedures from the Roadless Rule to the planning regulations should have triggered consideration of new alternatives to the Roadless Rule. In any event, the procedural aspects of Roadless Rule management were amply considered in the Forest Service's process of crafting new planning regulations, which was open to Wyoming and all others.

22

"independent utility" from one another. See Airport Neighbors Alliance v. United States, 90
F.3d 426, 429-31 (10th Cir. 1996).

The Forest Service's discussion of the Roadless Rule's potential cumulative impacts fully
comports with the "rule of reason" applied to such matters by the Tenth Circuit. Envtl. Def.
Fund v. Andrus, 619 F.2d 1368, 1375 (10th Cir. 1980); Utahns, 305 F.3d at 1163. The FEIS
thoroughly explained how the Roadless Rule's prohibition on roadbuilding would dovetail with
management guidance set forth in the Planning Rule, Road Management Rule and
Transportation Policy being considered when the Roadless Rules was promulgated. See App.
6:926-31; App. 7:1133; App. 7:1288-90. And, to the extent possible, the agency disclosed the
potential impacts of implementing these alternatives together. For instance, the Forest Service
stated that it "anticipated that the majority of the existing roads will continue to be needed for
management," App. 6:927, that in the West, "[e]liminating roads to reduce road density and not
creating unroaded areas is likely to be the most common [road] decommissioning scenario
accounting for perhaps 90% or more of road decommissioning decisions," App. 6:930, that
unroaded areas "are likely to increase by 5% to 10%" but that "it is less likely that unroaded
areas would be expanded in the East due to the way these forests were reserved" among other
factors. Id. Ultimately, the agency offered a straightforward assessment of cumulative impacts:
"given that a purpose of the Roadless Rule is to conserve roadless characteristics, if the ... rules
are implemented together, it is reasonable to predict that more inventoried roadless areas would
be allocated to management uses that maintain undeveloped roadless characteristics than may
have been allocated under the Planning Regulations alone" and that "the proposed Roads Policy

23

[set forth in the Road Management Rule and Transportation Policy] would result in better road planning and a probable decrease in road construction overall." App. 7:1289-90.

In the Roadless Rule EIS, further analysis of the cumulative impacts of the planning rule, road management rule, and transportation policy would have been wholly speculative because these three were merely planning provisions to be applied in the context of later forest-specific decision-making. See 65 Fed. Reg. 67,514 (Nov. 9, 2000); 66 Fed. Reg. at 3,250 (Jan. 12, 2001); 66 Fed. Reg. 3,219 (Jan. 12, 2001). They did not dictate whether to build or close any particular road, but simply established a framework for evaluating future proposals to manage roads on a forest-by-forest basis. Until local forest officials actually used this new planning criteria to reach decisions on individual local projects, the Forest Service could only speculate about cumulative impacts with the Roadless Rule. Thus, the Forest Service necessarily concluded it was "not possible to predict the outcome to NFS roads on individual national forests and grasslands from decisions that will be made from the combined implementation of the Planning Regulations, the Roads Policy, and the alternatives considered in this FEIS." App. 6:927 (actual implementation of the new roads initiative would be "dependent on many factors including budgets, environmental risks, capabilities of the land, and use"). Under the law of this Circuit, NEPA does not require any further analysis of such speculative actions. See Airport Neighbors Alliance, 90 F.3d at 429-31 (explaining that such an analysis would be a "gross misallocation of resources, would trivialize NEPA and would diminish its utility in providing useful

environmental analysis for major federal action that truly affect the environment") (quotation omitted).[18]

In any case, as Wyoming well knows – but fails to mention in its complaint or brief – the Forest Service never carried out the alleged "strategy" embodied in the Planning Rule, Transportation Policy and Road Management Rule. In July of 2001, the Forest Service issued a directive suspending the Transportation Policy's provisions for roadbuilding in unroaded and inventoried roadless areas, and the agency's policy manual has since been formally amended to reflect that directive. See 68 Fed. Reg. 69,986 (Dec. 16, 2003). This Court should not invalidate the Roadless Rule on the grounds the Forest Service failed to sufficiently analyze theoretical cumulative impacts with a planning provision that did not even exist when Wyoming filed its complaint in this case.[19]

The lone element of the Forest Service's alleged "comprehensive strategy" being implemented today is the Road Management Rule, which does nothing more than direct forest officials to "identify the minimum road system needed for safe and efficient travel and for

---

[18] Wyoming's cumulative impacts argument is notable for failing to pinpoint what more the Forest Service should or could have done in its cumulative impacts analysis. For example, the State does not point to any particular resource that would be impacted in an unanalyzed fashion as a result of the interaction of the several rules. Instead, the State simply claims generally that something more was required. Such general and unspecified complaints do not satisfy a plaintiff's burden in a NEPA case.

[19] Similarly, although the 2000 Planning regulations have nominally sprung back to life as a result of a recent legal challenge to the 2005 regulations that took their place (Citizens for Better Forestry v. U.S. Dep't of Agric., 481 F. Supp. 2d 1059, 1100 (N.D. Cal. 2007)), the Forest Service does not appear to be preparing any land use plans or amendments pursuant to the 2000 rules. See Directive from Forest Service Washington Office to Regional Foresters (April 27, 2007) (App. 9:1708-10). Furthermore, it appears that even the nominal revival of the 2000 regulations may be short-lived as the Forest Service is moving quickly to remedy the 2005 rule's legal failings so the 2005 rule can go back into effect. See 72 Fed. Reg. 48,514 (August 23, 2007) (announcing release of draft EIS for NFMA planning regulation that is essentially identical to the 2005 rule).

25

administration, utilization, and protection of National Forest System lands" for each individual forest unit. 36 C.F.R. § 212.5(b) (emphasis added); see also Wyoming, 277 F. Supp. 2d at 1214 (recognizing the Road Management Rules lacks "any on-the-ground impact for road construction"). Because the Roads Management Rule lacked any action-forcing mechanism with quantifiable on-the-ground impacts, the Forest Service could not possibly have determined when the Roadless Rule was promulgated how this directive would be implemented at the local level. The Ninth Circuit was correct to conclude, therefore, that any "potential cumulative effect" from the Roadless Rule's implementation in concert with the Road Management Rule "was too speculative to be amenable to in-depth analysis in the EIS." Kootenai Tribe, 313 F.3d at 1123.

The fact that the various rules discussed above have been implemented to varying degrees over the past several years undermines Wyoming's cumulative impacts claim still further. The Tenth Circuit employs an "independent utility test," under which separate actions must be addressed in a single NEPA analysis only where the actions are "so interdependent that it would be unwise or irrational to complete one without the others." Utahns, 305 F.3d at 1173; see also Airport Neighbors Alliance, 90 F.3d at 430-31 (NEPA analysis for airport runway expansion need not look at cumulative impacts of that expansion with other potential airport projects because it would not be unwise or irrational to do the runway project alone). While Wyoming cites to this standard, Wyoming Br. at 32, the State has never even attempted to demonstrate – as it must in order to succeed on this claim – that it would be "unwise or irrational" to adopt the Roadless Rule in the absence of the other rules. That the various rules have gone into and out of effect without affecting the viability of the other rules proves any such

interdependence argument must fail. See also Wyoming Br. at 33 (Wyoming's recognition that the various planning efforts are "separate"). Because Wyoming has not proven that the rules – especially the Roadless Rule – lack any independent utility, the State's cumulative impacts argument must fail.

### 3. A Supplemental EIS Was Not Required.

An agency must prepare a supplemental EIS when it "makes substantial changes in the proposed action that are relevant to environmental concerns," or when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1). "This requirement is not interpreted to require a supplemental environmental impact statement 'every time new information comes to light.'" Colo. Envtl. Coal., 185 F.3d at 1177 (quoting Marsh v. Or. Natural Res. Council, 490 U.S. 360, 373 (1989)). A supplemental EIS is required only "if the new information is sufficient to show [the proposed action] will affect the quality of the human environment in a significant manner or to a significant extent not already considered." Marsh, 490 U.S. at 374.

Wyoming claims the Forest Service was required to prepare a supplemental EIS because the impacts of applying the Rule's road construction and timber harvest restrictions was not assessed in the Draft EIS. Wyoming Br. at 36. The State misreads the Rule when it asserts it applies fully to roaded areas. It does not. The Forest Service initially proposed to apply prohibitions on roading and logging within "unroaded portions of inventoried roadless areas." App. 3:553-55. In response to public comments, see App. 6:859 n.3; 66 Fed. Reg. at 3251, the Forest Service modified its alternatives in the Final EIS to apply to inventoried roadless areas in

27

their entirety, including the small percentage of previously developed areas within their boundaries. See App. 6:859-62; App. 6:877; 66 Fed. Reg. at 3251; 66 Fed. Reg. at 3246 (roaded portions of inventoried roadless areas comprise only 2.8 million acres (4.8%) of the 58.5 million acres initially subject to the Roadless Rule).

If the process had ceased at that stage, Wyoming's argument would have been accurate. However, the FEIS's proposed application of the Rule to roaded areas led commenters to question "why the agency would seek to protect roadless area values and characteristics in areas that have already been roaded and had timber harvest." 66 Fed. Reg. at 3251. In response, the agency modified its final rule by carving out an exception for timber harvest in "portions of inventoried roadless areas that no longer possess roadless characteristics" because of road construction. Id.; see also 36 C.F.R. § 294.13(b)(4) (Addendum at 30). Consequently, the timber prohibition does not apply to roaded and logged areas in inventoried roadless areas. Moreover, this is precisely how NEPA should operate: At every stage in the decision-making process, the Forest Service meaningfully addressed public comment by modifying its proposal. As the Council for Environmental Quality makes clear, "responses [to comments] should result in changes in the text of the EIS, not simply a separate answer at the back of the document." 46 Fed. Reg. 18,026, 18,034 (March 23, 1981) (emphasis added).

In addition to overstating the change to the Rule after the DEIS, Wyoming's argument ignores the fact that a supplemental EIS is not required whenever there is a change in the action, but only when the alteration "will affect the quality of the human environment in a significant manner or to a significant extent not already considered." Marsh, 490 U.S. at 374. Wyoming

28

does not attempt to carry its burden of detailing such unanticipated impacts. Furthermore, the record demonstrates that no "significant" unanalyzed impacts exist. As the Final EIS explains, "[t]he effects analysis in the DEIS was actually based on application of the prohibitions to entire roadless areas, since data was not specific to roaded or unroaded portions." AR 6:859.

The EIS also makes clear that, "[n]o existing roads or trails would be closed by the prohibitions. No new roads would be built in inventoried roadless areas, and existing roads could not be reconstructed. Therefore, at a minimum, the current level of roaded access to inventoried roadless areas would be maintained, as would all forest uses associated with existing access." App. 6:933-34. Thus, the final Roadless Rule essentially maintained the status quo in roaded portions of inventoried roadless areas and so did not "affect the quality of the human environment in a significant manner or to a significant extent not already considered." Marsh, 490 U.S. at 374 (internal quotation and citation omitted).[20]

Similarly, a supplemental EIS was not necessary for minor boundary adjustments that clarified the Rule's scope. Wyoming Br. at 35. In its Final EIS, the Forest Service corrected selected maps of inventoried roadless areas, incorporated certain inventory changes made through public processes at individual National Forests, and included in its inventory those roadless lands already covered by special protective designations, such as National Recreation Areas. See App. 6:877; App. 2:389-411. As a result, the total of inventoried lands subject to the Roadless Rule rose from 54.3 million to 58.5 million acres between the Draft EIS and Final EIS.

---

[20] Even if the Roadless Rule had been applied fully to the roaded areas – which it is not – the application of the Rule to an additional 2.8 million acres cannot justify the nationwide invalidation and injunction of the Rule when those 2.8 million acres constitute less than 5% of the roadless land affected by the Rule.

29

See App. 6:877.[21]  Nearly 90% of these added acres already were protected from roadbuilding and logging.  Lands given new protection by the Roadless Rule itself increased by 500,000 acres, which amounts to less than 1% of the total area covered by the Roadless Rule.  Compare App. 3:557 with App. 6:894.

Given that nearly all of the added acres were protected from development without the Roadless Rule, and that the added acres share the same features of (and in most cases are contiguous with) the lands assessed in the Draft EIS, the corrected acreage figures did not implicate environmental effects not already considered by the Forest Service.  See Swanson v. U.S. Forest Serv., 87 F.3d 339, 344 (9th Cir. 1996) (rejecting argument that changed legal status for fish species required supplemental EIS for logging projects where fish's biological status was considered in original EIS and was unchanged).

Moreover, the public had an opportunity to comment on those changes.  Acreage changes in the FEIS came as no surprise to the public.  The Forest Service made clear in its draft rule that it would apply the Roadless Rule to all roadless areas "inventoried during the Forest Service's Roadless Area Review and Evaluation (RARE II) process, subsequent assessments, or forest planning."  65 Fed. Reg. 30,287 (May 10, 2000).  It also advised the public that these areas were depicted on maps maintained at the Forest Service's national headquarters and that:

> [i]n the event a modification to correct any clerical, typographical, or other
> technical error is needed, the change will be made to the national headquarters

---

[21] The map volume published with the FEIS included corrected and updated maps depicting all 58.5 million acres of roadless areas that were ultimately subject to the Rule.  Compare, e.g., App. 5:741 (omitting roadless areas within Hells Canyon National Recreation Area) with App. 9:1627 (depicting such areas).

maps and the corrected copies of the maps made available on the web at
roadless.fs.fed.us/. Prior to finalizing this proposed rule, map adjustments may be
made for forests and grasslands currently undergoing assessments or land and
resource management plan revisions.

Id. at 30,279. Thus, in adjusting inventoried roadless area acreage based on public comment and
internal data collection, the agency did nothing more than what it promised to do in its proposed
rulemaking. See App. 2:389-411 (documenting acreage changes between Draft EIS and Final
EIS); App. 8:1323 (summarizing updated Roadless Area Acreage by State, Region and Forest);
App. 2:412, 2:421 (explaining changes due to inclusion of "special designated areas" such as a
1.9-million-acre Inventoried Roadless Area in Alaska's Chugach National Forest that was
already protected within a wilderness study area). In the wake of these changes, "members of
the public had every right and ability after publication of the FEIS on November 13, 2000 to
comment further before adoption of the final rule on January 12, 2001." Kootenai Tribe, 313
F.3d at 1118.

Finally, Wyoming mistakenly claims the Forest Service was required to prepare a
supplemental EIS because the FEIS allegedly imposed a new restriction under which the
"stewardship logging exception" would be limited to "small diameter timber." See Wyoming
Br. 35. The exception does not impose the absolute restriction Wyoming alleges. 36 C.F.R. §
294.13(b)(1) states only that the stewardship exception will be limited to "generally small
diameter timber." Addendum at 30 (emphasis added). In any event, the final version of the Rule
did not mark a "significant" departure from the Draft EIS because the Draft EIS's impacts
analysis plainly anticipated that a stewardship logging exception would be invoked for small

31

diameter timber.  For example, the Draft EIS explains that little stewardship logging "would be done using timber sale contracts because the lower values of the smaller diameter trees removed would likely result in fewer economically viable timber sales."  App. 3:570h (emphasis added). See also App. 3:570g (Draft EIS explaining that the analysis assumes for all alternatives that fire risk – of the sort to be addressed through stewardship logging – is reduced "by disposing of the fine fuels … and the smaller diameter trees that create a 'fire ladder' to the crowns of the dominant trees in the overstory") (emphasis added) ; App. 3:570e & 570f (key purpose of steward logging is to reduce fire intensity "by reducing accumulated fuels"); App. 3:570b (many forests have poor forest health and are at heightened risk of wildfire because past fire suppression has left them with "dense stands of small diameter trees and shrubs") (emphasis added).  See also App. 6:1037 (Final EIS explaining that restoration of threatened and endangered species habitat would generally entail thinning of small diameter trees, not "larger and more fire resistant trees").

Because the Draft EIS explained – and assumed for the sake of its impacts analysis - that stewardship logging would focus naturally on shrubs and "small diameter trees," the Final Rule did not mark a "substantial change" that will cause "significant" new and unanalyzed environmental impacts.  Under the circumstances, there is no basis for second-guessing the Forest Service's decision not to prepare a supplemental EIS – a decision that is entitled to substantial deference.  See Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1524 (10th Cir. 1992).

32

### 4.    The Forest Service Satisfied NEPA's Scoping Requirements.

The scoping process represents the earliest stage of EIS development, during which the agency "solicits comments and input from the public and other state and federal agencies with the goal of identifying specific issues to be addressed and studied." Citizen's Comm., 297 F.3d at 1022. NEPA regulations "do not set forth a required procedure for scoping and leave most decisions on scoping procedures to the federal agency." Daniel R. Mandelker, NEPA LAW AND LITIGATION § 7.12 at 7-47 (2d ed. 2001). NEPA's scoping regulation merely requires an agency to "[i]nvite the participation" of affected and interested agencies and other entities and "[d]etermine the scope and the significant issues to be analyzed in depth in the [EIS]." 40 C.F.R. § 1501.7(a)(1), (2).

Here the Forest Service met and exceeded these requirements, going far beyond what it normally does at the scoping stage. The agency published a detailed Notice of Intent to Prepare an EIS (NOI) in the Federal Register soliciting public comment on the scope of its Roadless Rule EIS, held nearly 200 public scoping meetings, created a website to solicit even more public comment, and then carefully categorized and analyzed the resulting 517,000 public comments to guide its EIS process. See supra at 5-6. This was more than sufficient to satisfy 40 C.F.R. § 1501.7's general command for the agency to "[i]nvite the participation" of affected parties and "[d]etermine the scope" of the Roadless Rule EIS.

Nevertheless, Wyoming insists that the Roadless Rule violated NEPA and must be enjoined because the Forest Service allegedly failed to provide detailed roadless area maps

33

during the scoping stage. The Ninth Circuit rejected an identical argument, Kootenai Tribe, 313 F.3d at 1117, and this Court should do likewise.

First, as a matter of law, NEPA's scoping regulations do not even mention maps – much less require agencies to fill the Federal Register with maps of all areas affected by their proposals – nor do they require extension of the scoping period at the demand of a party such as Wyoming. See 40 C.F.R. § 1501.7. Nor may courts create their own additional scoping or comment period requirements. See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, 435 U.S. 519, 548 (1978) (holding that court may not impose rulemaking procedures on federal agencies beyond those prescribed by Congress and emphasizing that "the only procedural requirements imposed by NEPA are those stated in the plain language of the Act"); Phillips Petroleum Co. v. EPA, 803 F.2d 545, 559 (10th Cir. 1986) (rejecting challenge to agency's refusal to extend public comment period, noting that "the formulation of procedure is to be basically left within the discretion of the agencies to which Congress has confined the responsibility for substantive judgments.").

Here the Forest Service's Roadless Rule NOI announced the agency was considering new development restrictions involving "inventoried roadless areas, as previously identified in RARE II and existing forest plan inventories." 64 Fed. Reg. at 56,307. Given that these RARE II and forest plan inventories have been the focus of public debate for decades, see App. 6:837, such

34

disclosure alone reasonably informed the public of the nature of the proposed Forest Service action.[22]

Second, Wyoming's claim that the Forest Service "did not provide any maps of the affected areas until ... over one month after the close of the scoping comment period" is simply false. Wyoming Br. at 8. The Forest Service displayed "large, colored GIS maps" depicting Wyoming roadless areas at the Wyoming scoping meetings. App. 2:285; see also App. 2:304-05.[23] If Wyoming was ignorant during the scoping process of where its own roadless areas were, it was not for want of detailed maps from the Forest Service.[24]

_____

[22] Wyoming's professed ignorance during the scoping process concerning where the State's inventoried roadless areas are located is not credible. Wyoming was extensively involved in the Forest Service RARE II process that defined the inventoried roadless areas in the first place. See United States Forest Serv., RARE II Final Environmental Statement Appendix T (Jan. 1979) (describing Wyoming inventoried roadless areas), available at http://www.roadless.fs.fed.us/data/pdfdocs/rare2.pdf (last visited July 12, 2007); see also id. at viii-ix (documenting Wyoming's participation), 100 (describing distribution of roadless area information to "State agencies"); V-40 to V-43 (comment letter from then-Wyoming Gov. Herschler); see also Kootenai Tribe, 313 F.3d at 1117 (finding that "plaintiffs cannot seriously dispute that they had actual notice as to the roadless areas that would be affected, by virtue of their prior contact with the Forest Service"). Furthermore, National Forest inventoried roadless areas have been recognized and depicted by name on maps for decades and are routinely identified by name in National Forest planning documents. See, e.g., FEISs for Routt and Medicine Bow National Forest Plans, available at http://www.fs.fed.us/r2/mbr/projects/forestplans/routt/pdfdoc/feisapp/Appendix%20C.pdf; http://www.fs.fed.us/r2/mbr/projects/forestplans/mb/eis_apps/final_eis_app_c_rdless.pdf.

[23] Copies of some of the maps displayed at these meetings are reproduced at App. 4:571-74.

[24] In its earlier ruling, this Court cited to alleged Forest Service "admissions" that the agency's maps at the scoping stage were "incomplete, outdated, and simply inaccurate." Wyoming, 277 F. Supp. 2d at 1220. But the Forest Service did not purport to have comprehensive and absolutely precise nationwide roadless area mapping data at the early scoping stage of the EIS process. To the contrary, the agency acknowledged that such nationwide information was still being compiled, and advised local Forest Service officials to utilize existing roadless area maps published with individual forest plans in the meantime. See App. 2:387. Forest Service officials displayed such maps at the Wyoming scoping meetings, and those maps provided sufficiently detailed notice of the State's roadless areas. Moreover, the Forest Service undertook a diligent effort to update and correct its roadless area information throughout the EIS process. See, e.g., App. 2:365-86; App. 2:494-503 (all documenting corrections of roadless area data before Final EIS). As this Court pointed out in its earlier ruling, "[t]he maps

35

Third, a scoping error can not justify invalidation of the Roadless Rule. The Forest Service afforded Wyoming ample post-scoping opportunities to comment on the Roadless Rule as the agency issued a Draft EIS, with roadless area maps, followed by a 69-day public comment period, and a Final EIS, also with roadless area maps, followed by additional public comment before the final rulemaking. See App. 5:575-804; App. 9:1461-1701; 66 Fed. Reg. at 3247-48. Wyoming had every opportunity to raise its concerns, and its scoping complaints cannot justify invalidation of the Roadless Rule. See Nw. Coal. for Alternatives to Pesticides v. Lyng, 844 F.2d 588, 596 (9th Cir. 1988) (refusing to invalidate EIS based on scoping violation where plaintiff participated in the EIS process); Providence Road Cmty. Ass'n v. EPA, 683 F.2d 80, 81, 82 (4th Cir. 1982) (rejecting NEPA claim where agency hearing notices "did not specify the location of the proposed project"; "[e]ven though the [appellants] ... were unable to participate until the eleventh hour, their comments were received and considered ...."); Muhly v. Espy, 877 F. Supp. 294, 300-01 (W.D. Va. 1995) (finding exclusion from scoping process not prejudicial); 5 U.S.C. § 706 (providing that "due account shall be taken of the rule of prejudicial error" in review of agency actions).

## 5.     The Forest Service Did Not Violate Any Cooperating Agency Requirement.

Recognizing that additional parties may assist or unduly complicate a NEPA process, NEPA's regulations provide wide latitude to lead federal agencies in deciding whether to include non-federal agencies as cooperating agencies:

---

accompanying the final EIS generally identified the inventoried roadless areas within each state that were subject to the Roadless Rule." Wyoming, 277 F. Supp. 2d at 1210.

> Upon request of the lead agency, any other <u>Federal</u> agency which has jurisdiction by law shall be a cooperating agency. In addition any other <u>Federal</u> agency which has special expertise with respect to any environmental issue, which should be addressed in the statement may be a cooperating agency upon request of the lead agency. An agency may request the lead agency to designate it a cooperating agency.

40 C.F.R. § 1501.6 (emphasis added). Under the last sentence of this regulation, a state agency may participate as a cooperating agency only if the lead agency grants its "request."[25] There is nothing in § 1501.6 that requires a lead federal agency to grant cooperating agency status to any non-federal agency or sets a legal standard for deciding such a request.

Because NEPA's regulations do not set a standard for the Forest Service to follow in deciding whether to designate a non-federal agency a cooperating agency, the State cannot show that the agency's denial of its request was contrary to law or arbitrary. Indeed, because the regulation sets no discernable standard, the Forest Service's decision on Wyoming's request is "committed to agency discretion by law," leaving this Court without jurisdiction over the State's claim. 5 U.S.C. § 701(a)(2); <u>see also</u>, <u>e.g.</u>, Heckler v. Chaney, 470 U.S. 821, 830 (1985) (APA "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"); Webster v. Doe, 486 U.S. 592, 600 (1988); Biller v. Veneman, 2005 WL 2476244, *5 (10th Cir. 2005); McAlpine v. United States, 112 F.3d 1429, 1434 (10th Cir. 1997); Comm. Action of Laramie County, Inc. v. Brown, 866 F.2d 347, 353 (10th Cir. 1989).

---

[25] The definition of "cooperating agency" specifies that a state agency "may <u>by agreement with the lead agency</u> become a cooperating agency." 40 C.F.R. § 1508.5 (emphasis added).

37

Wyoming acknowledges that "granting or denying cooperating agency status is discretionary." Wyoming Br. at 25 (citing Wyoming, 277 F. Supp. 2d at 1221). Nevertheless, the State argues the Forest Service's decision not to grant Wyoming cooperating agency status should be subject to judicial review in this instance because of the "momentous nature of the proposed rule." Id. However, whether an action is committed to agency discretion by law, turns on the law, not the magnitude of the decision. Because the decision to grant or deny cooperating agency status is committed to Forest Service discretion by law, the agency's cooperating agency decision in this case is exempt from review regardless of the sweep of the Roadless Rule.[26]

In any event, the Forest Service's decision not to grant cooperating agency status to Wyoming was reasonable. Numerous states, counties, and assorted state and regional bodies requested cooperating agency status for the Roadless Rule. App. 2:361-64. The Forest Service recognized that, if these requests had been granted, each cooperating agency would want to work at a level of local, site-specific detail that would be incompatible with a national-level roadless rule.[27] App. 2:388; see also id. (noting that "[t]here is no precedence [sic] for granting cooperating agency status for a national EIS") (emphasis in original). In addition, granting cooperating agency status to all of these groups would have presented daunting logistical problems as each cooperating agency fought to ensure that its particular local interests were

---

[26] Wyoming claims the Forest Service's decision to deny the State cooperating agency status conflicts with an internal CEQ memorandum to agency heads. Wyoming Br. at 25. Such documents are non-binding and do not create a judicially enforceable duty. See, e.g., Western Radio Services Co., Inc. v. Espy, 79 F.3d 896, 901 (9th Cir. 1996).

[27] This is in keeping with this Court's conclusion that the Forest Service was not required to produce a site-specific analysis of the Roadless Rule's impacts. See infra note 29.

38

represented and protected in the Roadless Rule. Id. Turning down the cooperating agency requests under these circumstances was reasonable and certainly not so irrational as to be arbitrary and capricious and justify the invalidation of the entire Roadless Rule.

The agency's determination was even more clearly reasonable in light of the fact that the Forest Service, as a substitute, offered Wyoming and other western states the opportunity to participate in a specially created collaborative process that would have given the State a special opportunity for involvement in the rulemaking. The Forest Service proposed that each state designate a representative to gather and synthesize the views of the various state agencies and serve as a liaison between the other states and the Forest Service. App. 2:353-54. The Forest Service, in turn, would designate a special liaison to the governors. Id. Through this collaborative process, the Forest Service hoped to create an open line of communication and information sharing that would, among other things, guarantee a more effective and informed public involvement process. Id.

Wyoming never responded to the Forest Service's offer.[28]

### 6. The EIS For The Roadless Rule Was Sufficiently Site-Specific For Its National Purpose.

The State argues the Forest Service violated NEPA because the Roadless Rule EIS does not consider the site-specific impacts of such a national rule. Wyoming Br. at 38-41. Wyoming asserts at various points that the Roadless Rule EIS was legally required to tailor its analysis of a

---

[28] Wyoming claims the Forest Service's rejection of the State's cooperating agency resulted in the agency's being deprived of "relevant and valuable information." It is telling that Wyoming never says what that information was. Nor does the State explain why it was unable to provide its "relevant and valuable information" to the Forest Service during the public comment periods on the Roadless Rule.

national rule to "individual forest management parcels," "land type," "ecosystem type," "separate inventoried roadless areas," or "each particular forest." Wyoming Br. at 38-40. Wyoming's failure to offer a consistent site-specificity requirement is a telling reflection of the fact that its argument is unmoored from any forest planning or NEPA provision. See Wyoming, 277 F. Supp. 2d at 1227 (this Court noting in its earlier decision that Wyoming's argument is not based on any "clear statutory or regulatory directive"). The State's claim that an EIS for a national rule affecting the entire 192 million-acre national forest system must offer the same local detail as a NEPA analysis for a project affecting a single roadless area has no legal foundation and would plainly make it impossible for any land agency to adopt national regulations. This Court rejected Wyoming's argument initially and it should do so again. See id.[29]

Wyoming's argument relies entirely on a single Ninth Circuit decision, California v. Block, 690 F.2d 753 (9th Cir. 1982). That case, however, undermines rather than supports the State's argument. The purpose of the roadless area review (referred to as "RARE II") at issue in Block was to designate certain areas for wilderness use and – more importantly – to designate certain other areas for development. Id. at 767. The court concluded the agency failed to adequately evaluate the site-specific impacts on sites designated for development. Id. at 760-65. However, in a portion of the Block decision that Wyoming ignores, the Ninth Circuit held that NEPA did not require the Forest Service to conduct a similarly site-specific analysis for areas left alone for further wilderness consideration because a wilderness designation would cause no environmental consequences. The court stated:

---

[29] Wyoming claims this Court was "reluctant to address" the State's site-specificity claim. Wyoming Br. at 39. In truth, this Court addressed, and rejected, the argument. See Wyoming, 277 F. Supp. 2d at 1227.

40

> Webco argues that if the Final RARE II EIS is legally insufficient to support the
> Nonwilderness designations, the same EIS cannot be held legally sufficient to
> support the Wilderness designations. We disagree. California's complaint below
> urged only that the Forest Service's Nonwilderness designations failed to follow
> these procedures, limiting the scope of the litigation to this single area. Moreover,
> NEPA's central requirement is that agencies must take a "hard look" at the
> environmental consequences of its proposed action. It is unclear why a more
> intensive review of the Wilderness designations' environmental consequences
> might have given the Forest Service reason to reconsider its Wilderness
> recommendations and allocate additional areas to Nonwilderness.

Id. at 776. Contrary to the State's argument, therefore, the lesson to be drawn from Block is not

that a rule or policy with national scope requires evaluation of the multitude of site-specific

impacts. Indeed, such a requirement would make national-level decision-making impossible.

Rather, Block stands for the logical proposition that where the nature of a proposed action is to

protect resources from development, especially at a national scale, a site-specific catalogue of

impacts is not required because the proposed action does not call for a commitment of resources

to development.

The goal of the Forest Service in the Roadless Rule was to protect roadless areas

nationwide from certain especially widespread and harmful activities, including roadbuilding.

This goal was based on the agency's finding that roadless areas supply ecological benefits

nationwide and its conclusion that a highly regionalized approach would frustrate the stated

purpose of and need for the Rule. Nevertheless, the Forest Service did consider the role of local

decision-makers and local decisions under the Roadless Rule in evaluating the probable impacts

of the Rule. The Federal Register notice announcing the Roadless Rule itself summarizes the

process by which the agency balanced its consideration of national versus local impacts. It

states:

> At the national level, Forest Service officials have the responsibility to consider
> the "whole picture" regarding the management of the National Forest System,
> including inventoried roadless areas. Local land management planning efforts
> may not always recognize the national significance of inventoried roadless areas
> and the values they represent in an increasingly developed landscape. If

41

management decisions for these areas were made on a case-by-case basis at a forest or regional level, inventoried roadless areas and their ecological characteristics and social values could be incrementally reduced through road construction and certain forms of timber harvest. Added together, the nation-wide results of these reductions could be a substantial loss of quality and quantity of roadless area values and characteristics over time.

\* \* \*

One perspective is that decisions concerning management of inventoried roadless areas should be left to the local responsible official, without national intervention. The other perspective is that national prohibitions on road constructions, reconstruction, and timber harvest in inventoried roadless areas, along with a stop to other activities, must occur from a national level, as local decisionmaking does not always reflect the national significance of the issues involved. The agency considered and attempted to balance both perspectives throughout this rulemaking.

66 Fed. Reg. 3246, 3248 (Jan. 12, 2001).

In short, in seeking a site-specific analysis of impacts from the Roadless Rule, the State

understates the authority of local agencies to initiate and carry out land management activities

after promulgation of the final Rule and their responsibility to assess the site-specific impacts of

such decisions when they occur. The Rule itself recognizes that local officials are those persons

best informed and equipped to modify or make necessary adjustments to management plans

within the context of the Rule, including its exceptions. As a result,

[l]ocal responsible officials' discretion to initiate land and resource management plan amendments, as deemed necessary, would not be limited by this provision. There may be instances where a local responsible official elects to initiate amendment or revision of forest and grassland plans following final promulgation of this final rule. While the analysis undertaken at the national scale is sufficient for the prohibitions established pursuant to this rulemaking, the Department appreciates that additional management issues may need to be addressed, both within and outside of inventoried roadless areas. The local official is best positioned to assess whether any such adjustment is necessary.

66 Fed. Reg. at 3259 (Jan. 12, 2001).

Finally, it is worth noting that, notwithstanding its complaint regarding the lack of a site-

specific analysis, the State fails to identify any unique effects of protecting roadless areas from

42

development that were not disclosed in the Roadless Rule EIS. The EIS describes the various kinds of consequences that may arise from protecting roadless areas against activities that impair their character and values. App. 6:893-8:1301. The State fails to identify any unique effects from the Roadless Rule that are not encompassed by this "analysis undertaken at the national scale . . . for the prohibitions established pursuant to this rulemaking." 66 Fed. Reg. at 3259 (Jan. 12, 2001). In sum, the analysis of the impacts of the Roadless Rule is appropriate and complete for the nature of the proposed action – a national decision to forego committing resources to development on certain national forest lands.[30]

_____

[30] Wyoming asserts dramatically – and without citation – that the Roadless Rule will have "catastrophic consequences for millions of acres of National Forest land" allegedly at risk of wildfire because they have become overgrown as a result of past fire policy or because of insect infestation. Wyoming Br. at 41. Wyoming's dire forecast ignores the Roadless Rule's exception for roadbuilding necessary to protect public health and safety from "fire, or other catastrophic event." Addendum at 28 (36 C.F.R. § 294.12(b)(1). Wyoming also ignores 36 C.F.R. § 294.13(b)(1)(ii) (Addendum at 30), which allows cutting and removal of "small diameter timber" to reduce the risk of uncharacteristically intense fires. The State's suggestion that 7.5 million acres would be vulnerable to fire because of the alleged unavailability of "mechanical treatment," Wyoming Br. at 39 (citing App. 6:987), ignores the FEIS's explanation that while thinning will not be available on these lands, "other mechanical fuel treatments, such as crushing, piling, or limbing would be permitted, as would construction of firelines and fuelbreaks needed to implement effective fire use." App. 6:988. Wyoming similarly ignores the FEIS's 20-page fire suppression analysis, which concludes that, "[b]ecause a majority of the fire suppression activities will continue to take place outside of inventoried roadless areas [because of the agency's emphasis on treating less remote areas where fire poses more of a threat to life and property], the cumulative effect of applying the Roadless Rule to them is negligible." App. 6:1006. See also App. 6:988 (FEIS citing published paper in which a team of forest ecologists concludes that "[n]o evidence supports the view that natural forests or reserves are more vulnerable to disturbances such as wildland fire, windthrow, and pests than intensively managed forests."); App. 6:1012 (FEIS's conclusion that even under no-action alternative "[i]t is unlikely that national forest managers would have any substantive impact on insect and disease condition over the next 5 years"); App. 6:120-121 (difference in the long-term between roadless area acreage than might be treated for forest health improvement under no-action and preferred alternatives is approximately 13,000 acres annually a miniscule fraction of the 58.5 million acres covered by the Rule).

43

**C.    The Adoption Of The Roadless Rule Did Not Violate The Wilderness Act.**

### 1.    The Wilderness Act

The Wilderness Act established a "National Wilderness Preservation System" whose purpose is to "secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C. § 1131(a). In order to qualify for wilderness designation, an area must "appear[] to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable." 16 U.S.C. § 1131(c).

Once designated as a wilderness area, new commercial development and other activities that mark the landscape are generally prohibited. 16 U.S.C. § 1133(c). For example, the Wilderness Act generally prohibits commercial enterprises, temporary or permanent roads (regardless of their purpose), aircraft landing strips or helicopter landing pads, the use of motorized vehicles, motorized equipment, motorboats or other forms of mechanical transport, the landing of aircraft or dropping of materials, supplies, or persons from an aircraft, any structures or installations, the cutting of trees for non-wilderness purposes, and the appropriation and disposition of minerals. 16 U.S.C. § 1133(c) & (d)(3); 36 C.F.R. § 293.6.[31]

As a first step towards establishing a wilderness system, Congress directed the Secretaries of Agriculture and Interior to review specific federal lands under their jurisdiction and determine, within ten years, which lands qualified for wilderness designation by Congress, the sole body empowered to establish formal wilderness areas. 16 U.S.C. § 1132(a)-(c). After abandoning its initial Roadless Area Review and Evaluation (RARE I) – an evaluation

---

[31] These restrictions are much stronger than those that flow from the Roadless Rule. See infra note 32.

undertaken by the Forest Service independently of the Wilderness Act's review provision -- the Forest Service finally completed a nation-wide wilderness study, RARE II, in 1977 and issued its wilderness recommendations in an environmental impact statement (EIS) on January 4, 1979. See California v. Block, 690 F.2d 753, 758 (9th Cir. 1982) (describing RARE II process).

Over the years, many of the wilderness-eligible lands identified in RARE II have been added by Congress to the wilderness system, while many others have been logged or otherwise developed and rendered ineligible for wilderness designation. Other lands identified through RARE II inventories have remained unroaded and undeveloped. These areas are well known and, indeed, identified by name on government maps and in National Forest plans. See App. 4:571-73; supra note 22 (describing State of Wyoming's involvement in the RARE II process). As noted above, the Forest Service and the public have become increasingly aware over the years of the broad ecological and other values of the remaining inventoried roadless areas. Supra at 3-4.

### 2.    The Roadless Rule Does Not Violate The Wilderness Act.

Wyoming claims the Roadless Rule illegally creates "de facto wilderness" in violation of the Wilderness Act. Wyoming Br. at 47-50. The State's argument fails in numerous respects. First, the Roadless Rule does not conflict with the Wilderness Act provision that only Congress may add areas to the National Wilderness Preservation System, 16 U.S.C. § 1131(a), because the Roadless Rule does not designate, or attempt to designate, any wilderness areas. The Roadless Rule only imposes a particular protective management regime on National Forest roadless areas; it does not add any land to the National Wilderness Preservation System and does not subject any

45

land to the particular suite of management restrictions that apply within the Wilderness System.

The Roadless Rule restricts just two activities: roadbuilding and commercial logging. 36 C.F.R.

§§ 294.12-.13. Apart from logging, multiple uses that are prohibited by the Wilderness Act are

free to continue under the Roadless Rule as long as they do not involve road-building. [32]

Moreover, under the Rule, existing classified roads on the affected lands may be maintained and

used, 36 C.F.R. § 294.12(c), and rights of access to locatable mineral exploration and

development of valid claims are not affected, 66 Fed. Reg. at 3255. Furthermore, unlike the

Roadless Rule, whose scope, terms and existence may be altered by this or any other

---

[32] Wyoming ignores the significant differences between Wilderness Area management and the restrictions imposed by the Roadless Rule. For example, although barred in wilderness areas, motorized recreational use is common in roadless areas and would continue unhindered by the Roadless Rule. See 66 Fed. Reg. at 3249 (multiple uses that do not require road-building, "including motorized uses, grazing, and oil and gas development," may continue); App. 7:1171 (FEIS discussion of ORV use in roadless areas); Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 60 (2004) (referring to damage done by off-road vehicles in wilderness study areas, which are, by definition, roadless). Non-motorized mechanized recreation such as bike riding, also prohibited within wilderness areas, likewise is common within roadless areas. App. 3:513-16 (International Mountain Biking Association letter in support of Roadless Rule explaining that it would oppose the imposition of travel restrictions akin to those that apply in wilderness areas). By the same token, while barred in designated Wilderness, new oil and gas exploration and development may occur in National Forest roadless areas under the Roadless Rule with "no surface occupancy" lease restrictions that allow development through directional drilling without additional roads. See Addendum at 49, 51, 68-69, 74, 77, 80, 83, 89, 91-92 (listing oil and gas development as a permitted use for management prescriptions applied to roadless areas); App. 7:1151-52 (describing how oil and gas leasing may proceed in roadless areas through technologies such as directional drilling); United States Dep't of Interior, Bureau of Land Management, Finding of No Significant Impact/Decision Record, Stone Cabin 3D Seismic Project (March 19, 2004), available at http://governor.utah.gov /rdcc/Y2004/04-3878.pdf (describing how oil and gas exploration will be conducted without ground disturbance in a roadless area) (last visited July 18, 2007). As these examples demonstrate, the Roadless Rule protections are significantly different and more relaxed than those afforded congressionally designated Wilderness. Finally, it is worth noting that the Roadless Rule does not eliminate livestock use; cattle are grazed in countless National Forest roadless areas throughout the country, including the Routt and Medicine Bow National Forests in Wyoming. Addendum at 68-69, 89 (listing grazing as a permitted use for management prescriptions applied to roadless areas); App. 7:1181-82 (describing grazing activities in roadless areas and stating that a ban on road construction would have no effect on grazing).

administration through rulemaking, changes to the size or management of the Wilderness System require congressional action.

Second, and more fundamentally, the Wilderness Act does not repeal the Forest Service's long-standing authority to protect sensitive non-Wilderness areas from development. App. 1:231-32. This authority comes from at least two of the bedrock statutes governing National Forest management: the Forest Service's 1897 Organic Act, 16 U.S.C. §§ 472-482, 551, and the Multiple-Use Sustained-Yield Act (MUSYA), 16 U.S.C. §§ 528-531. The Wilderness Act did not repeal or limit the Forest Service's management authority under either statute.

A key provision of the Organic Act, 16 U.S.C. § 551, empowers the Secretary of Agriculture to "make such rules and regulations" as are necessary to regulate the "occupancy and use" of the National Forest System and to "preserve the forests thereon from destruction." Over the past ninety-six years, courts have repeatedly recognized the Forest Service's broad regulatory authority under § 551. See, e.g., United States v. Grimaud, 220 U.S. 506, 521-23 (1911); Clouser v. Espy, 42 F.3d 1522, 1538 (9th Cir. 1994); Wilson v. Block, 708 F.2d 735, 756-60 (D.C. Cir. 1983); Denver v. Bergland, 695 F.2d 465, 476 (10th Cir. 1982); United States v. Weiss, 642 F.2d 296, 298 (9th Cir. 1981); Mountain States Tel. & Tel. Co. v. United States, 499 F.2d 611, 613-18 (Ct. Cl. 1974); United States v. Hymans, 463 F.2d 615, 617-18 (10th Cir. 1972); Jones v. Freeman, 400 F.2d 383, 388-89 (8th Cir. 1968); Elko County Bd. of Supervisors v. Glickman, 909 F. Supp. 759, 764 (D. Nev. 1995). There is not a hint in any of these cases that the Forest Service's authority to adopt regulations protecting areas of the National Forests under § 551 was restricted by the Wilderness Act. This absence is most telling in a post-Wilderness

47

Act case, McMichael v. United States, 355 F.2d 283 (9th Cir. 1965), in which the Ninth Circuit confirmed that § 551 authorized Forest Service regulations protecting undeveloped National Forest lands. In doing so, the court squarely rejected Wyoming's present argument "that regulations establishing primitive, wilderness and wild areas and providing limitations upon the use to be made of such areas are not authorized by section 551," finding the argument contrary both to long-established administrative practice and clear congressional intent. Id. at 284-86. [33] Indeed, as Congress recognized when it passed MUSYA in 1960, the Forest Service had used this authority in the past to create eighty-four "wilderness-type areas," totaling 14 million acres. S. Rep. 86-1407 at 4 (1960).

That Congress meant the Forest Service to have the ability to preclude development in pristine areas or elsewhere is even more apparent in MUSYA. MUSYA declares that the National Forests "shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. In balancing these oftentimes competing uses, MUSYA requires that the Service administer forest resources for their "multiple use and sustained yield." 16 U.S.C. § 529. As one court observed, this multiple-use mandate "breathes discretion at every pore." Perkins v. Bergland, 608 F.2d 803, 806 (9th Cir. 1979) (quotation omitted). Furthermore, and importantly for this case, MUSYA states explicitly that the Secretary of Agriculture's "establishment and maintenance of areas of wilderness" is consistent with MUSYA's multiple-use mandate. 16 U.S.C. § 529. On its face, MUSYA recognizes that the

---

[33] See also Charles F. Wilkinson & H. Michael Anderson, LAND AND RESOURCE PLANNING IN THE NATIONAL FORESTS 65-66 (1987) (because "Congress has never amended the agency's basic grant of authority to regulate occupancy and use in 16 U.S.C. § 551 ….[,] that expansive charter remains the starting point for analysis when Forest Service regulatory authority is challenged").

48

Forest Service may protect pristine wild areas and declares that doing so serves the purposes of the National Forests.

Because there is no explicit statement in the Wilderness Act repealing the broad grants of management authority in § 551 and MUSYA, Wyoming's Wilderness Act "argument" can succeed only if the Wilderness Act worked a broad repeal – entirely by implication – of the Forest Service's regulatory authority. Any such argument, though, runs headlong into the Tenth Circuit's repeated application of the "well-established canon of statutory construction against repeals by implication." Amerada Hess Corp. v. Dep't of Interior, 170 F.3d 1032, 1034 (10th Cir. 1999). This canon is particularly strong where, as here, the allegedly repealed provision is a broad rulemaking power. As the Supreme Court has said, "[a]s a matter of statutory drafting, if Congress had intended to curtail in a particular area the [agency's] broad rulemaking authority ..., we would have expected it to do so in language expressly describing an exception from that section or at least referring specifically to the section." Am. Hospital Ass'n v. NLRB, 499 U.S. 606, 613 (1991). No such language exists in the Wilderness Act, and none has been cited in Wyoming's briefing.

Moreover, in order to overcome the presumption against repeals by implication, the intent of Congress must be "clear and manifest." Watt v. Alaska, 451 U.S. 259, 267 (1981) (quotation omitted). As the Supreme Court recently explained:

> While a later enacted statute ... can sometimes operate to amend or even repeal an earlier statutory provision ..., "repeals by implication are not favored" and will not be presumed unless the "intention of the legislature to repeal [is] clear and manifest." Watt v. Alaska, 451 U.S. 259, 267 (1981) (internal quotation marks omitted). We will not infer a statutory repeal "unless the later statute '"expressly

49

contradict[s] the original act'" or unless such a construction '"is absolutely necessary . . . in order that [the] words [of the later statute] shall have any meaning at all.""" Traynor v. Turnage, 485 U.S. 535, 548 (1988) (quoting Radzanower v. Touche Ross & Co., 426 U.S. 148, 153 (1976), in turn quoting T. Sedgwick, The Interpretation and Construction of Statutory and Constitutional Law 98(2d ed. 1874)); see also Branch v. Smith, 538 U. S. 254, 273 (2003) ("An implied repeal will only be found where provisions in two statutes are in 'irreconcilable conflict,' or where the latter Act covers the whole subject of the earlier one and 'is clearly intended as a substitute'"); Posadas v. National City Bank, 296 U. S. 497, 503 (1936) ("[T]he intention of the legislature to repeal must be clear and manifest"). Outside these limited circumstances, "a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." Radzanower, supra, at 153.

National Ass'n of Homebuilders v. Defenders of Wildlife, 127 S.Ct. 2518, 2532 (2007).

Wyoming cannot possibly demonstrate Congress's "clear and manifest" intent that the Wilderness Act repeal the Forest Service's ability under the Organic Act and MUSYA to protect National Forest wildlands from development. To the contrary, the Wilderness Act evidences Congress's "clear and manifest" intent to preserve all of the Forest Service's authority under those laws. 16 U.S.C. § 1133(a)(1) declares that "[n]othing in this Act shall be deemed to be in interference with the purpose for which National Forests are established as set forth in [the Organic Act] and [MUSYA]." As explained above, and as is particularly clear with regard to MUSYA, those purposes may be served by regulations that preclude some or all development. 16 U.S.C. § 529. Therefore, when Wyoming argues that the Wilderness Act precludes the Forest Service from protecting roadless areas, the State reads the Act to do precisely what Congress says it did not intend: interfere with the achievement of the purposes recognized in MUSYA. Repeal by implication cannot apply under these circumstances. See, e.g., National Ass'n of Homebuilders, 127 S.Ct. at 2532-33; United States v. Hahn, 359 F.3d 1315, 1322 (10th Cir.

2004) (silence in legislative history regarding repeal does not support finding of implied repeal of jurisdictional grant, particularly when legislative history evidenced Congress's intent to expand rather than limit courts' subject matter jurisdiction); Denver, 695 F.2d at 475 (maxim against repeal by implication is "particularly appropriate" when the statute includes a savings clause). For these reasons, the Forest Service's view that the Wilderness Act did not eliminate the Forest Service's authority under the Organic Act and MUSYA to disallow logging and roadbuilding in roadless areas was reasonable and must be upheld. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-44 (1984); Friends of the Boundary Waters Wilderness v. Robertson, 978 F.2d 1484, 1486) (8th Cir. 1992) (granting Chevron deference to the Forest Service's interpretation of the Wilderness Act).[34]

In its earlier briefing, Wyoming argued that the Wilderness Act would bar any effort by the Forest Service to prohibit development of roadless areas because to do so would be tantamount to creating wilderness. See State of Wyoming's Opening Brief for Declaratory Relief and Injunctive Relief, Wyoming v. U.S. Dep't of Agric., No. 01-CV-86-B (filed Nov. 8,

---

[34] Wyoming's Wilderness Act repeal-by-implication argument relies heavily upon dicta in a District of Colorado case, in which the court suggested one of the Wilderness Act's goals was to limit the imposition of "arbitrary and capricious" land protections. Wyoming Br. at 49 (quoting Parker v. United States, 309 F. Supp. 593, 597 (D. Colo. 1970)). From this snippet, Wyoming argues that limiting land preservation is one of the Wilderness Act's "major purposes." Id. Notably, when it affirmed the district court's decision in that case, the Tenth Circuit did not adopt the lower court's interpretation of the Wilderness Act's purpose, declaring instead that the "general purpose of the Wilderness Act .... [is] preserving one factor of our natural environment from the progressive, destructive, and hasty inroads of man." Parker v. United States, 448 F.2d 793, 795 (10th Cir. 1971). This view has been repeated in a host of other decisions. See, e.g., The Wilderness Society v. U.S. Fish & Wildlife Serv., 353 F.3d 1051, 1061 (9th Cir. 2003) (en banc). In any event, as demonstrated supra at 16-18, it was neither arbitrary nor capricious for the Forest Service to adopt the Roadless Rule in response to the ruinous fiscal and ecological costs of continued roadless area development.

51

2002) (Dkt. No. 120) at 72 (suggesting the Wilderness Act is implicated whenever an agency "severely restrict[s] access"). In its most recent brief, though, Wyoming backs away from this sweeping argument – an argument whose implications are breathtaking.[35] Wyoming now argues that while the Wilderness Act leaves the Forest Service free under its Organic Act to protect an individual forest's wilderness values, that it cannot protect those values more broadly or nationally. Wyoming Br. at 50. Any other reading, the State declares dramatically, would "eviscerate" the Wilderness Act. Id. This argument has no basis whatsoever in the Wilderness Act; nowhere does that statute distinguish between the Forest Service's national and forest-specific rulemaking authority. This Court should refuse Wyoming's request that it create such a distinction out of whole-cloth. Doing so is certainly not compelled by any conflict between the statutes. Because there is no conflict between the Wilderness Act giving Congress the authority to apply one set of protective measures through Wilderness designation and the Forest Service

---

[35] The Forest Service has decided in many of its forest plans to disallow roadbuilding and logging in particular inventoried roadless areas. See, e.g., Addendum at 44, 49-52, 68-69, 73-84, 89-91; FEIS for Routt National Forest Plan, App. C (1998), available at http://www.fs.fed.us/r2/mbr/projects/forestplans/routt/pdfdoc/feisapp /Appendix%20C.pdf (listing implementation of protective management prescriptions in roadless areas pursuant to the selected Alternative C); FEIS for Medicine Bow National Forest Plan, App. C (2003), available at http://www.fs.fed.us/r2/mbr/projects/forestplans /mb/eis_apps/final_eis_app_c_rdless.pdf, (listing implementation of protective management prescriptions in roadless areas pursuant to the selected Alternative D); Henry B. Lacey, New Approach or Business as Usual: Protection of Aquatic Ecosystems Under the Clinton Administration's Westside Forests Plan, 10 J. Envtl. L. & Litig. 309, 343 (1995) (describing Northwest Forest Plan's prohibition of road construction and logging in ecologically critical inventoried roadless areas in Washington, Oregon, and California). Every one of these decisions would be illegal under Wyoming's earlier theory. Moreover, because there is nothing in Wyoming's argument that limits it to National Forests, a ruling in the State's favor also could call into question protective management restrictions placed on BLM land, National Wildlife Refuges, and even National Parks.

using its Organic Act authority to impose a very different and more limited suite of protections through rulemaking, Wyoming's argument must be rejected.

### D.     The Forest Service Did Not Violate The NFMA When It Adopted The Roadless Rule.

#### 1.     The Organic Act Authorized The Forest Service To Adopt A System-Wide Roadless Rule.

Wyoming's principal NFMA argument is that the Forest Service violated the statute by adopting the Roadless Rule at a national level rather than through the forest planning process on each of the 155 individual National Forests. Wyoming Br. at 43-46. This Court rejected an essentially identical NFMA challenge to the Forest Service's temporary roadbuilding moratorium, a precursor to the Roadless Rule, concluding that "the Forest Service had the right to proceed via rulemaking in lieu of forest plan modification." WTIA, 80 F. Supp. 2d at 1260. See also infra at 57 (Ninth Circuit reaching same conclusion when rejecting this argument in challenge to the Roadless Rule). There is nothing in Wyoming's latest brief that would warrant this Court reversing itself. The Forest Service promulgated the Roadless Rule pursuant to its broad regulatory authority under the 1897 Organic Act, 16 U.S.C. § 551. See 66 Fed. Reg. at 3252. The agency did not act through its forest planning authority under the NFMA, nor was it required to do so.

As discussed supra at 47, the 1897 Organic Act authorizes the Secretary of Agriculture to promulgate "rules and regulations" necessary to regulate the "occupancy and use" of the National Forest System and to "preserve the forests thereon from destruction." 16 U.S.C. § 551. Over the past century, numerous decisions by the Supreme Court and others – both before and

after the NFMA's enactment – have upheld the Forest Service's authority under § 551 to promulgate a broad range of regulations, including regulations to protect undeveloped National Forest land. See supra at 47-48.

Wyoming does not deny that § 551 would empower the Forest Service to "regulate the[] occupancy and use" of National Forests with a nationwide regulation identical to the Roadless Rule. The State suggests, however, that Congress repealed the agency's authority to do so in 1976 when it passed the NFMA. Wyoming Br. at 43-46, 50 (arguing that NFMA eliminated the Forest Service's authority under the Organic Act to adopt nationwide regulations regarding forest use and enacted new requirement that all decision regarding forest use be made on a "forest-by-forest basis"). As with its Wilderness Act argument, Wyoming cannot demonstrate Congress's "clear and manifest" intent that the NFMA extinguish the Forest Service's ability to adopt nationwide regulations outside of the NFMA's forest planning process. See supra at 49-51. Congress's utter silence in the NFMA regarding the Forest Service's decades-old rulemaking authority under § 551 is particularly telling because Congress did use the NFMA to amend other provisions of the 1897 Organic Act – specifically those that had been construed by the Fourth Circuit in W. Va. Div. of the Izaak Walton League of Amer., Inc. v. Butz, 522 F.2d 945 (4th Cir. 1975), to prohibit the clearcutting of trees in the National Forests. See S. Rep. No. 94-893, at 20 (1976), reprinted in 1976 U.S.C.C.A.N. 6662, 6680. Congress in the NFMA changed those provisions of the 1897 Organic Act that it sought to modify; § 551 was not among them.

Wyoming relies on three NFMA provisions to demonstrate that a nationwide rulemaking concerning logging and roadbuilding is inconsistent with the NFMA. Wyoming Br. at 44-45.

54

None of the sections comes anywhere near demonstrating Congress's "clear and manifest" intent

that the NFMA extinguish the Forest Service's ability to adopt nationwide forest-use regulations.

Wyoming cites first to 16 U.S.C. § 1604(f)(1) & (2) and argues that nationwide National Forest

rulemakings conflict with the NFMA's requirement that a forest plan "form one integrated plan"

that contains "maps and other descriptive materials." Wyoming Br. at 44. No conflict exists;

while each forest plan must be an integrated whole internally, it does not follow that every

decision regarding National Forest management must be made exclusively in the individual

forest planning process.

Wyoming cites next to 16 U.S.C. § 1604(e) & (k), which requires that forest plans

identify which lands are unsuitable for timber production and assure these areas are not logged

for ten years. Wyoming Br. at 44. The State asserts the Roadless Rule impermissibly

redesignated roadless areas as unsuitable for timber production without first going through the

NFMA's land use plan amendment process. Id. To the extent Wyoming is saying the Roadless

Rule is inconsistent with some unspecified forest plan provision concerning an area's suitable

timber base, that claim is rebutted below. See infra at 58-60 (demonstrating that the NFMA's

plan consistency provision, 16 U.S.C. § 1604(i), does not apply to the Roadless Rule).

Furthermore, the Roadless Rule does not determine whether an area belongs in the suitable

timber base, but only decides generally that timber will not be logged in inventoried roadless

areas regardless of whether it would be otherwise "suitable" to do so or not. Because a

determination in a forest plan that an area would be suitable for timber harvest is not a

commitment to actually allow any logging in the area, there is no inconsistency between a

55

national rulemaking such as the Roadless Rule and a forest plan's timber suitability
determinations. See 36 C.F.R. § 219.12(a)(2)(ii) (the identification of land as being suitable for
timber production "is not a final action compelling, approving, or prohibiting projects and
activities). See also infra at 61.[36]

The third NFMA provision offered by Wyoming as proof the Forest Service cannot adopt
a national rule regarding National Forest use is 16 U.S.C. § 1604(d) and its implementing
regulation, which requires a 90-day comment period NFMA forest plan amendments. Wyoming
Br. at 44-45. There is nothing in this deadline that demonstrates Congress's "clear and manifest"
intent that the Forest Service's authority to adopt nationwide rules be curtailed by the NFMA.
The fact the 90-day period in the NFMA is longer than the 60-day period required by the APA
does not mean Congress meant to do away with the APA rulemaking route altogether. The
Forest Service enacted the Roadless Rule pursuant to APA rulemaking and its power under 16
U.S.C. § 551, not the NFMA's forest planning provisions. In doing so, the agency did not
amend any forest plan. See 36 C.F.R. § 294.14(b). Consequently, the public comment
requirements that govern forest planning are inapplicable, and the 69-day comment period was
longer than required by the APA.

Because the Forest Service's ability to adopt nationwide management regulations was
unaffected by the NFMA, this Court was correct when it rejected an identical NFMA claim in

---

[36] Forest Service regulations also undermine Wyoming's view that a forest plan's timber suitability
determination constrains the agency's ability to adopt contrary regulations. See 36 C.F.R. § 219.28(a)(1)
(2001) (2000 NFMA Rule explaining that lands are to be deemed unsuitable for timber production if
logging is prohibited by regulations); 70 Fed. Reg. 1,023, 1,059 (36 C.F.R. § 219.12(a)(2)(A), (B)) (same
in 2005 NFMA Rule).

WTIA. See WTIA, 80 F. Supp. 2d at 1260 (holding the Forest Service "had the right to proceed

via rulemaking in lieu of forest plan modification."[37]  The Ninth Circuit was similarly correct

when it followed suit in Kootenai Tribe, holding that:

> [N]othing in the National Forest Management Act, which establishes procedures
> and standards for National Forest System land and resource management plans,
> precludes national action on a conservation issue within the power of the Forest
> Service. Moreover, the general rulemaking authority of the 1897 Organic Act is
> sufficient to support the Roadless Rule's promulgation to achieve the objects of
> our National Forest System. See 16 U.S.C. § 551. Local considerations are taken
> into account in plans for each forest; but government, if it chooses to do so, may
> act more broadly.

Kootenai Tribe, 313 F.3d at 1117 n.20 (citations omitted); see also 66 Fed. Reg. at 3250 ("Just as

development and approval of forest plans must conform to existing laws and regulations, new

laws or regulations, including this rule, can supersede existing forest plan management

direction.").

## 2.    The Roadless Rule Does Not Violate The NFMA's Forest Plan Consistency Provision.

The State's related argument that the Roadless Rule violates the NFMA because it

allegedly is inconsistent with some unnamed forest plan should be rejected on the same grounds.

See Wyoming Br. at 45. Because the Roadless Rule was not adopted pursuant to the NFMA's

forest planning provisions, there is no requirement that the Rule be consistent with forest plans.

---

[37] This Court reached this conclusion in the process of finding that the Association lacked standing to
pursue its NFMA claim. In that case, this Court recognized that the standing and merits inquiry
necessarily overlapped. See WTIA, 80 F. Supp. 2d at 1258 n.4. The same is true here. Whether this
Court considers the State's NFMA claim on its merits or in the standing context, the result is the same:
Wyoming's NFMA claim must fail.

### a.    The NFMA's Consistency Requirement Does Not Apply To The Roadless Rule.

The State's forest plan consistency argument must fail because a nation-wide regulation such as the Roadless Rule is not a "resource plan" or an "instrument for the use and occupancy" of the National Forests within the meaning of the NFMA plan consistency provision. See 16 U.S.C. § 1604(i) ("Resource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans."). The NFMA's legislative history makes clear that Congress did not mean "resource plans" and "instruments" in 16 U.S.C. § 1604(i) to include administrative rules and regulations, but rather the many plans and provisions for various uses of the National Forests that the Forest Service developed at the local level before enactment of the NFMA. See generally Charles F. Wilkinson & H. Michael Anderson, LAND AND RESOURCE PLANNING IN THE NATIONAL FORESTS 15-40 (1987) (summarizing history of local National Forest planning prior to NFMA). As the Senate Agriculture and Forestry Committee report stated in discussing the "consistency" provision upon which the State relies:

> Resource plans and permits, contracts, and other instruments for the use and occupancy of the National Forest System lands shall be consistent with land management plans. At the time a land management plan or revised plan is approved, there may be in existence any number of uses or occupancies granted or authorized by the United States pursuant to law on the area of National Forest System land covered, or to be covered, by the plan. Such uses or occupancies may include contracts for the sale of timber or other forest products, easements, leases, permits and licenses for a variety of purposes: grazing, recreation facilities, mining and mineral development, utilities, public works, power development and transmission rights-of-way, among others. The Committee expects the Forest Service, as soon as practicable, to bring all activities into conformity with the land management plans, as soon as practicable.

S. Rep. No. 94-893, at 35 (1976), reprinted in 1976 U.S.C.C.A.N. 6694 (emphasis added).

Congress enacted the "consistency" requirement of § 1604(i) to insure that site-specific activities authorized by contracts, easements, leases, and the like, would be subject to the management direction set through forest plans. There is not so much as a hint in the NFMA's legislative history that Congress sought to take the unprecedented step of extending such a "consistency" requirement to administrative rules and regulations promulgated at the national level.

Moreover, interpreting the NFMA's consistency provision to apply to nation-wide regulations would yield absurd results by transforming each individual forest plan into a driving force for national Forest Service policy. Section 1604(i) requires that, "[w]hen land management plans are revised, resource plans and permits, contracts, and other instruments, when necessary, shall be revised as soon as practicable." 16 U.S.C. § 1604(i). If, as the State suggests, rules and regulations are "resource plans" and "instruments" within the meaning of § 1604(i), a revision in the land management plan for any one of the 155 National Forests would require revision, "as soon as practicable," of all the Forest Service's national rules and regulations at variance with the revised plan provision to insure the "consistency" of the national rules and regulations with the individual forest plan revision.

This bizarre result is reason enough to reject the State's reading and hold that administrative rules such as the Roadless Rule are not subject to § 1604(i). It is hornbook law that "when one of several possible interpretations produces an unreasonable result, that is a reason for rejecting that interpretation in favor of another which would produce a reasonable result." 2A Norman J. Singer, SUTHERLAND STATUTORY CONSTRUCTION § 45:12, at 81-82 (6th

59

ed. 2000); see also Johnson v. United States, 529 U.S. 694, 707 n.9 (2000) ("nothing is better settled, than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and, if possible, so as to avoid an unjust or an absurd conclusion") (quoting In re Chapman, 166 U.S. 661, 667 (1897)).

### b.    Wyoming Has Not Demonstrated That The Roadless Rule Is Inconsistent With Any Forest Plan Provision.

Even if the NFMA's consistency provision did apply here, Wyoming could only prevail on its consistency claim by pointing to a Wyoming forest plan provision that is inconsistent with the Roadless Rule. For example, because the Roadless Rule prohibits most road-building and reconstruction in inventoried roadless areas, the State would have to point to a particular forest plan provision that requires logging or the building of a road in such an area. Cf. Friends of Southeast's Future v. Morrison, 153 F.3d 1059, 1069 (9th Cir. 1998) (finding Forest Service violated NFMA's consistency provision by approving timber sale without first carrying out analysis required by forest plan); Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 19 (2nd Cir. 1997) (reviewing consistency claims).

The State fails to do so. Indeed, the most striking feature of the State's consistency argument is the State's failure to cite to a single provision in any forest plan. This failure is all the more remarkable given that the State asks this Court to enjoin the forest rules everywhere based on forest plan inconsistencies that the State does not document anywhere. The State's failure to point to any inconsistent forest plan provision dooms its consistency claim.

Rather than point to specific provisions of particular forest plans, the State refers

generally to the NFMA regulations regarding the suitable timber base. Wyoming Br. at 44. The

State's discussion provides a misleading picture of the role and nature of forest plans. Wyoming

seems to believe that forest plans describe a forest plan's determination regarding the suitable

timber base is akin to a production commitment. This is not the case. As the Supreme Court

pointed out, although a forest plan may make logging more likely, "it does not itself authorize

the logging of any trees." Ohio Forestry Ass'n v. Sierra Club, 523 U.S. 726, 729 (1998). See

also 36 C.F.R. § 219.12(a)(2)(ii) (the identification of land as being suitable for timber

production "is not a final action compelling, approving, or prohibiting projects and activities).[38]

### E.      The Forest Service Did Not Violate The Wyoming Wilderness Act Or Multiple-Use Sustained-Yield Act.

Wyoming summarily accuses the Forest Service of violating the Wyoming Wilderness

Act and Multiple-Use Sustained Yield Act (MUSYA). Wyoming Br. at 46-47, 51. These

summary allegations deserve similarly summary rejection.

---

[38] In its earlier briefing, Wyoming did not refer to timber suitability, but rather to the NFMA's forest plan timber sale schedule and "allowable sale quantity" (ASQ) provisions. Those arguments fail for the same reason as does its newfound "suitable timber base" argument. Furthermore, the ASQ, which is derived from the timber sale schedule, is a ceiling on the amount of logging that can occur on a forest, not a floor. See 53 Fed. Reg. 26,832 (1988) (explaining that the ASQ "is the maximum regulated volume of timber that can be sold over the planning period, not necessarily the volume that will be sold"); California Forestry Ass'n v. Thomas, 936 F. Supp. 13, 18 (D.D.C. 1996) (timber sale schedules set out pursuant to 36 C.F.R §§ 219.3 and 219.16 "simply represent a ceiling on timber production and do not mandate that such quantities actually be harvested") (quoting Swan View Coal. v. Turner, 824 F. Supp. 923, 935 (D.Mont. 1992)); Region 8 Forest Serv. Timber Purchasers Council v. Alcock, 993 F.2d 800, 808 (11th Cir. 1993) (individual timber purchasers "have no right to compel the Forest Service to sell any future timber to them").

National Forests must be managed to "provide for multiple use and sustained yield of the

products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield

Act of 1960." 16 U.S.C. § 1604(e)(1). MUSYA, in turn, defines "multiple-use" as:

> The management of all the various renewable surface resources of the national
> forests so that they are utilized in the combination that will best serve the needs of
> the American people; … that some land will be used for less than all of the
> resources; and harmonious and coordinated management of the various resources,
> each with the other, without impairment of the productivity of the land, with
> consideration being given to the relative values of the various resources, and not
> necessarily the combination of uses that will give the greatest dollar return or the
> greatest unit output.

16 U.S.C. § 531(a). The multiple uses for which the National Forests must be administered

include "outdoor recreation, … watershed, and wildlife and fish purposes." 16 U.S.C. § 528.

There is nothing in MUSYA or its implementing regulations that bars the Forest Service

from serving the multiple-use mandate by not allowing road-building or reconstruction in the

nation's remaining National Forest roadless areas. Indeed, Congress has stated explicitly that

even wilderness is consistent with the multiple-use mandate. 16 U.S.C. § 529.

Although Wyoming admits that "maintenance of wilderness characteristics is consistent

with MUSYA purposes," it insists the Roadless Rule violates MUSYA because it preserves too

much land from logging and roadbuilding. Wyoming Br. at 46. MUSYA, though, does not set

some numerical standard by which this or any other court can measure whether some multiple

uses are being overemphasized illegally. MUSYA charges the Forest Service with balancing

amongst the various multiple uses and the Forest Service did so when it adopted the Roadless

Rule and there are no grounds – and absolutely no precedent – for upsetting the balance struck

by the agency. To WOC's knowledge, no court has ever invalidated an agency action on

62

MUSYA grounds; this Court should refuse Wyoming's invitation to be the first. See Perkins, 608 F.2d 806 (MUSYA's multiple-use mandate "breathes discretion at every pore").[39]

The State's stark declaration that the Roadless Rule must be enjoined nationwide because it "do[es] violence to the purpose and intent of the" Wyoming Wilderness Act, Pub. L. No. 98-550, 98 Stat. 2807 (1984), is entirely derivative of its MUSYA claim and is easily disposed of. Wyoming claims that the Roadless Rule violates the Wyoming Wilderness Act because that act requires lands not designated as wilderness or wilderness study areas be managed "for multiple use." Wyoming Br. at 51. Because the Roadless Rule is perfectly consonant with principles of multiple use, Wyoming's state wilderness act claim must be rejected.

In WTIA this Court determined after extensive briefing that a National Forest regulation prohibiting road construction does not violate the Wyoming Wilderness Act. WTIA, 80 F. Supp. 2d at 1258-60 (rejecting claim that the interim road-building moratorium that preceded that Roadless Rule violated the Wyoming Wilderness Act). This Court should reaffirm that holding here by rejecting the State's conclusory Wyoming Wilderness Act claim.

---

[39] Wyoming asserts the Roadless Rule violates MUSYA because the agency did not weigh the relative values of the resources in each inventoried roadless area. Wyoming Br. at 46-47. No court has ever recognized such a site-specific analysis requirement under MUSYA, and none exists. MUSYA instructs the Forest Service in the most general of terms to give "due consideration" to the relative values of the various resources in particular areas." 16 U.S.C. § 529. The Forest Service did so when it considered the ecological value of the nation's remaining National Forest roadless areas and the significant fiscal and ecological costs associated with their continued development.

63

## II.    WYOMING'S REQUEST FOR AN INJUNCTION SHOULD BE DENIED.

### A.    Principles of Comity Counsel Against Any Injunction.

When this Court issued its initial opinion in 2003, there were no pending injunctions governing the implementation of the Roadless Rule. That is not the case now; today the Forest Service is subject to an injunction from the Northern District of California that requires the agency to comply with the Roadless Rule. In its recent order denying Wyoming's motion to reinstate this Court's 2003 ruling, the Tenth Circuit directed that, in addressing any request for injunctive relief in this case, this Court must consider "the extraterritorial effect, if any, of the California district court ruling enjoining enforcement of the State Petitions Rule and also specifically ordering compliance with the Roadless Rule." App. 9:1713.[40]

The California district court's injunction was nationwide in scope. See App. 9:1703-04; California ex rel. Lockyer v. U.S. Dep't of Agric., 468 F. Supp. 2d 1140, 1144 (N.D. Cal. 2006) (rejecting federal defendants' request to limit geographic scope of injunction requiring compliance with Roadless Rule; "[b]ecause Defendants unlawfully repealed a broad national regulation, whose very purpose was to achieve uniform national protection of roadless areas, the

---

[40] The situation here is different than in the Yellowstone National Park snowmobile litigation. In the snowmobile cases, the D.C. District Court set aside a regulation from 2003 and reinstated the National Park Service's 2001 Snowcoach Rule. Subsequently, this Court invalidated the 2001 Snowcoach Rule. On appeal, the Tenth Circuit determined the doctrine of comity did not prevent the Wyoming District Court from invalidating the 2001 Snowcoach Rule because the D.C. District Court did not issue an injunction expressly requiring its implementation. Int'l Snowmobile Mfrs. Ass'n v. Wyoming, No. 04-8018, slip op. at *4 (10th Cir. March 10, 2004). Here, in contrast, the California district court explicitly enjoined the Forest Service from taking any action in violation of the Roadless Rule until the agency remedied the legal violations the court identified. As explained in the text below, the nationwide injunction sought by Wyoming here would impermissibly frustrate the California court's injunction.

64

partial reinstatement that Defendants urge would deny Plaintiffs' adequate relief."). This result was appropriate because the plaintiffs before the California court included four states (joined by two state amici) and twenty conservation organizations whose collective interests in the protection of National Forest roadless areas spanned the nation. See Bresgal v. Brock, 843 F.2d 1163, 1170-71 (9th Cir. 1987) (holding nationwide relief appropriate "if such breadth is necessary to give prevailing parties the relief to which they are entitled") (emphasis omitted).

Given the nationwide scope of the California court's remedial order, Wyoming's requested injunction should be denied. This Circuit has established that a "district court is without jurisdiction to afford relief from a mandatory injunction issued from a federal district court in another circuit." Carter v. Attorney Gen. of the United States, 782 F.2d 138, 142 (10th Cir. 1986) (internal quotations and citation omitted).[41] This is precisely the result that would arise if this Court imposes an injunction because any injunction by this Court would effectively and unnecessarily interfere with the California court's injunction by prohibiting implementation of the same rule.[42]

---

[41] See also Mann Mfg. Inc. v. Hortex, Inc., 439 F.2d 403, 408 (5th Cir. 1971) (demanding courts avoid "serious interference with or usurpation of" another district court's "continuing power" to supervise and modify injunctive relief); Lapin v. Shulton, Inc., 333 F.2d 169, 172 (9th Cir. 1964) (same); Common Cause v. Judicial Ethics Comm., 473 F. Supp. 1251, 1253 (D.D.C. 1979) (same); Torquay Corp. v. Radio Corp. of Am., 2 F. Supp. 841, 844 (S.D.N.Y. 1932) (same).

[42] The California court would have been faced with the same considerations if the Tenth Circuit had not vacated this Court's 2003 ruling when it dismissed WOC's appeal as moot. However, the very purpose of the Tenth Circuit's vacatur order was "to prevent a judgment, unreviewable because of mootness, from spawning any legal consequences." United States v. Munsingwear, 340 U.S. 36, 41 (1950) (emphasis added). The California court recognized this when it explained that "because the Tenth Circuit vacated the [Wyoming] district court's decisions ..., this Court cannot give any legal consequence to the vacated decision, including relying on it as a justification for not reinstating the Roadless Rule." California ex rel. Lockyer, 459 F. Supp. 2d at 915-16.

The Ninth Circuit has considered a similar situation where a district court was asked to render a decision that would conflict with a judgment from another proceeding. In Bergh v. Washington, 535 F.2d 505 (9th Cir. 1976), the appellant argued for an injunction that would bar a judge from ordering the State of Washington to promulgate certain fishing regulations when that judge had, in a separate proceeding, ordered those regulations promulgated. Id. at 506. The Ninth Circuit refused to issue the injunction, holding that, "[w]hen an injunction sought in one federal proceeding would interfere with another federal proceeding, considerations of comity require more than the usual measure of restraint, and such injunctions should be granted only in the most unusual cases." Id. at 507 (citation omitted); see also MAI Basic Four, Inc. v. Basis, Inc. 962 F.2d 978, 988 (10th Cir. 1992) (same); Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d 1477, 1484 (10th Cir. 1983) (same, quoting Bergh). These considerations counsel against an injunction in this case.[43]

### B.    A Weighing Of The Equities Also Demonstrates That An Injunction Is Not Warranted.

It has long been established that the courts have broad equitable power to craft appropriate injunctions to remedy violations of the law. See Hecht v. Bowles, 321 U.S. 321, 329 (1944) ("The essence of equity jurisdiction has been the power ... to do equity and to mould each decree to the necessities of the particular case."). Even if the Court rules for Wyoming on some of its legal claims, it does not automatically follow that the Roadless Rule must be

---

[43] This does not mean Wyoming is entirely foreclosed from obtaining injunctive relief. If Wyoming prevails on the merits of any of its claims here, the Forest Service and Wyoming would have an opportunity to ask the California court to reconsider its remedial order in light of this Court's ruling.

enjoined. Instead, this Court must balance the equities involved. <u>See</u>, <u>e.g.</u>, <u>eBay, Inc. v.</u>
<u>MercExchange</u>, L.L.C., 126 S. Ct. 1837, 1841 (2006) (holding that "the decision whether to
grant or deny injunctive relief rests within the equitable discretion of the district courts, and that
such discretion must be exercised consistent with traditional principles of equity"); <u>Amoco Prod.</u>
<u>Co. v. Village of Gambell</u>, 480 U.S. 531, 542 (1987) ("In each case, a court must balance the
competing claims of injury and must consider the effect on each party of the granting of
withholding of the requested relief.").

     Here, the equities weigh heavily in favor of withholding any injunctive relief – let alone
the nationwide relief sought by Wyoming. The Forest Service adopted the Roadless Rule
because the pre-existing, forest-by-forest roadless area management approach was leading to the
piecemeal destruction of the nation's remaining pristine National Forest wildlands. <u>See</u> <u>supra</u> at
3-4. That same management regime had allowed the creation of a largely unmaintained network
of some 380,000 miles of road in the National Forest System. The destruction of the country's
roadless areas and development of an astonishingly large and unmanageable forest road network
has come at tremendous fiscal and ecological cost. <u>See</u> <u>supra</u> at 4-5 (describing ecological
importance of roadless areas, the ecological harms associated with roadbuilding and logging on
those lands, and the $8.4 <u>billion</u> forest road maintenance and repair backlog); <u>see</u> <u>also</u> <u>Kootenai</u>
<u>Tribe</u>, 313 F.3d at 1125 n.30 ("Many sensitive wildlife species – whether mammals, birds,
reptiles, fish, insects or other organisms – make their homes in wild and roadless areas of forest,
and can know no other life. ... We cannot properly be unmindful of the fact that mountain lion,

elk, wolverine, grizzly bears, wolves, and other threatened species need roadless areas to survive.").

If the Roadless Rule is enjoined, roadless area logging and roadbuilding projects will commence once again and the nation and its taxpayers will once again be saddled with the fiscal and ecological costs the Roadless Rule was meant to avoid. This is not a matter of conjecture; Forest Service documents attest to the many roadless area projects that are poised to move forward immediately should an injunction issue. For example, pending oil and gas development constitutes a significant, immediate threat to roadless areas. Energy companies have applied for permits to drill on five lease parcels in inventoried roadless areas in North Dakota. See App. 10:1752-53; App. 1758-1822. Those applications are pending and on-the-ground development of these leases can proceed as soon as the BLM and Forest Service issue the permits to drill and approve the companies' surface use plans. See Rocky Mountain Oil & Gas Ass'n v. Watt, 696 F.2d 734, 741(10th Cir. 1984) ("If an APD [Application for Permit to Drill] is granted, the well can then be drilled"); see also 36 C.F.R. § 228.106(a) (surface disturbing activity can occur after Forest Service approves surface use plan of operations). Such development would include the construction of access roads within the roadless areas, which would have adverse impacts on air quality, water quality, visual resources, wildlife, and wildlife habitat. See App. 10:1752-53 (noting that drilling proposals include construction of roads); App. 10:1757-1822 (showing proposed access roads).[44]

---

[44] The California court's final injunction order in California ex rel. Lockyer prohibited the Forest Service from "approving any surface use of a mineral lease issued after January 12, 2001, that would violate the

Moreover, BLM has issued numerous oil and gas leases within roadless areas throughout the western United States that convey development rights, including road construction, to their purchasers. See App. 10:1824-44 (showing that government sold 327 and issued 284 leases within or partially within Forest Service inventoried roadless areas since promulgation of the Roadless Rule). These lessees also may apply for permits to drill at any time and move toward developing their leases in the near future. In most cases, the terms of these leases offer no protection to roadless areas. And even when oil and gas leases include stipulations that purport to protect roadless areas, these stipulations do not guarantee continued protection for roadless lands if the Roadless Rule is enjoined. For example, "controlled surface use" (CSU) stipulations in recently issued Colorado oil and gas leases prohibit road construction in roadless areas, but provide that the prohibition automatically "will cease to apply" if the 2001 Roadless Rule is set aside. See App. 10:1852-69 (collecting CSU stipulations from ten oil and gas leases sold in the August 2006 Colorado BLM Competitive Oil and Gas Lease Sale); see also App. 10:1870 (BLM decision dismissing protest of lease sale and noting that high bidders accepted the CSU stipulations); App. 10:1880-84 (showing leases with CSU stipulations in relation to roadless areas).

---

Roadless Rule (including the Tongass Amendment), if such approval occurs after May 13, 2005." See App. 10:1847. The pending North Dakota drilling and road construction proposals all relate to leases issued after January 12, 2001, and would involve surface use approvals issued after May 13, 2005. See App. 10:1826-28 (documenting issuance date of leases); App. 10:1819 (identifying leases with pending drilling proposals). Accordingly, these development proposals are prohibited under the California court's injunction that reinstated the Roadless Rule.

Also, if the Roadless Rule is enjoined, a proposed expansion of the Smoky Canyon phosphate mine in Idaho's Caribou-Targhee National Forest will cause significant, lasting damage to the Sage Creek and Meade Creek roadless areas. App. 10:1721; App. 10:1729; App. 10:1731-32. According to the federal government's own environmental review, the proposed mine expansion would cause "permanent modifications within the IRAs [Inventoried Roadless Areas] that would have unavoidable impacts to several of the roadless … and wilderness … attributes." App. 10:1729. Some of these modifications would constitute "major" impacts and some would leave "permanent indications of past mining activities in the IRAs." App. 10:1721. Such damage to the roadless areas is prohibited under the Roadless Rule, but will be permitted if this Court issues an injunction. See California ex rel. Lockyer, 459 F. Supp. 2d at 891-92 (describing project).

An injunction would similarly result in the resumption of ecologically destructive roadless area logging projects. In the course of the California litigation, the Forest Service submitted documents showing that in the short period between the formal repeal of the Roadless Rule in May 2005 and the court proceedings a year later, the Forest Service approved at least thirteen logging and road construction projects in roadless areas that would have been prohibited by the Roadless Rule. Id. at 892.[45] If the Roadless Rule is enjoined, these roadless area projects – and no doubt many more in the future – would go forward to the irreparable ecological and

---

[45] As the States of California, New Mexico, Montana, and Oregon note in their amicus brief, "Oregon sustained recent, irreparable harm to its national forests during even a brief interval without Roadless Rule protections, when logging projects were conducted in inventoried roadless areas – over the State's strenuous objections – in 2006." Brief of Amici Curiae States of California, New Mexico, Montana, and Oregon, Regarding Scope of Relief ("State Amicus Br.") at 5.

fiscal detriment of the public, taxpayers, and future generations.  See, e.g., Amoco Prod. Co., 480

U.S. at 545 ("[e]nvironmental injury, by its nature, can seldom be adequately remedied by

money damages and is often permanent or at least of long duration, i.e., irreparable."); Catron

Co. v. U.S. Fish & Wildlife Serv., 75 F.3d 1429, 1440 (10th Cir. 1996) ("An environmental

injury usually is of an enduring or permanent nature, seldom remedied by money damages and

generally considered irreparable"); Kootenai Tribe, 313 F.3d at 1125 ("the public's interest in

preserving precious, unreplenishable resources must be taken into account in balancing the

hardships" of any Roadless Rule injunction); State Amicus Br. at 4-5 (noting that national forests

in California now leave more than 2.5 million acres of roadless land open to development and

that "Oregon, New Mexico, and Montana likewise contain vast acreage potentially available for

extractive use should the Roadless Rule be enjoined").

    In contrast to the imminent substantial and irreparable fiscal and ecological harms

associated with opening roadless areas to road-building and logging, Wyoming offers only an

unsubstantiated presumption of environmental harm to support its request for nationwide

injunctive relief.  See Wyoming Br. at 52.  While Wyoming cites the Tenth Circuit's decision in

Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002), to justify this presumption, Wyoming ignores

Davis' further holding that, even where such a presumption may apply, "[p]laintiffs must still

make a specific showing that the environmental harm results in irreparable injury to their specific

environmental interests."  Id. at 1104.  Here, far from making any such "specific showing",

Wyoming offers only vague, speculative, and entirely intrastate allegations of the harms it might

suffer from the continued application of the Roadless Rule.  See infra at 66-68 (pointing out that

71

Wyoming has never alleged that the Roadless Rule's implementation outside of Wyoming would injure the State). Nowhere, for example, does the State mention a single National Forest project that would benefit the State's interests and that has not, or will not, take place because of the Roadless Rule.

Rather than provide any concrete examples of harm, the State relies upon general statements in its complaint and a four-year-old declaration from Harold Kemp, then Acting Director of Office of Wyoming State Lands and Investments, which declares summarily and without any supporting citation that the Roadless Rule will prevent the "active management" of roadless National Forest lands and that, as a result, "vital tools necessary to prevent the spread of disease, insect infestations, and catastrophic wildfires will not be available." App. 1:148. Mr. Kemp's sweeping statement ignores 36 C.F.R. § 219.12(b), which sets out a series of exceptions to the Roadless Rule's general roadbuilding prohibition, including an exception for roads "needed to protect public health and safety in cases of an imminent threat of flood, fire, or other catastrophic event that, without intervention, would cause the loss of life or property." 36 C.F.R. § 294.12(b)(1) (Addendum at 28). Mr. Kemp also ignores 36 C.F.R. § 294.13(b)(1)(ii) (Addendum at 30), which provides that in appropriate circumstances timber may be "cut, sold, or removed" under the Roadless Rule to, among other things, "reduce the risk of uncharacteristic wildfire events." Moreover, Mr. Kemp's declaration is undermined by the record evidence and Forest Service's expert judgment – to which this Court owes substantial deference, Wyoming, 279 F.3d at 1240 (deference "appropriate where th[e] [agency] action implicates scientific and technical judgments within the scope of agency expertise") – that the risk of wildfire is actually

72

lower in intact roadless areas than in developed areas where "active management" has been practiced. See supra at 4.

Wyoming's vague and non-specific allegations of harm are far outweighed by the ecological and fiscal harms that would result from an injunction of the Roadless Rule. Therefore, WOC respectfully requests that if Wyoming prevails on the merits of any of its claims, the Court refrain from issuing an injunction.

### C. If This Court Issues Any Injunction, It Must Be Narrowly Tailored To Fit The Wyoming-Only Harm Alleged By The State.

Federal district courts have broad discretionary power to fashion appropriate injunctive relief. Lemon v. Kurtzman, 411 U.S. 192, 200 (1973); Prows v. Fed. Bureau of Prisons, 981 F.2d 466, 468 (10th Cir. 1992). Though broad, this discretion is circumscribed by the "case or controversy" requirement of Article III of the Constitution, which limits both the parties that may bring a case and the equitable relief to which they may be entitled. See, e.g., Lewis v. Casey, 518 U.S. 343, 385 (1996) (Thomas, J., concurring) (rejecting system-wide prison injunction and noting that "[p]rinciples of federalism and separation of powers impose stringent limitations on the equitable power of federal courts"); Conservation Law Found. v. Reilly, 950 F.2d 38, 43 (1st Cir. 1991) (holding that plaintiff lacked standing to seek nationwide injunction). A court's injunctive power is limited, the Supreme Court has explained, because:

> It is the role of courts to provide relief to claimants . . . who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution.

Lewis, 518 U.S. at 349.

In keeping with the case or controversy requirement, and with general principles of equity, courts must narrowly tailor any injunctive relief to the plaintiff's harm. See, e.g., Garrison v. Baker Hughes Oilfield Operations, 287 F.3d 955, 962 (10th Cir. 2002) ("It is well settled an injunction must be narrowly tailored to remedy the harm shown.") (collecting cases); Kentuckians for the Commonwealth v. Rivenburgh, 317 F.3d 425, 436 (4th Cir. 2003) (invalidating an overly broad injunction on the grounds that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" (quoting Califano v. Yamasaki, 442 U.S. 682, 702 (1979) (emphasis added)); Virginia Soc'y for Human Life v. FEC, 263 F.3d 379, 392-94 (4th Cir. 2001) (vacating nationwide injunction of Federal Elections Commission regulation because it was unnecessary to provide relief to the plaintiff); Conservation Law Found., 950 F.2d at 43 (invalidating nationwide injunction, holding that "[b]ecause plaintiffs have ties to only a few federal facilities, they have failed to carry their burden of showing injury-in-fact sufficient to grant them standing to obtain nationwide injunctive relief").[46]

---

[46] Amici Blueribbon Coalition et al. state wrongly that the cases cited by WOC regarding injunctive relief are distinguishable because they "primarily involve challenges to discrete agency actions" rather than nationwide rules. Brief of Amici Curiae Blueribbon Coalition et al. in Support of Plaintiff State of Wyoming (Blueribbon Br.) at 7. This is incorrect. Virginia Society for Human Life, 263 F.3d 379, the case highlighted by the Tenth Circuit when it denied Wyoming's motion to recall the mandate, was a challenge to an FEC Commission regulation. In addition to misstating the law, the Coalition fails to explain why such a distinction should be meaningful. Finally, the Roadless Rule's logging and roadbuilding prohibition does not close any existing roads or impose any new limitations on the ability of Blueribbon Coalition members to ride off-road vehicles in National Forests or engage in any of the other activities mentioned in its amicus brief. See Addendum at 26-32 (Roadless Rule); text supra at 9, 45-46.

Indeed, when the Tenth Circuit recently denied Wyoming's request that it revive the appeal in Wyoming's initial case, the panel specifically directed this Court to consider the appropriate geographic scope of any injunction in this case. After noting that this Court must consider comity issues raised by the California court's mandatory injunction, the Tenth Circuit pointed out that this Court also must consider the "permissible scope of any injunction" it issues, citing Virginia Soc'y for Human Life, 263 F.3d 379, in which the court struck down a nationwide injunction. See App. 9:1714.[47] To drive home its point, the Tenth Circuit's Order quoted the Fourth Circuit's admonition that such an injunction "has the effect of precluding other circuits from ruling on the constitutionality of [a regulation and] conflicts with the principle that a federal court of appeals's decision is only binding within its circuit." Id. (citing Virginia Soc'y for Human Life, 263 F.3d at 392-94).[48]

This Court should heed the Tenth Circuit's warning and, if it issues any injunction at all – which it should not do for the reasons above – should limit its scope to Wyoming's borders. The

---

[47] The Blueribbon Coalition and the State of Idaho would have this Court ignore the Tenth Circuit's warning in favor of the D.C. Circuit's decision in National Mining Ass'n v. U.S. Army Corps of Engineers, 145 F.3d 1399, 1409 (D.C. Cir. 1998), which they offer for the proposition that a nationwide rule must be enjoined nationwide regardless of the harm actually caused the plaintiff. Blueribbon Br. at 7; Idaho Br. at 7-8. However, the Supreme Court has made clear that "a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." Weinberger v. Romero-Barcelo, 456 U.S. 305, 313 (1982). Moreover, the geographic scope of the injunction was not at issue in the National Mining case because plaintiffs were trade associations representing affected businesses across the country. National Mining, 145 F.3d at 1401. The Tenth Circuit has held that "an injunction must be narrowly tailored to remedy the harm shown," Garrison, 287 F.3d at 962, and this mandate cannot be overcome by an inapposite citation to out-of-circuit authority.

[48] This concern is especially acute here where the Ninth Circuit rejected the arguments offered by Wyoming in this case. See Kootenai Tribe v. Veneman, 313 F.3d 1094 (9th Cir. 2002). It would be inappropriate – and unnecessary given Wyoming's intrastate-only harm – for this Court to issue a nation-wide injunction that would invalidate the Roadless Rule in the Ninth Circuit when that court has given every indication it believes the Rule was adopted legally.

75

State of Wyoming is the sole plaintiff and, when previously challenged to demonstrate how it would be injured by the Roadless Rule, the State pointed to unsupported allegations in its complaint that its interests would be harmed by the implementation of the Rule on National Forests within the State. See App. 1:109 (citing paragraphs 13, 15, 16, 70, 71, 73, and 74 of the Complaint). None of these paragraphs suggest that Wyoming would be injured by the implementation of the Roadless Rule beyond the State's borders.[49] Mr. Kemp's general allegations are likewise limited to the purported intrastate impacts of the Roadless Rule. See App. 1:148 (¶ 8).[50] Such intrastate allegations cannot justify an injunction outside the State, particularly when the ecological and fiscal harms that would flow from a more far-reaching injunction are so significant. See supra at 3-5. Thus, if Wyoming is correct on any of its merits arguments – which it is not – any injunction must be limited to the State.[51]

---

[49] Wyoming's intrastate focus also is reflected in its briefing in its initial Roadless Rule challenge, which explains that, "[i]n this case, Wyoming seeks to protect its access to its State lands. Wyoming seeks to protect its ability to develop recreation, education, or historic opportunities on these State lands. Wyoming seeks to protect the health and well-being of the State lands, as well as the health and well-being of the National Forests within its borders." App. 1:115. This is in marked contrast to California ex rel. Lockyer v. U.S. Dep't of Agric., 459 F. Supp. 2d 874, 879 (N.D. Cal. 2006), where there were four state plaintiffs, two state amici supporting plaintiffs, and a host of conservation organization plaintiffs with members throughout the country. In order to remedy the harms suffered by these states and national groups, a nation-wide injunction was necessary. Furthermore, because plaintiffs included two groups with a significant Wyoming focus – the Greater Yellowstone Coalition and Biodiversity Conservation Alliance – the California court's injunction necessarily included Wyoming.

[50] Mr. Kemp's sole mention of any National Forest outside of Wyoming is the Routt National Forest, which straddles the Wyoming/Colorado border. App. 1:148 (¶ 7).

[51] Wyoming argues that a nation-wide injunction is required by the APA whenever a court finds a regulation was adopted illegally. See Wyoming Br. at 52-53. In addition to conflicting with the case law in the text above, Wyoming's claim flies in the face of the APA's explicit declaration that, though an agency may not raise a sovereign immunity defense, courts maintain the right to "deny relief on any other appropriate legal or equitable ground." 5 U.S.C. § 702 (emphasis added); see also Sanchez-Espinoza v. Reagan, 770 F.2d 202, 207-08 (D.C. Cir. 1985) (citing § 702 to support conclusion that "all the bases for

Still further militating against the imposition of a nation-wide injunction in response to Wyoming's alleged state-specific harms is that such an order would determine the rights and obligations of parties not before the court, including states that were satisfied with the status quo and deliberately chose not to pursue litigation. This is clearly the case here where a number of states that supported the Roadless Rule would be denied its benefits by the Forest Service if the Rule is enjoined nationwide. See, e.g., California ex rel. Lockyer, 459 F. Supp. 2d 874 (N.D. Cal. 2006) (suit in which New Mexico, California, Washington, Maine, Oregon, and Montana fought as plaintiffs and amici to have Roadless Rule reinstated); Kootenai Tribe, 313 F.3d at 1116 n.19 (describing Montana's Ninth Circuit amicus brief supporting the Roadless Rule); http://www.ourforests.org/fact/roadlessletter1.pdf (letter from nine governors supporting the Rule) (last visited July 17, 2007); http://www.colorado.gov/governor/press/april07/insurance-policy-roadless.html (Colorado's Governor Ritter expressing his support for the Roadless Rule) (last visited July 17, 2007).

---

nonmonetary relief – including injunction, mandamus, and declaratory judgment – are discretionary") (footnote and citations omitted) (Scalia, J.)); H.R. Rep. No. 94-1656 at 10 (1976), reprinted in 1976 U.S.C.C.A.N. 6121, 6131 (legislative history of § 702 amendment stating that the equitable grounds for denying relief include "hardship to the defendant or to the public ('balancing the equities')"). Wyoming's argument also conflicts with its position in California ex rel. Lockyer, 459 F. Supp. 2d at 918, in which it argued that no injunction should issue and that "[i]n the context of environmental regulation, courts frequently enforce a rule that has been promulgated improperly while the rule is remanded to the agency for further proceedings." See Amicus Curiae State of Wyoming's Brief in Opposition to Remedy Requested by Plaintiffs at 4, California ex rel. Lockyer v. U.S. Dep't of Agric., 459 F. Supp. 2d 874 (N.D. Cal. 2006) (No. 05-03508-EDL). Finally, Wyoming's attempt to bolster its position by citing Forest Guardians v. Babbitt, 174 F.3d 1178 (10th Cir. 1998), is unavailing. See Wyoming Br. at 52. Forest Guardians addressed claims under APA § 706(1) alleging "agency action unlawfully withheld or unreasonably delayed," not claims—such as Wyoming's here—under APA § 706(2)(A) alleging arbitrary and capricious agency action. See Forest Guardians, 174 F.3d at 1187; see also Missouri ex rel. Nixon v. Sec'y of the Interior, 158 F. Supp. 2d 984, 990 (W.D. Mo. 2001) (distinguishing Forest Guardians in challenge alleging arbitrary and capricious agency action).

Wyoming has never explained why the Roadless Rule must be enjoined nation-wide in order to remedy the State's alleged in-state injuries, nor is there any other apparent justification for such a sweeping remedy. Accordingly, even assuming arguendo that an injunction should issue, its scope should be limited to Wyoming.

## CONCLUSION

For the foregoing reasons, WOC respectfully requests that this Court reject the State's claims on the merits. To the extent this Court holds in Wyoming's favor on the merits, WOC asks that the Court withhold any injunctive relief out of respect for the principle of comity and because Wyoming has not, and cannot, meet the balance of harms test for an injunction. If the Court feels an injunction must issue, WOC asks that it narrowly tailor that relief to the Wyoming-only harms the State alleges.

Respectfully submitted September 21, 2007

James S. Angell, WY Bar # 6-4086
Andrew E. Hartsig
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO 80202
Tel: (303) 623-0466
Fax: (303) 623-8083
Email: jangell@earthjustice.org
        ahartsig@earthjustice.org

Douglas L. Honnold
Timothy J. Preso
Earthjustice
209 South Willson Avenue
Bozeman, MT 59715-4630
Tel: (406) 586-9699
Fax: (406) 586-9695
Email: dhonnold@earthjustice.org
        tpreso@earthjustice.org

## CERTIFICATE OF SERVICE

I hereby certify that one copy each of the Opposition Brief of Defendant-Intervenors Wyoming Outdoor Council et al., Appendices to Opposition Brief of Defendant-Intervenors Wyoming Outdoor Council et al., and Addendum to Opposition Brief of Defendant-Intervenors Wyoming Outdoor Council et al. have been served on all parties by placing same in the United States mail, postage prepaid and properly addressed this September 21, 2007:

Patrick J. Crank
Jay Jerde
Robert A. Nicholas
Wyoming Attorney General's Office
123 Capitol Building
Cheyenne, WY 82002
pcrank@state.wy.us

Barclay T. Samford
U.S. Department of Justice
Environmental and Natural Resources
General Litigation Section
PO Box 663
Washington D.C. 20044-0663
clay.samford@usdoj.gov

James S. Angell