FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

AUG 1 2 2008

Stephan Harris, Clerk
Cheyenne

## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| STATE OF WYOMING, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and the COLORADO MINING | ) |
| ASSOCIATION, | ) |
| | ) |
| Plaintiff- | ) |
| Intervenor | ) |
| | ) |
| vs. | ) Case No. 07-CV-17-B |
| | ) |
| | ) |
| UNITED STATES DEPARTMENT OF | ) |
| AGRICULTURE, et al., | ) |
| | ) |
| Defendants, | ) |
| | ) |
| and the WYOMING OUTDOOR | ) |
| COUNCIL, et al., | ) |
| | ) |
| Defendant - | ) |
| Intervenors. | ) |

## ORDER GRANTING PLAINTIFF'S MOTION FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

Today, this Court, for the second time, has before it the State of Wyoming's ("Wyoming's") challenge to the adoption of the Roadless Area Conservation Final Rule (the "2001 Roadless Rule"), 66 Fed. Reg. 3244-3272 (Jan. 12, 2001), promulgated by the United

States Department of Agriculture ("USDA") and the United States Forest Service (jointly referred to as the "Forest Service"). The 2001 Roadless Rule applies nationwide and prohibits road construction, road reconstruction, and timber harvesting in inventoried roadless areas. Specifically, the Court is tasked with determining whether the Forest Service violated the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 (1969), the National Forest Management Act (NFMA), 16 U.S.C. § 1600-1614 (1976), the Wilderness Act, 16 U.S.C. § 1131-1136 (1964), the Wyoming Wilderness Act of 1984 (WWA), Pub. L. 98-550 (October 30, 1984), the Multiple-Use and Sustained Yield Act (MUSYA), 16 U.S.C. §528-531 (1960), and the Administrative Procedure Act (APA), 5 U.S.C. § 701-706 (1966), in promulgating and adopting the 2001 Roadless Rule. Wyoming asks this Court for declaratory judgment, injunctive relief, and a review of the agency action.

In evaluating Wyoming's complaint, the Court is not traversing unfamiliar ground. On May 18, 2001, Wyoming filed a complaint, in this Court, challenging the 2001 Roadless Rule as violating various federal statutes including NEPA, the Wilderness Act, the WWA, the NFMA, and the MUSYA. On July 14, 2003, this Court ruled that the 2001 Roadless Rule was promulgated in violation of NEPA and the

Wilderness Act and that it must be set aside pursuant to the APA. Wyoming v. United States Dep't of Agric., 277 F.Supp. 2d 1197, 1239 (D. Wyo. 2003)(cited as "Roadless I").   The Court also ordered the 2001 Roadless Rule to be permanently enjoined.   Id.

On July 16, 2003, the Intervenors appealed this Court's decision to the Tenth Circuit Court of Appeals, however, the Federal Defendants did not participate in the appeal.   On appeal, the Tenth Circuit did not render an opinion as to this Court's decision on the merits, as it held Roadless I moot because the Forest Service had adopted the State Petitions Rule which superceded the 2001 Roadless Rule.   Wyoming v. U.S. Dep't of Agric., 414 F.3d 1207, 1213 (10th Cir. 2005)("Roadless II").

After the Forest Service adopted the State Petitions Rule, several states and environmental groups challenged its propriety in the Northern District Court of California.   In October 2006, that court held that the State Petitions Rule was promulgated in violation of NEPA and the ESA.   California ex rel. Lockyer v. U.S. Dep't of Agric., 459 F. Supp. 2d 874, 919 (N.D. Cal. 2006).   The Northern California District Court, by way of a Magistrate Judge, surreptitiously re-instituted the 2001 Roadless Rule, even though this Court had previously ruled that it was promulgated in

violation of NEPA and the Wilderness Act.

On January 12, 2007, Wyoming renewed its challenge to the 2001

Roadless Rule, bringing this issue once again before the Court.¹

_____

¹The complaint in this case is nearly identical to the complaint
Wyoming filed in this Court in Roadless I.   In the present
complaint, however, Wyoming has withdrawn claims asserting
violations of the National Historic Preservation Act, the
Regulatory Flexibility Act and the Federal Advisory Committee Act.
The Court did not consider these federal statutes in its decision
in Roadless I.

Wyoming, in its complaint in the present case, also appears to have
dropped its request for declaratory and injunctive relief regarding
the National Forest Management Act Planning Regulations (the
"Planning Regulations"), 36 C.F.R. § 219 et seq., the Forest
Transportation System Final Administrative Policy (the
"Transportation Policy"), and the National Forest System Road
Management Rule (the "Road Management Rule"), 36 C.F.R. § 212 et
seq. In its prior complaint, Wyoming specifically enumerated these
rules and policies, alongside the Roadless Rule, in requesting
declaratory and injunctive relief (see Pl's Opening Compl. at 2);
the present complaint only specifically enumerates the Roadless
Rule (see Pl's Supp. Compl. at 5).   As such, this Court will
proceed only with regard to Wyoming's challenge to the 2001
Roadless Rule.

If by some strained reading of the complaint, Wyoming was
requesting relief for the adoption and implementation of the
Planning Regulations, the Transportation Policy and the Road
Management Rule, the Court finds that these claims are not
justiciable.   First, Wyoming has not shown any injury it has
suffered from the Forest Service's utilization of the transition
period pending replacement of the 2000 Planning Regulations.   As
the State cannot show a present injury, the claim is not
justiciable and should be dismissed. Wyoming Outdoor Council v.
U.S. Forest Service, 165 F.3d 43, 47-48 (D.C. Cir. 1999). Finally,
as this Court stated in Roadless I, to the extent Wyoming
challenges the Road Management and Transportation Policy, these

4

After considering the administrative record, reading the briefs of the parties, hearing counsels' oral arguments, and being fully advised in the premises, the Court **FINDS** and **ORDERS** as follows:[2]

### STATEMENT OF THE PARTIES AND JURISDICTION

Plaintiff, the State of Wyoming, is a sovereign state of the United States and has brought this suit in its own right and on behalf of its own citizens.

Defendant, United States Department of Agriculture ("USDA") is a department of the executive branch of the United States government. The USDA is responsible for overseeing the activities of the Forest Service. The Forest Service is an agency of the USDA and is charged with the administration of the National Forests,

---

claims are also not ripe for judicial review as they merely present an abstract disagreement over Forest Service process for amending forest plans and its transportation system. As no injury has been sustained, the claims are not justiciable. Id.

[2] This Court, by order dated June 19, 2007, supplemented the record in this case with the entire district court record for Roadless I. (01-CV-86-B). The administrative records for the previous case and the instant case are identical. Furthermore, the parties incorporated their previous merit briefs into the supplemented briefs they submitted in the present case. As the administrative record is identical, and the arguments of the parties are nearly the same, this Court will adopt many of its factual findings and conclusions of law it previously articulated in Roadless I. Accordingly, the only real question in this Court's mind is whether the remedy is still proper.

5

including the National Forests within Wyoming's borders. Defendant, Mike Johanns, is the former Secretary of Agriculture and has been sued in his official capacity for the actions of his predecessor, former Secretary of Agriculture Daniel R. Glickman. Defendant, Dale N. Bosworth, is the former Chief of the Forest Service and has been sued in his official capacity for the actions of his predecessor, former Chief Michael Dombeck. Collectively, these Defendants will be referred to as the "Federal Defendants."

The Plaintiff-Intervenor is the Colorado Mining Association ("CMA"). CMA is an association of 650 members, that engage in the production of coal, metals, and agricultural and industrial minerals throughout Colorado and the West. CMA promotes and engages in the responsible extraction of coal and mineral resources from National Forest Service lands to supply electricity and other fundamental needs to our country.

The Defendant-Intervenors are environmental organizations that have advocated for the protection of roadless areas. Parties that have intervened in this action are the Biodiversity Conservation Alliance, Defenders of Wildlife, National Audubon Society, Natural Resource Defense Council, Pacific Rivers Counsel, Sierra Club, Wilderness Society, and the Wyoming Outdoor Council (collectively

6

"Defendant-Intervenors"). The Defendant-Intervenors were active participants in the rulemaking process leading to the promulgation of the 2001 Roadless Rule.

The Court exercises federal question jurisdiction. 28 U.S.C. § 1331; 5 U.S.C. §§ 701-706. Venue is proper. 28 U.S.C. § 1391(b),(e).

## BACKGROUND

### I. Introduction

In 1897, Congress enacted the Forest Service Organic Act ("Organic Act"). See Act of June 4, 1897, ch. 2, § 1, 30 Stat. 11, 34-36 (codified as amended at 16 U.S.C. §§ 473-482, 551). The Organic Act, for the first time, established a limited multiple-use mandate for management of the National Forests. See 16 U.S.C. § 475. That multiple-use mandate provides that National Forests may be established and administered to improve and protect the forest within its boundaries and to furnish a continuous supply of timber for the use and necessities of the American people. Id.

In 1905, after the Forest Service was transferred to the Department of Agriculture, it began actively managing the National

Forest System.[3]   In 1960, Congress codified the multiple-use mandate when it enacted the Multiple-Use and Sustained-Yield Act ("MUSYA").   See 16 U.S.C. §§ 528-531.   Currently, the Forest Service manages 191.8 million acres of forest, grass, and shrub lands, which comprises about one-twelfth of the land and waters in the United States.   See John Fedkiw, Managing Multiple Uses on National Forests 1905-1995, at 1-4 (1998).[4]

In 1924, Congress designated a portion of the Gila National Forest in New Mexico as a wilderness preserve, which was the first "roadless area" in the National Forest System.   See H. Michael Anderson & Aliki Moncrief, America's Unprotected Wilderness, 76 Denv. U. L. Rev. 413, 434 (1999).   Thereafter, the Forest Service established regulations for managing "primitive" roadless areas. See id. In 1964, Congress enacted the Wilderness Act, 16 U.S.C. §§ 1131-36, which established a procedure by which Congress could designate roadless "wilderness" areas in the National Forest System.   16 U.S.C. § 1131(a).

---

[3] In 1881, Congress established the "Division of Forestry."   The Division of Forestry was part of the Department of the Interior until it was transferred to the Department of Agriculture in 1905. See 16 U.S.C. § 472.

[4]
 Available at:
<www.fs.fed.us/research/publications/Managing_Multiple_Uses.htm>

In 1967, the Forest Service embarked on the Roadless Area Review Evaluation ("RARE I"), which was a nationwide inventory of the National Forest System to identify areas that could be designated as "wilderness" pursuant to the Wilderness Act. See Fedkiw, Managing Multiple Uses on National Forests 1905-1995, at 113-14. The RARE I inventory ended in 1972, with the Forest Service finding that approximately 56 million acres in the National Forests were suitable for wilderness designation. Id. However, RARE I was abandoned after a successful National Environmental Policy Act ("NEPA") challenge to the procedure employed by the Forest Service during the evaluation. Id. at 114; see also Wyoming Outdoor Coordinating Council v. Butz, 484 F.2d 1244 (10th Cir. 1973), Sierra Club v. Butz, 349 F. Supp. 934 (N.D. Cal. 1972).

In 1977, the Forest Service began a new Roadless Area Review Evaluation ("RARE II"). Fedkiw, Managing Multiple Uses on National Forests 1905-1995, at 115-19. RARE II, like its predecessor, was administratively initiated for the purpose of identifying those roadless and undeveloped areas which could be designated as "wilderness areas" pursuant to the Wilderness Act. Mountain States Legal Foundation v. Andrus, 499 F. Supp. 383, 387 (D. Wyo. 1980). The RARE II inventory culminated in 1979 with the Forest Service

9

identifying approximately 62 million National Forest acres as potential wilderness.  Fedkiw, <u>Managing Multiple Uses on National Forests 1905-1995</u>, at 117.

The purpose behind the RARE I and RARE II inventories was to gather information upon which the President could rely in making wilderness area recommendations to Congress pursuant to the Wilderness Act.  <u>See</u> 16 U.S.C. § 1132 (requiring the Secretary of Agriculture to review potential wilderness areas and make a report to the President so he can recommend designated areas to Congress). Pursuant to the Wilderness Act, Congress has designated 103.6 million roadless "wilderness areas" in the United States.  Anderson & Moncrief, <u>America's Unprotected Wilderness</u>, 76 Denv. U. L. Rev. at 415.

After another successful challenge to the procedure employed by the Forest Service in its RARE II inventory, <u>see</u> <u>California v. Block</u>, 690 F.2d 753 (9th Cir. 1982), the Forest Service's involvement in the roadless area controversies remained relatively stagnant for the next seventeen years.  In February 1999, however, the Forest Service temporarily suspended road construction activities in inventoried National Forest roadless areas while it developed a new road management policy and refocused its attention

on the larger issue of public use surrounding the National Forest transportation system.  64 Fed. Reg. 7,290 (Feb. 12, 1999).

The "Interim Roadless Rule" went into effect on March 1, 1999. See id.  The Interim Roadless Rule imposed an eighteen month moratorium on road construction in inventoried roadless areas. Id.; Wyo. Timber Indus. Ass'n v. U.S. Forest Service, 80 F. Supp. 2d 1245, 1249 (D. Wyo. 2000).

The Interim Roadless Rule was the first step in the Executive Branch's strategy to protect roadless areas.  (Admin. Record ("AR"), Doc. 1535, at p. 2).  By July 1999, the Forest Service had developed a comprehensive strategy and timeline for the promulgation of the Roadless Rule and Forest Service Transportation Policy.  (AR, Doc. 3440).  Three months later, President Clinton noted that the temporary moratorium on road construction gave his administration time to assess the ecological, economic, and social value of roadless areas and to evaluate the long-term management options for inventoried roadless areas.  (AR, Doc. 1535, at p. 2).

## II. The Roadless Area Conservation Rule

On October 13, 1999, President Clinton directed the Forest Service to initiate administrative proceedings to protect inventoried roadless areas and to determine whether roadless

11

protection was warranted for any uninventoried roadless areas. (Id.). President Clinton's directive set the Forest Service's administrative process in motion.

A.    The Scoping Process.[5]

On October 19, 1999, the Forest Service issued a Notice of Intent ("NOI") to prepare a draft environmental impact statement ("EIS") and to initiate rulemaking. (AR, Doc. 1608, at p. 1). The proposal set forth in the NOI was to promulgate a rule that would initiate a two-part process to protect roadless areas by:   (1) immediately restricting certain activities such as road construction in unroaded portions of the RARE II inventoried roadless areas; and (2) determining whether to extend similar protections to uninventoried roadless areas.  (Id., at p. 2). The NOI did not provide any information regarding the estimated

---

[5]  Generally, an agency begins its "NEPA process" with an environmental assessment. An environmental assessment is a brief document that provides the agency with sufficient evidence to determine whether it should prepare a finding of no significant impact or an environmental impact statement.   40 C.F.R. § 1508.9. If the agency determines that an environmental impact statement is necessary, it must publish a notice of intent that an environmental impact statement will be prepared and considered.   40 C.F.R. § 1508.22.   The scoping process begins after the agency determines that an environmental impact statement will be prepared.  40 C.F.R. § 1501.7.   The purpose of the scoping period is to determine the scope of the issues to be addressed during the promulgation of the proposed rule.   40 C.F.R. §§ 1501.7, 1508.25.

geographic scope of the proposed rulemaking, nor did it provide any maps to identify the land areas that would be covered by the proposed rule.   (See id.).

      1.   The Comment Period.

President Clinton directed the Forest Service to issue the final Roadless Rule by the fall of 2000.[6]   (AR, Doc. 1549, at p. 2).   In turn, Forest Service Chief Michael Dombeck informed his employees of the President's directive that the final Roadless Rule was expected to be completed in late 2000.   (AR, Doc. 330, at p. 1).   To this end, Chief Dombeck created a "Roadless Team" to work exclusively on promulgating the Roadless Rule.   (AR, Doc. 331). The Roadless Team proceeded according to the following schedule: "Dates – get done during the Clinton Administration (Dec. 2000)." (AR, Doc. 123, at p. 3).

The Forest Service recognized that if it were to issue the final rule by December 2000, it would have to require "a very short timeframe [sic] for the public to respond to [the] NOI."   (AR, Doc. 1549, at p. 2).   As a result, the Roadless Rule NOI provided for a sixty-day comment period, which expired on December 20, 1999.   (AR, Doc. 1608, at p. 2).

---

[6] President Clinton's second term in office ended in January 2001.

13

2.    Range of Alternatives.

According to Chief Dombeck, the NOI was to be limited to examining only those alternative methods that would meet President Clinton's goals.   (AR, Doc. 330, at p. 1).   Thus, the Forest Service would only examine "alternatives that limit or eliminate certain activities in inventoried roadless areas such as road construction."   (AR, Doc. 330, at p. 1).   The NOI provided four alternatives that could be considered in the draft EIS:   (1) prohibiting road construction activities in inventoried roadless areas; (2) prohibiting road construction activities and commercial timber harvest in inventoried roadless areas; (3) prohibiting the implementation of all activities that did not contribute to enhancing ecological values, subject to valid existing rights, in inventoried roadless areas; and (4) making no changes (no action alternative).[7]

3.    Public Participation.

During the scoping process, the Forest Service held 187 public

---

[7] The "no action alternative" is required by Council of Environmental Quality regulations.   40 C.F.R. § 1502.14(d). Interestingly, the Interim Roadless Rule prohibited road construction in inventoried roadless areas until December 2000. Thus, even if the Forest Service would have adopted the "no action alternative," road construction still would have been prohibited in inventoried roadless areas during the remainder of the Clinton Administration.

14

meetings across the nation concerning the Roadless Rule. (AR, Doc. 4609, at p. 1-7). On December 3, 1999 – forty-three days into the comment period – the Forest Service published notice of the local scoping meetings to be held in Wyoming. (AR, Doc. 149, at pp. 4, 6). These meetings overlapped each other and were held on the last thirteen days of the sixty-day comment period. (AR, Doc. 149).

On December 14, 1999, Wyoming submitted comments prepared by Governor Jim Geringer that described the fundamental defects with the NOI and scoping period. (AR, Doc. 207, at pp. 6-8). Specifically, Governor Geringer criticized the "extraordinarily short" time for the public to consider the proposed rule, and what he perceived as the Forest Service's predetermined outcome. (Id.). In addition, the Forest Service received numerous requests to extend the scoping comment period from states, individuals, businesses, and members of Congress. (AR, Doc. 1549).

However, the Forest Service refused to extend the comment period, even though it did not have any maps of the inventoried roadless areas and was strategizing on how to respond to requests for maps just ten days prior to the close of the comment period. (AR, Doc. 2748, 2765). The Roadless Team was reluctant to extend the comment period because they had to meet the strict EIS

15

timelines imposed by Chief Dombeck. (AR, Doc. 2765, at p. 2). The Roadless Team also figured they would have another opportunity to update the roadless area data between the draft EIS and final EIS. (Id.).

On December 20, 1999, the NOI comment period closed on schedule. During those sixty days, approximately 517,000 comments were submitted on the Roadless Rule NOI. (AR, Doc. 4609, at p. 1-7).

B.    The Draft EIS and Proposed Roadless Rule.

1.    Events Before the Publication of the Draft EIS.

One month after the close of the NOI comment period, the Forest Service announced that maps of the proposed roadless areas were available. (AR, Doc. 76, at p. 1). However, the Forest Service also acknowledged that these maps did not contain the best data available, even though it had access to better data for the maps. (AR, Doc. 2610). The maps that the Forest Service distributed provided little, if any, substantive information on the inventoried roadless areas. (See AR, Doc. 274).

On February 8, 2000, Wyoming requested "cooperating agency status" pursuant to the Council for Environmental Quality ("CEQ") regulations. (AR, Doc. 1889, at pp. 6-7). The CEQ encouraged

16

federal agencies to work with state and tribal governments. (AR,
Doc. 3544, at pp. 2-3; 40 C.F.R. §§ 1501.6, 1508.5). Prior to
Wyoming's request for cooperating agency status, the Roadless Team
recognized that it had "an obligation to consider and routinely
solicit cooperating agency status." (AR, Doc. 2292, at p. 1).
Nevertheless, the Forest Service did not respond to Wyoming's
request for cooperating agency status and impliedly rejected that
request when it issued the draft EIS. (AR, Doc. 1889, at p. 1).

   2.  The Draft Environmental Impact Statement.

 On May 10, 2000, the Forest Service published the draft EIS
and the proposed Roadless Rule. (AR, Doc. 1350). The draft EIS
identified 54 million acres of inventoried roadless areas that were
subject to the proposed rule. (Id., at p. 2).

 The proposed rule was made up of two parts: (1) the
"Prohibition Rule" and (2) the "Procedural Rule." The "Prohibition
Rule" banned road construction and reconstruction within
inventoried roadless areas.[8]  (Id., at pp. 5-6, 14).[9]  The

---

8

In the draft EIS, the Forest Service considered four alternatives
to its proposed "Prohibition Rule." Those four alternatives were:
(1) the "no action" alternative; (2) a prohibition on road
construction within unroaded portions of inventoried roadless
areas, but allowing timber harvest where such timber harvest could
occur without road construction; (3) a prohibition on road
construction, except for stewardship purposes, in the unroaded

17

"Procedural Rule" required local forest managers to identify other uninventoried roadless areas and to designate whether those areas also warranted protection.[10]   (<u>Id.</u>, at pp. 6-7, 14).

>           3.   The Draft EIS Comment Period.

Originally, Chief Dombeck stated that because the Roadless Rule would amend or lead to the amendment of local forest plans it would have to provide a ninety-day public comment period in order to comply with the National Forest Management Act ("NFMA").   (AR, Doc. 3440, at p. 4; <u>see</u> <u>also</u> 36 C.F.R. § 219).   However, the Forest Service only provided a sixty-nine day comment period for the draft

---

portions of the inventoried roadless area; and (4) a prohibition on road construction and all timber harvest within unroaded portions of inventoried roadless areas.   (AR, Doc. 1362, at pp. 2-3 to 2-6). The Forest Service selected Alternative 2 as its preferred alternative to the Prohibition Rule.   (<u>Id.</u>, at p. 2-4).

[9] Unless otherwise stated, as used in this Order, the terms "road construction" include new road construction and road reconstruction.

[10] In the draft EIS, the Forest Service considered four alternatives to its proposed "Procedural Rule."   Those four alternatives were: (A) the "no action" alternative; (B) evaluation and implementation of protections for unroaded areas at the next forest plan revision; (C) a project-by-protect analysis whereby local managers would evaluate whether and how to protect roadless characteristics; and (D) a project-by-project analysis to evaluate whether and how to protect roadless area characteristics until completion of a plan revision.   (AR, Doc. 1362, at pp. 2-6 to 2-9).   The Forest Service selected Alternative B as its preferred alternative to the Procedural Rule.   (<u>Id.</u>, at p. 2-7).

EIS and proposed Roadless Rule. (AR, Doc. 4608, at p. S-2).

During this comment period, the Forest Service held over 400 public meetings. (Id.). Between May 22 and June 27, 2000, sixteen of these meetings were held in Wyoming. (AR, Doc. 1350, at p. 34). At the meetings held in Wyoming, the public was given three minutes to comment on the proposed Roadless Rule. (AR, Doc. 4580, at pp. 1, 11). Additionally, the local Forest Service employees who conducted the meetings did not have enough information to answer questions. (Id.). Several attendees of these public meetings described them as a "sham." (AR, Doc. 4580, at p. 1). Governor Geringer expressed these, and other, concerns to Chief Dombeck. (AR, Doc. 4580, at pp. 1-3). Governor Geringer believed that the Forest Service was simply going through the NEPA motions to reach a predetermined outcome.[11]   (AR, Doc. 4580, at p. 2).

The Forest Service provided maps during this comment period; however, the maps were of such a large scale – a continental scale

---

[11]  The Forest Service designated Wyoming as one of the states "most affected" by the proposed Roadless Rule. (AR, Doc. 1537, at p. 2). As a result, Governor Geringer was an active participant in the public process surrounding the implementation of the Roadless Rule. Thus, Governor Geringer's observations that the proposed Roadless Rule, and the Forest Service's illusory public process, was the result of political posturing for an outgoing president, and geared to support a vice president who was also a presidential candidate, are based on firsthand knowledge and carry their own indicia of reliability. (See AR, Doc. 4580).

19

– that they actually provided less detail than a standard highway map.[12]   The maps did not identify the unroaded areas that were subject to the Procedural Rule or the "roaded" areas that were subject to the Roadless (Prohibition) Rule.[13]   (See generally AR, Doc. 4110 (maps of inventoried roadless areas)).   The Wyoming State Engineer's Office commented that the "maps provided in the [draft EIS] lack sufficient detail to be of help [in] determining what specific roads and areas are affected."   (AR, Doc. 4580, at p. 30).

Numerous states and various agencies requested an extension of the draft EIS comment period because of:   (1) the lack of maps and inaccuracies in the maps provided, (AR, Doc. 4580, at pp. 24-40; AR Doc. 4111, at pp. 80-81, 161, 500, 589); (2) the size of the draft EIS and proposed Roadless Rule, (AR, Doc. 4580); (3) confusion over what "roaded" areas were covered by the proposed Roadless Rule, (AR, Doc. 4580, at p. 30); (4) concerns regarding the narrow range of alternatives the Forest Service analyzed in the draft EIS, (AR, Doc. 4580, at p. 33; AR, Doc. 4111, at pp. 80-81, 161, 500, 589);

---

[12] The actual scale of the maps provided by the Forest Service was between 10 miles per inch and 40 miles per inch.   A standard highway map has scale of 18 miles per inch.

[13] The draft EIS classified 2.8 million acres of National Forest land that contained roads within the inventoried "roadless areas." (AR, Doc. 1350, at p. 2).

and (5) concerns regarding the lack of a site-specific analysis (i.e., the issues involving Wyoming's natural resources were lumped in the same category as issues involving Alabama's natural resources), (AR, Doc. 4580, at pp. 25-26).

The Forest Service refused to extend the comment period, which was contrary to its usual policy of liberally granting extensions on important issues.[14]   The Forest Service received approximately 1,155,000 public comments on the Roadless Rule draft EIS.[15]   (AR, Doc. 4609, at p. 1-7).   Nevertheless, the comment period closed after sixty-nine days on July 17, 2000, as scheduled.

C.   The Final Environmental Impact Statement.

In November 2000, the Forest Service issued the Roadless Rule final EIS.   (AR, Doc. 4609).   The final EIS departed from the draft EIS and proposed Roadless Rule in four material aspects:   (1) the final EIS broadened the scope of the Roadless Rule to apply to all

---

[14] For example, the Forest Service extended the comment period for the Interim Roadless Rule in response to several requests.   See 64 Fed. Reg. 7290.

[15] Defendant-Intervenors consistently point to the number of comments received on the draft EIS to bolster their argument that this comment period was sufficiently long to permit meaningful participation.   However, the Court finds these arguments unhelpful since 1,095,000 of these comments were form letters, form e-mails, post-cards, or faxes.   (AR, Doc. 4609, at p. 1-7).   The Forest Service only received 60,000 original letters.   (Id.).

inventoried roadless areas, not just the "unroaded portions" of the inventoried roadless areas, (AR, Doc. 4609, at p. xi); (2) the final EIS adopted an even more restrictive Roadless Rule Alternative, which prohibited road construction and timber harvest (except for stewardship purposes) in all inventoried roadless areas (AR, Doc. 4609, at p. 2-13); (3) the Forest Service added an additional 4.2 million acres of inventoried roadless areas subject to the Roadless Rule, thereby increasing the geographic scope of the Roadless Rule to 58.5 million acres (increasing the roadless area in Wyoming by 39,000 acres), (AR, Doc. 4608, at p. S-1; AR, Doc. 4609, App. A, at p. A-4); and (4) the final EIS eliminated all analyses related to the "Procedural Rule" part of the Roadless Rule, which was incorporated into the final Forest Service Planning Regulations issued on November 9, 2000, (AR, Doc. 4609, at p. xi).

The maps accompanying the final EIS generally identified the inventoried roadless areas within each state that were subject to the Roadless Rule. (See AR, Doc. 4110, at pp. 3-213). The maps did not, however, provide sufficient information to identify existing roads within the "roadless" area and did not identify the additional 4.2 million acres of "roadless" area identified in the final EIS. (See id.). The maps contained in the final EIS did not

22

contain this information because the Roadless Team did not have
information such as the number of classified roads within the
inventoried roadless areas and total acres of classified road
impacts. (AR, Doc. 5590, at pp. 1, 2, 9). Interestingly, the
Forest Service's deadline imposed for gathering this basic
information was not until after the scheduled date of publication
of the Record of Decision. (AR, Doc. 5590, at p. 2).

D.    The Final Roadless Rule and Record of Decision.

On January 5, 2001, the Secretary of Agriculture signed the
Record of Decision ("ROD"). The final Roadless Rule was published
in the Federal Register on January 12, 2001. (AR, Doc. 5796).[16]

The Roadless Rule prohibits road construction in inventoried
roadless areas of the National Forest System unless the road
construction falls within an exception to the general prohibition.
36 C.F.R. § 294.12(a). The exceptions permit road construction in
inventoried roadless areas:    (1) to protect public health and
safety in cases of an imminent threat of flood, fire, or other
catastrophic event that, without intervention, would cause property

---

[16] The final Roadless Rule departed from the final EIS by
restricting stewardship timber harvests to small diameter timber.
(AR, Doc. 5796, at p. 15). The final Roadless Rule also added a
narrow exception to the prohibition on timber harvesting. (AR,
Doc. 5796, at p. 15).

23

damage; (2) to conduct an environmental cleanup pursuant to federal pollution statutes; (3) pursuant to reserved or outstanding rights, or as provided for by statute or treaty; or (4) when needed in conjunction with the continuation, extension, or renewal of a mineral lease.  36 C.F.R. § 294.12(b)(1)-(3),(7).  The Roadless Rule also prohibits timber harvesting in inventoried roadless areas subject to certain limited exceptions.  See 36 C.F.R. § 294.13.

In all, the Roadless Rule affects 58.5 million acres (or 31%) of the National Forest System lands.  This constitutes approximately two percent of America's land mass.  The Roadless Rule affects 3.25 million acres (or 35%) of the 9.2 million acres of National Forest System land in Wyoming.

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") empowers a district court to review an agency's final action.  See 5 U.S.C. § 704; Utahns for Better Transp. v. U.S. Dep't of Transp., 305 F.3d 1152, 1164 (10th Cir. 2002).  A reviewing court may hold an agency action to be unlawful and set it aside if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. 5 U.S.C. § 706(2)(A); Utahns for Better Transp., 305 F.3d at 1164. Under this standard, the court must determine whether "the

24

[agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Utah Environmental Congress v. Richmond, 483 F.3d 1127, 1134 (10th Cir. 2007)(quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971)).   An agency action is arbitrary and capricious if it: (1) failed to consider an important aspect of the problem; (2) offered an explanation for its decision that runs counter to the evidence before the agency; or (3) produced a decision that is so implausible that is could not be ascribed to a difference in view or the product of agency expertise.   Utah Environmental Congress, 483 F.3d at 1134.   Furthermore, the Tenth Circuit has held that agency action must be set aside if it fails to meet statutory, procedural, or constitutional requirements. Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1573-74 (10th Cir. 1994).

In reviewing the agency's action, the court must consider the administrative record as a whole and must be mindful not to substitute its own judgment for that of the agency's.   Utahns for Better Transp., 305 F.3d at 1164. The function of the court is to determine whether the agency:     (1) acted within its scope of authority; (2) complied with prescribed procedures; and (3) acted

25

in accordance with law (i.e., did not act arbitrarily or capriciously). Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1574 (10th Cir. 1994). Finally, courts and agencies alike should be mindful that an "agency's rulemaking power is not the power to make law, it is only the power to adopt regulations to carry into effect the will of Congress as expressed by the statute." Sundance Assoc., Inc. v. Reno, 139 F.3d 804, 808 (10th Cir. 1998) (internal quotation marks and citations omitted).

## DISCUSSION

The parties have presented several issues in their briefs. The Court will first address Federal Defendants' and Defendant-Intervenors' contention that Wyoming lacks standing to challenge the Roadless Rule. Next, the Court will address Wyoming's argument that the Roadless Rule was promulgated in violation of several federal environmental statutes. Finally, the Court will consider the appropriate remedy.

## I. Justiciability Claims

Federal Defendants argue that Wyoming's challenge to the Roadless Rule should be dismissed because the potential injury to the national and state forests in Wyoming could not be redressed by setting aside the Roadless Rule. (Fed. Defs.' Resp. Br., at pp.

26

22-28). Defendant-Intervenors argue that Wyoming lacks standing because it has only alleged economic injury, which is not within the zone-of-interests protected by NEPA. (Def.-Intervenors' Resp. Br., at pp. 11-20). Wyoming replies that it has standing because it seeks to protect state lands and National Forests within its borders from the irreparable environmental consequences that will result from the Forest Service's uninformed implementation of the Roadless Rule. (Pl.'s Reply Br., at pp. 4-13).[17]

     1.    Article III Standing Requirements.

Federal courts are courts of limited jurisdiction. U.S. Const. art. III, § 2. A federal court only has jurisdiction to hear "cases" or "controversies." Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992). Standing is a jurisdictional doctrine that is an essential part of Article III's case-or-controversy requirement. Id. at 560. Jurisdiction is a threshold question that must be addressed before reaching the merits of any case. Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). This rule is inflexible and without exception. Id. The

---

[17] As the Court supplemented the current record with all pleadings from the previous case each party has two sets of pleadings. Citation to a party's "brief", "response brief" or "reply brief" will refer to the pleadings from the original case. Citation to a party's "supplemental" or "opposition" brief will refer to the pleadings from the second case.

27

party invoking federal jurisdiction has the burden of proving it
exists.  <u>Defenders of Wildlife</u>, 504 U.S. at 561.

To have standing, the party invoking federal jurisdiction must
prove:  (1) it has suffered an injury in fact – an invasion of a
legally protected concrete interest that is not conjectural;  (2)
a causal connection between the injury and the conduct complained
of; and (3) that the injury will be redressed by a favorable
decision.  <u>Comm. to Save the Rio Hondo v. Lucero</u>, 102 F.3d 445, 447
(10th Cir. 1996).   In a NEPA case, the standing analysis is
slightly more complex.

a.   Injury-in-Fact Prong.

Under the injury-in-fact prong of the standing doctrine, the
plaintiff  must  prove  that:   (1)  the  agency  increased  the
plaintiff's risk of actual, threatened, or environmental harm by
failing to comply with NEPA; and (2) this increased risk of
environmental harm injured the plaintiff's concrete interests.  <u>Id.</u>
at 449; <u>Sierra Club v. U.S. Dep't of Energy</u>, 287 F.3d 1256, 1265
(10th Cir. 2002).  "A litigant shows an injury to its concrete
interest by demonstrating either a geographical nexus to or actual
use of the site of agency action."  <u>Id.</u>

b.   Causation Prong.

28

Under the causation prong of the standing doctrine, a plaintiff must show its actual or threatened harm is "fairly traceable to the agency's failure to comply with NEPA." Rio Hondo, 102 F.3d at 451. The plaintiff's burden of demonstrating traceability is fairly low where the plaintiff's injury in fact consists of a procedural injury under NEPA. Jackson Hole Conservation Alliance v. Babbit, 96 F. Supp. 2d 1288, 1294 (D. Wyo. 2000). When an agency fails to perform, or performs an inadequate NEPA analysis, the harm that is traceable to the agency's deficient analysis is the agency's uninformed decisionmaking.[18] Sierra Club, 287 F.3d at 1265.

        c.   Redressability Prong.

With respect to redressability, the plaintiff must prove that its injury would be redressed by a favorable decision requiring the agency to comply with NEPA procedures. Rio Hondo, 102 F.3d at 452. The redressability requirement is fairly low in NEPA cases because

---

[18] Determining whether a plaintiff has suffered a procedural injury as a result of an agency's failure to comply with NEPA requires some analysis into merits of the plaintiff's underlying claim, which should ordinarily be avoided in a federal court's standing analysis. Ass'n of Data Processing Serv. Org. v. Camp, 397 U.S. 150, 153 (1970). However, this "is the unavoidable consequence of premising standing on injuries to statutory rights." Wyo. Timber Indus. Ass'n v. U.S. Forest Service, 80 F. Supp. 2d 1245, 1258 n.4 (D. Wyo. 2000).

the plaintiff is only required to demonstrate that the agency could
have proceeded on a more informed basis if it would have complied
with NEPA. Jackson Hole, 96 F. Supp. 2d at 1294. The plaintiff is
not required to demonstrate that the agency would change its
decision upon NEPA compliance. Id. Ordinarily, this element is
easily satisfied in NEPA cases because a federal court can enjoin
the implementation of the rule that is based on a deficient NEPA
analysis until the agency can better inform itself of the
consequences of its actions. Sierra Club, 287 F.3d at 1265.

    2.   Application.

Wyoming has standing because it was adversely aggrieved by the
Forest Service's failure to follow mandatory NEPA procedures when
it promulgated the Roadless Rule, which necessarily increased the
environmental risks to state and federal forests within Wyoming.
See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 883 (1990); Rio
Hondo, 102 F.3d at 448-49.

    a.   Injury in Fact.

Wyoming has presented evidence that the Roadless Rule will
increase the risk of environmental harm to its thousands of acres
of state forest land that are adjacent to, or intermingled with,
lands designated by the Forest Service as inventoried roadless

30

areas. Defendant-Intervenors' standing arguments fail because those arguments are based on the flawed premise that the sole injury Wyoming has alleged is an injury to its economic interests. Wyoming has been injured within the scope of NEPA in two fundamental ways.

First, Wyoming's risk of actual or threatened harm was increased by the Forest Service's promulgation of the Roadless Rule because the Roadless Rule may damage Wyoming's environmental resources. For decades, the Forest Service has actively managed the National Forests to prevent the spread of forest disease, insect infestations, and wildfires. Many of the National Forest acres that were previously managed in Wyoming have been designated as roadless areas. (Pl.'s Reply Br., Exh. 2). As a result, there is a real and substantial possibility that forest disease, insect infestation, and wildfires from the non-managed National Forests in Wyoming will spread into Wyoming's state forests that are contiguous to those National Forests.

For example, the Medicine Bow-Routt National Forest has several "blow down" sections that have become infected with the spruce bark beetle.[19] (Id.). Additionally, the downed timber in

---

[19] The "blow down" areas in the Medicine Bow-Routt National Forest were caused by 120-mile per hour winds that hit the forest in the

these areas creates the risk of catastrophic wildfire. (Id., at ¶¶
7-8).   The Forest Service had planned some timber salvage in
certain areas of the Medicine Bow-Routt National Forest to reduce
the risk of wildfire and the impact of the spruce bark beetle
infestation.  However, because of the designation of certain areas
in the Medicine Bow-Routt National Forest as roadless areas, such
active forest management is no longer feasible.  Consequently, the
decrease in active forest management in the Medicine Bow-Routt
National Forest substantially increases the risk of spruce beetle
infestation and wildfire spread to forested lands in Wyoming
contiguous to that National Forest.

     Second, the Tenth Circuit has held that "harm to the
environment may be presumed when the agency fails to comply with
the required NEPA procedure." Davis v. Mineta, 302 F.3d 1104, 1115
(10th Cir. 2002).   As described more fully below, the Forest
Service failed to comply with NEPA in promulgating the Roadless
Rule.  Wyoming has demonstrated injury to its concrete interests
for purposes of standing because it has shown actual or threatened
injury to its natural resources, which have a close geographic

---

fall of 1997.  That windstorm resulted in over four million trees
being blown down in a thirty mile stretch of the National Forest.

nexus to the inventoried roadless areas.  <u>See</u> <u>Sierra Club</u>, 287 F.3d
at 1265.

         b.    Causation.

    Neither Federal Defendants nor Defendant-Intervenors have
argued that Wyoming's injuries were not caused by the Roadless
Rule.  The Court notes, however, that the Forest Service's failure
to consider certain environmental impacts, such as the cumulative
impacts of the Roadless Rule, increased the risk of injury to
Wyoming's natural resources because the Forest Service was
proceeding on an uninformed basis.  <u>See</u> <u>Jackson Hole</u>, 96 F. Supp.
2d at 1294.

         c.    Redressability.

    Federal Defendants argue that the increased risk of injury to
Wyoming's lands is not redressable because fuel treatments and
responses to spruce bark beetles within National Forest lands are
entirely within the discretion of the Forest Service.  (Fed. Defs.'
Resp. Br., at pp. 23-26).  This argument is unavailing for two
reasons.

    First, while the Forest Service does have discretion in its
management of the National Forests, the Roadless Rule takes away
that discretion.  For example, the Roadless Rule does not provide

33

for an exception that would permit the Forest Service to build a
road into the inventoried roadless area in the Medicine Bow-Routt
National Forest (or any national forest) to treat a particularly
pervasive insect infestation, such as the case of the spruce bark
beetle.[20]   Therefore, without access to the inventoried roadless
areas, the local foresters have one choice in how to manage the
problem: let nature run its course.

Second, Wyoming has demonstrated a procedural injury by the
Forest Service's failure to comply with NEPA.  Therefore, setting
aside the Roadless Rule would redress Wyoming's injuries because
the Forest Service would then be proceeding on a more informed
basis.

    3.   Conclusion.

For the aforementioned reasons, the Court **FINDS** Wyoming has
satisfied all the Article III jurisdictional requirements to

---

[20] The only exception to the Roadless Rule that would arguably apply
in such a situation is found in 36 C.F.R. § 294.12(b)(1).  However,
that subsection of the Roadless Rule does not provide for treatment
of insect infestations unless such infestation is classified as a
"catastrophic event."   For a road to be built to treat a
"catastrophic event," a claimant would still have to demonstrate
that the fire or event is:  (1) imminent; and (2) would cause the
loss of life or property without intervention.   36 C.F.R.
294.12(b)(1).  In other words, routine and proactive insect and
fire treatment is unavailable under the Roadless Rule.

maintain its challenge to the Roadless Rule.

## II.   **Wyoming's Claims Challenging the Roadless Rule**.

Wyoming argues that the Roadless Rule was promulgated in violation of NEPA, the Wilderness Act, the NFMA, the MUSYA, and the Wyoming Wilderness Act.  Each argument will be discussed in turn.

A.   Wyoming's National Environmental Policy Act Claims.

Wyoming argues that the Roadless Rule was promulgated in violation of NEPA.  (Pl.'s Opening Br., at pp. 48-62).  Federal Defendants and Defendant-Intervenors respond that the Forest Service involved Wyoming, and the public generally, in one of the most extensive public involvement campaigns ever undertaken in the history of administrative law and that the Forest Service met, if not exceeded, all statutory and regulatory requirements.  (Fed. Defs.' Resp. Br., at pp. 40-61; Def.-Intervenors' Resp. Br., at pp. 20-46).

1.   NEPA Overview.

a.   NEPA's Statutory Mandate and Structure.

NEPA requires federal agencies to consider the environmental impacts of their actions, disclose those impacts to the public, and then explain how their actions will address those impacts. Baltimore Gas & Elec. Co. v. Natural Res. Defense Council, 462 U.S.

35

87, 97 (1983). NEPA prescribes the process, not the end result, of agency action. Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989). If the agency follows the NEPA process, as set forth in the agency's implementing regulations, the public is ensured that the agency was informed of the environmental consequences of its final action. Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1172 (10th Cir. 1999). In this regard, the Tenth Circuit has repeatedly emphasized that NEPA only requires an agency to take a "hard look" at environmental consequences before taking a major federal action that significantly affects the quality of the human environment. Citizens' Comm. to Save Our Canyons v. U.S. Forest Service, 297 F.3d 1012, 1022 (10th Cir. 2002) [hereinafter "Save Our Canyons"].

To ensure that federal agencies take a "hard look" at the environmental consequences of their actions, NEPA requires an agency to prepare an environmental impact statement ("EIS"). Friends of the Bow v. Thompson, 124 F.3d 1210, 1213 (10th Cir. 1997). "An EIS is a detailed statement of the environmental impact of a proposed action." Id. The Tenth Circuit has described the NEPA process an agency follows in preparing an EIS:

Initially, any agency announces its intent to study a proposed action through a process called scoping, during

36

which the agency solicits comments and input from the
public and other state and federal agencies with the goal
of identifying specific issues to be addressed and
studied. 40 C.F.R. § 1501.7. After assessing the input
from the scoping process, the government then prepares a
draft Environmental Impact Statement (DEIS), id. §
1502.9(a), which is then presented to the public and
other government agencies for notice and comment. Id. §
1503.1(a). After evaluating the feedback received during
the notice and comment process, the agency prepares a
[final EIS (FEIS)]. Id. § 1502.9(b). If after preparing
either a DEIS or FEIS, the proposed action substantially
changes in a way "relevant to environmental concerns," or
if new information comes to light about environmental
impacts, an agency must prepare a supplemental EIS
(SEIS). Id. § 1502.9(c)(1).

Save Our Canyons, 297 F.3d at 1022.

In the end, the agency must address the following in its EIS:
(1) the purpose and need for the proposed action; (2) environmental
impacts resulting from the actions; (3) alternatives to the
proposed action; (4) the relationship between short-term uses and
long-term productivity; and (5) the amount of resources that must
be devoted to the proposed action. Id.; 42 U.S.C. § 4332(2)(C)(i)-
(v); 40 C.F.R. § 1502.10.

              b.   Judicial Review of NEPA Compliance.

The role of the judiciary in the NEPA process is twofold.
First, the court must ensure that the agency has taken a hard look
at the environmental consequences of its actions and has adequately
disclosed those impacts to the public. Baltimore Gas, 462 U.S. at

                                37

97-98; Middle Rio Conservancy Dist. v. Norton, 294 F.3d 1220, 1225 (10th Cir. 2002). Second, the court must ensure that the agency's decisions were not arbitrary or capricious. Baltimore Gas, 462 U.S. at 97-98; Utahns for Better Transp., 305 F.3d at 1163.

In reviewing the adequacy of an EIS, a federal court simply examines whether the agency objectively presented all the topics required by NEPA. Colo Envtl. Coalition, 185 F.3d at 1172. In so reviewing, the court must make a pragmatic judgment about whether the preparation of the EIS and its ultimate form and content fostered informed public participation and informed decisionmaking. Id.

While a federal agency is entitled to a presumption of regularity in arriving at its decision, the court is not simply a "rubber stamp" for agency action and will set aside agency action if it is in contravention of the agency's own rules or congressional mandate. See Glisson v. U.S. Forest Service, 876 F. Supp. 1016, 1023-24 (S.D. Ill. 1993). In other words, the court will not accept pro forma compliance with NEPA procedures, nor post hoc rationalizations as to why and how the agency complied with NEPA. See Davis v. Mineta, 302 F.3d 1104, 1112-13 (10th Cir. 2002); Utahns for Better Transp., 305 F.3d at 1165.

38

2.  Wyoming's Specific Claims Against the Forest
    Service.

Wyoming argues the Forest Service violated NEPA in six ways
when it promulgated the Roadless Rule.  Each contention will be
addressed in turn.

        a.  The Forest Service's Procedure in Implementing
            the Roadless Rule.

Wyoming argues that the Forest Service's process in
implementing the Roadless Rule was fundamentally flawed as a result
of its "mad dash to complete the Roadless Initiative before
President Clinton left office." (Pl.'s Opening Br., at p. 48).
Federal Defendants respond that the Forest Service provided
adequate information to the public during the rulemaking process.
(Fed. Defs.' Resp. Br., at pp. 42-45). Defendant-Intervenors
contend that Wyoming has blurred the distinct phases of the NEPA
process, which has resulted in its confusion regarding the NEPA
requirements at each stage. (Def.-Intervenors' Resp. Br., at pp.
20-27).

            i.  The Dissemination of Information During
                the Scoping Period.

Wyoming argues that the information disseminated to the public
during the scoping period and development of the EIS was "woefully
inadequate" and that the Forest Service should have extended the

39

scoping period until it made better information available. (Pl.'s
Opening Br., at p. 49-51).

The scoping period is an "early and open" process for
determining the scope of the issues to be addressed in the EIS and
for identifying significant issues related to the rulemaking.    40
C.F.R. §§ 1501.7, 1508.25. During the scoping process, an agency
is required to invite the participation of federal agencies,
states, local governments, and Indian tribes that may be affected
by the agency action.[21]   40 C.F.R. § 1501.7(a)(1).   The agency
determines the scope of the proposed action by considering three
types of actions, three types of alternatives, and three types of
impacts.   40 C.F.R. §§ 1501.7(a)(2), 1508.25(a)-(c). The agency is
then required to allocate assignments for preparation of the EIS
among   itself   and   cooperating   agencies.   40   C.F.R.   §
1501.7(a)(4),(6).

The clear import of  § 1501.7(a)'s mandatory language is that
the   agency   undertaking   the   action   shall   engage   with   other
governmental entities in an open and public manner so that they may

_____

[21] In subsection (a) of § 1501.7, the regulation provides that the
agency "shall" perform certain activities.    This language is
mandatory as evidenced by subsection (b) of § 1501.7, which
provides a list of activities the agency "may" perform during the
scoping period.   See 40 C.F.R. § 1501.7(a)-(b).

work together in preparing the EIS.  40 C.F.R. § 1501.7(a).  When a federal agency is required to invite the participation of other governmental entities and allocate responsibilities to those governmental entities, that participation and delegation of duty must be meaningful.

### ii.  Application.

Wyoming contends that although it was one of the states most affected by the Roadless Rule, it could not meaningfully participate  in the scoping process because the Forest Service did not provide it with adequate information.  Specifically, Wyoming did not know where the alleged roadless areas were because the Forest Service did not provide any maps until after the scoping period had ended.  The Forest Service's NOI to prepare the draft EIS did not provide any information regarding the estimated geographic ambit of the proposed rule nor any maps of the inventoried roadless area.

The Court agrees that Wyoming and other affected states could not meaningfully "participate" in determining the scope and significant issues to be analyzed in the EIS, which requires consideration of the mitigating measures and impacts of the alleged action, without knowing specifically what roadless areas the rule

41

covered.   See 40 C.F.R. §§ 1501.7(a)(1)-(2), 1508.25(b)-(c).   For
example, Wyoming could not meaningfully provide input on the scope
of the proposed EIS by commenting on the direct, indirect, and
cumulative impacts of the Roadless Rule in Wyoming when it did not
know what areas in Wyoming were to be designated as roadless.   See
40 C.F.R. §§ 1501.7(a)(1)-(2), 1508.25(c)(1)-(3).

     According to Defendant-Intervenors, the Roadless Rule was the
"most  significant  land  conservation  initiative  in  nearly  a
century."   (Def.-Intervenors' Resp. Br., at p. 1).   With NEPA's
purpose in mind – adequate and full disclosure – maps accurately
depicting the areas covered by the Roadless Rule are the most basic
and fundamental information needed to begin the scoping process.
Wyoming could not meaningfully participate in defining the scope of
a rule when it did not know what lands within its borders would be
impacted by the rule.   The Administrative Record is replete with
the Forest Service's own admissions that its data was incomplete,
outdated, and simply inaccurate.[22]

     Notwithstanding these admissions, the Forest Service would not

---

[22] (See AR, Doc. 5612, at pp. 14, 73-74, 77, 80-82; Doc. 1408, at
pp. 1, 8; Doc. 2113, at p. 1; Doc. 2115, at p. 1; Doc. 2123, at p.
1; Doc. 3062, at p. 1; Doc. 2770, at pp. 1-6; Doc. 2600, at p. 1;
Doc. 2610, at p. 1; Doc. 899, at p. 1; Doc. 4060, at pp. 1-2; Doc.
3682, at p. 1).

extend the scoping period because of the significant time
constraints that it imposed on itself. From the outset, the Forest
Service's plan was to proceed according to its predetermined
schedule, which was imposed before the scoping process began, with
the hope that the updated roadless information would be included in
the final EIS.[23]

### iii. Conclusion.

To the Court, the facts evidence mere *pro forma* compliance
with NEPA's scoping procedures and requirements. Therefore, the
Court finds that the Forest Service's refusal to extend the scoping
period, notwithstanding the protests of nearly all of the affected
states, for the sole reason of meeting a self-imposed deadline was
arbitrary and capricious. This is particularly true in this case
because the Forest Service was aware that better information was
available, even within the Forest Service itself, but simply
refused to use that information because it did not comport with the
arbitrary deadline by which the final rule had to be promulgated.

b. Denial of Cooperating Agency Status.

---

[23] The predetermined schedule from which the Forest Service
adamantly refused to deviate is in contravention of the CEQ
regulations. Those regulations provide that the agency may set
time limits as part of the open scoping process. See 40 C.F.R. §
1501.7(b)(2).

Wyoming argues that the Forest Service's decision to deny it cooperating agency status was arbitrary and capricious. (Pl.'s Opening Br., at p. 51-52). Federal Defendants respond that the decision to grant cooperating agency status is completely discretionary; therefore, the Forest Service cannot be faulted for its failure to exercise its discretion. (Fed. Defs.' Br., at p. 50). Defendant-Intervenors argue that NEPA's regulations provide federal agencies wide latitude on whether to include non-federal agencies as a cooperating agency. (Def.-Intervenors' Opp. Br., at p. 36).

> i.    The Grant of Cooperating Agency Status to
>       States.

The NEPA regulations emphasize inter-agency cooperation early in the NEPA process by designating as cooperating agencies those agencies that have expertise in the field or are affected by the lead agency's actions. 40 C.F.R. § 1501.6. A state may become a cooperating agency only through agreement with the lead federal agency. 40 C.F.R. § 1508.5. However, just over two months before the Roadless Rule NOI was published, the Director of the CEQ urged agencies to more actively solicit the participation of state governments as cooperating agencies during the scoping process because cooperating agency relationships with state agencies help

44

to achieve the purposes of NEPA.  (AR, Doc. 3544, at pp. 2-3).

ii.   Application.

The Court agrees with Federal Defendants that the Forest
Service, acting as lead agency, had the discretion to grant or deny
the states cooperating agency status.  See 40 C.F.R. § 1508.5.  The
Court also agrees with the Director of the CEQ that granting
cooperating agency status serves the purposes of NEPA.   See 42
U.S.C. § 4331(a).   Wyoming requested cooperating agency status
early in the scoping process; however, the Forest Service did not
even see fit to respond to that request until after the draft EIS
was released.  (AR, Doc. 1889).  When it did respond, the Forest
Service still did not provide Wyoming with a reason why it denied
the state cooperating agency status.[24]  However, the director of the
roadless project indicated that cooperating agency status was
denied because states would want to work at too great of a "level
of detail."  (AR, Doc. 3085).

The Court finds that the Forest Service acted arbitrarily and

_____

[24] The Forest Service did reference Wyoming to a proposal it
extended to the Western Governors' Association, which would have
relegated the state to "collecting and synthesizing" comments
rather than participating in the production of the EIS as a
cooperating agency pursuant to 40 C.F.R. § 1501.6(b).   In other
words, the Forest Service told Wyoming, and the Western Governors:
"You are good enough to work for us, but not good enough to work
with us."

45

capriciously in denying Wyoming, and the nine other states most affected by the Roadless Rule, cooperating agency status. This finding is not premised on a conclusion that the Forest Service had a duty to grant cooperating agency status to any of the states that requested that status, nor does it provide a judicial gloss on the lead federal agency's discretionary authority to grant cooperating agency status. Rather, the finding is based on the fact that the Roadless Rule affected 53.37 million acres of land, or 92% of the total inventoried roadless areas, in those ten most affected states, and the Forest Service did not find it worth its time to explain why it was denying cooperating agency status to those states. Moreover, the logistics of coordinating with ten states would not have been insurmountable.

The roadless team director's statement that cooperating agency status was being denied because the Forest Service did not want to work at the "level of detail" as the states affected by the Roadless Rule also evidences: (1) that the Forest Service was not proceeding with all the relevant and valuable information that was available on the environmental consequences of its action; and (2) that the Forest Service was omitting relevant and valuable information for the sole reason of administrative simplicity. With

regard to the latter, it is also important to note that the Forest
Service adopted the top-down administrative approach to the
implementation of the Roadless Rule and defined the scope of the
project itself, so it cannot now complain of the administrative
difficulties associated with the implementation of the Roadless
Rule.

### iii. Conclusion.

There is not one good reason in the administrative record
before the Court explaining why cooperating agency status was
denied to the ten most affected states, including Wyoming,
especially in light of the CEQ's direction that federal agencies
should actively solicit participation of the states in order to
comply with NEPA's statutory mandate. Absent any such explanation,
the Court must again conclude that Wyoming was right in
characterizing the Forest Service's process as a "mad dash to
complete the Roadless Initiative before President Clinton left
office." The Forest Service dared not let any of the ten most
affected states have cooperating agency status, lest its "mad dash"
would be slowed to a walk. For these reasons, the Court finds that
the Forest Service acted arbitrarily and capriciously in denying
cooperating agency status to the ten states most affected by the

47

Roadless Rule.

        c.    The Forest Service's Failure to Consider a
             Reasonable Range of Alternatives.

Wyoming argues that the Forest Service failed to consider a
reasonable range of alternatives to its proposed action. (Pl.'s
Opening Br., at pp. 52-55). Federal Defendants respond that the
Forest Service considered a "wide range" of alternatives in light
of its defined purpose for the Roadless Rule. (Fed. Defs.' Br., at
pp. 52-57). Defendant-Intervenors argue that the Forest Service
complied with NEPA's alternatives requirement by analyzing a full
range of alternatives that would satisfy the agency's legitimate
goal of protecting roadless areas. (Def.-Intervenors' Opp. Br., at
14).

        i.    NEPA's Alternatives Requirement.

Early in the NEPA process, a federal agency is required to
"[s]tudy, develop, and describe" alternatives to its proposed
action. 42 U.S.C. § 4332(E); 40 C.F.R. § 1501.2(c). If the
federal agency prepares an EIS, NEPA requires the federal agency to
rigorously explore and objectively evaluate reasonable alternatives
to its proposed action. 42 U.S.C. § 4332(C)(iii); 40 C.F.R. §
1502.14(a); Utahns for Better Transp., 305 F.3d at 1166. The
requisite level of detail and the number of alternatives an agency

48

must consider depends on the nature and scope of the agency's proposed action. Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1289 (1st Cir. 1996). The alternatives requirement is the linchpin of NEPA, and the alternatives section is "the heart" of the EIS. Save Our Canyons, 297 F.3d at 1030; 40 C.F.R. § 1502.14.

To comply with NEPA, an agency must give each reasonable alternative "substantial treatment" in the EIS. 40 C.F.R. § 1502.14(b); Save Our Canyons, 297 F.3d at 1030. A "reasonable alternative" is one that is non-speculative and bounded by some notion of feasibility. Utahns for Better Transp., 305 F.3d at 1172. When the agency eliminates an alternative from detailed study, it must briefly discuss the reason for eliminating that alternative. 40 C.F.R. § 1502.14(a); Utahns for Better Transp., 305 F.3d at 1166. The existence of a reasonable, but unexamined, alternative renders the EIS inadequate. Dubois, 102 F.3d at 1287.

In the Tenth Circuit, federal courts are required to "look closely" at the EIS's purpose to determine whether the agency considered reasonable alternatives. Save Our Canyons, 297 F.3d at 1030. It is well established that an agency cannot define the purpose of its project so narrowly that it precludes consideration of reasonable alternatives. Davis, 302 F.3d at 1119. This is

because "[o]ne obvious way for an agency to slip past the structures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." Id. (quoting Simmons v. U.S. Army Corps of Eng'rs, 120 F.3d 664, 666 (7th Cir. 1997)).

In reviewing an agency's choice of alternatives, and the extent to which the EIS addresses each alternative, federal courts in the Tenth Circuit employ the "rule of reason." Custer County Action Ass'n, 256 F.3d at 1040. The rule of reason requires the court to determine whether the EIS contained a sufficient discussion of the relevant issues and opposing viewpoints to enable the agency to take a hard look at the environmental consequences of its proposed action and the alternatives to that action. Save Our Canyons, 297 F.3d at 1031. In applying this rule, federal courts will not permit an agency to circumvent NEPA by narrowly defining the purpose of the proposed action and thereby avoiding its duty to consider reasonable alternatives. 42 U.S.C. § 4332(C)(iii); Davis, 302 F.3d at 1119. As explained by the Seventh Circuit, if "NEPA mandates anything, it mandates this: a federal agency cannot ram through a project before first weighing the pros and cons of the alternatives." Simmons, 120 F.3d at 670 (emphasis added).

ii. The Forest Service's Alternatives Analysis in Implementing the Roadless Rule.

On October 13, 1999, President Clinton directed the Forest Service to develop regulations that provide appropriate long-term protection for most or all currently inventoried roadless areas (i.e., RARE I and RARE II inventoried Roadless Areas). (AR, Doc. 1535, at p. 2). The next day, Chief Dombeck informed Forest Service employees that the public process would begin with a notice of intent to prepare an EIS. (AR, Doc. 330, at p. 1). The EIS was to "examine alternative methods to meet the goals established by the President." (AR, Doc. 330, at p. 1). However, the Forest Service was only to "examine alternatives that limit or eliminate certain activities in inventoried roadless areas such as road construction." (AR, Doc. 330, at p. 1).

The Forest Service apparently believed that public comments in response to the NOI were unhelpful in defining a range of alternatives for the draft EIS. (AR, Doc. 4609, at p. 2-15). In the draft EIS, the Forest Service defined the twofold purpose of the Roadless Rule:

(1) to immediately stop activities that have the greatest likelihood of degrading desirable characteristics of inventoried roadless areas, and (2) to ensure that ecological and social characteristics of inventoried

51

roadless and other unroaded areas are identified and
evaluated through local forest planning efforts.

(AR, Doc. 1362, at p. 1-10).  The final EIS defined the purpose of
the Roadless Rule in substantially the same manner.    (AR, Doc.
4609, at p. 1-14).[25]

    To achieve this purpose, the Forest Service decided only to
analyze alternatives that eliminated road construction and timber
harvest in roadless areas because road construction and timber
harvest:    (1) occur on a national scale; (2) have the greatest
likelihood of altering landscapes; (3) often cause landscape
fragmentation; and (4) often result in immediate, irreversible, and
long term loss of roadless characteristics.  (AR, Doc. 1362, at pp.
1-10 to 1-11; AR, Doc. 4609, at p. 1-16).  The Forest Service then
eliminated from detailed study every other proposed alternative on
the basis that they did not meet the purpose of immediately
stopping activities that resulted in the degradation of roadless
areas.    (AR, Doc. 1362, at pp. 2-16 to 2-21; AR, Doc. 4609, at pp.

_____

[25] The preamble to the Roadless Rule stated that the "final rule
prohibits road construction, reconstruction, and timber harvest in
inventoried roadless areas because they have the greatest
likelihood of resulting in long-term loss of roadless area values
and characteristics."  66 Fed. Reg. at 3244 (Jan. 12, 2001).  The
purpose of the final Roadless Rule was to "provide, within the
context of multiple-use management, lasting protection for
inventoried roadless areas within the National Forest System."  40
C.F.R. § 294.10.

2-15 to 2-22).

After eliminating alternatives that did not meet the purpose of the Roadless Rule, the Forest Service considered the mandatory no-action alternative and three "action alternatives."[26] (AR, Doc. 4609, at pp. 2-5 to 2-8). As the Forest Service explained, the "action alternatives have essentially the same effect on access. . . . No new roads would be built in inventoried roadless areas, and existing roads could not be reconstructed." (AR, Doc. 4609, at p. 3-41). In other words, the proposed action alternatives were all identical except the degree of restrictions placed on timber harvest.

Alternative 2, which prohibited road construction in inventoried roadless areas, and Alternative 4, which prohibited road construction and all timber cutting in inventoried roadless areas, had the same practical effect with regard to timber harvest. (See AR, Doc. 4609, at pp. 2-6 to 2-8). Alternative 2 prohibited all road construction in roadless areas and explained that road construction activities in support of logging activities that used

---

[26] The Forest Service never actually considered the "no action" alternative as a viable alternative. In fact, the Forest Service eliminated other proposed alternatives because, like the no action alternative, they did not meet the purpose of the Roadless Rule. (AR, Doc. 4609, at p. 2-18).

ground-based equipment (including helicopters) would be prohibited under this alternative. (AR, Doc. 4609, at p. 2-7). Thus, Alternatives 2 and 4 had the practical effect of eliminating all timber harvest in roadless areas.[27]

In essence, the Forest Service only considered two action alternatives: (1) prohibiting road construction and timber harvest altogether (Alternatives 2 and 4); or (2) prohibiting road construction and timber harvest except for stewardship purposes (Alternative 3). However, under Alternative 3, harvesting timber for stewardship purposes could only occur in roadless areas where the harvesting: (1) maintained or improved roadless area characteristics; and (2) improved threatened, endangered, proposed or sensitive species habitat; or, reduced the risk of "uncharacteristically intense" fire; or, restored ecological structure, function, processes, or composition to roadless areas (AR, Doc. 4609, at p. 2-7 (emphasis added)). In addition, Alternative 3 also prohibited logging for stewardship purposes using ground-based equipment. (AR, Doc. 4609, at p. 2-7). This exception, if it permits timber harvesting at all, is extremely

_____

[27] The Court notes that it is extremely difficult to harvest timber without a road, and this especially true when the Forest Service prohibits foresting by helicopter.

54

limited.

### iii. Application.

The Court finds that the Forest Service's alternatives analysis for the Roadless Rule violated NEPA and its implementing regulations because the agency did not provide an adequate discussion of the alternatives it was required to address.  This is true in several respects.

First, the Court notes that, in reality, the Forest Service only considered two action alternatives in implementing the "most significant land conservation initiative in nearly a century."  The number of alternatives an agency must consider, and the requisite level of detail it must give to those alternatives, are directly proportional to the scope and nature of the proposed action.  The Forest Service stated that it did not consider various components of the alternatives, "such as mitigation, geographical scope, and exemptions for specific roadless areas" because it would create an "unmanageably large number of alternatives."  (AR, Doc. 4609, at p. 2-15).  Thus, the Court is left to believe that the Forest Service violated CEQ regulations because it did not rigorously explore reasonable alternatives and did not include appropriate mitigation measures in the proposed alternatives.    See  40  C.F.R.  §

1502.14(a),(b), (f). This Court will not permit the Forest Service to promulgate a rule of national scope and then eliminate alternatives simply because it finds considering a large number of them "unmanageable."

Second, the Forest Service eliminated some alternatives on the basis that they were covered by procedural aspect of the Roadless Rule and then eliminated the procedural aspect of the Roadless Rule, without giving further consideration to the eliminated alternatives. The Forest Service stated that the Roadless Rule was promulgated for two purposes: (1) to immediately stop activities that have the greatest likelihood of degrading desirable characteristics of roadless areas; and (2) to ensure that ecological and social characteristics of inventoried roadless areas were identified and evaluated through local forest planning efforts. However, the Forest Service unilaterally, and without notice to the public, eliminated the latter purpose from the rule when it removed the "procedural aspects" of the Roadless Rule. As a result, alternatives that were eliminated from consideration in the draft EIS on the grounds that the procedural aspect of the Roadless Rule precluded further examination, should have been reevaluated.

For example, the mineral withdrawal exemptions were eliminated from study because such activities could be proposed through the implementation of the procedural alternatives, i.e., through proposals to local forest managers. (AR, Doc. 1362, at p. 2-18). However, after the final EIS was published, and the procedural aspect of the rule was eliminated, the Forest Service did not reevaluate the need for mineral withdrawal exemptions. Instead, it simply stated that mineral withdrawals in inventoried roadless areas could be proposed "in compliance with Department of Interior rules and procedures." (AR, Doc. 4609, at p. 2-19). The Forest Service did not inform the public or the mining industry what these rules were, nor why it had changed its position between the draft EIS and the final EIS.

As this example demonstrates, by eliminating the procedural aspects of the Roadless Rule, the Forest Service eliminated all reasonable alternatives that could have been evaluated through the local forest planning process without rigorously exploring or objectively evaluating this potential large and significant class of alternatives. 40 C.F.R. § 1502.14(a). In other words, the range of alternatives considered by the Forest Service was inadequate. This is because the nature and scope of the proposed

57

action materially changed between the draft EIS and the final EIS, and the agency failed to update the list of alternatives it considered to reflect those changes.

Third, early in the NEPA process, Chief Dombeck informed his employees that they would only consider alternatives, such as eliminating road construction, that protected roadless areas. The Forest Service then proceeded throughout the NEPA process on the premise that any road construction whatsoever would degrade the desirable characteristics of inventoried roadless areas in contravention of the purpose of the Roadless Rule. See 66 Fed. Reg. 3244. Neither Federal Defendants nor Defendant-Intervenors have directed the Court to any evidence considered by the Forest Service to support this conclusory premise.

Thus, the Court is left with the conclusion that the Forest Service did not rigorously explore and objectively evaluate reasonable alternatives to the Roadless Rule. 40 C.F.R. § 1502.14(a),(b); see also Concerned About Trident v. Rumsfeld, 555 F.2d 817, 827 (D.C. Cir. 1977) (finding conclusory discussion of alternatives in a final EIS inadequate). The Court's conclusion is supported by the administrative record. For example, the Forest Service eliminated from consideration exceptions to permit road

construction activities for "hazardous fuel reduction treatments, insect and disease treatments, and forest health management" because an "exception for these activities could lead to widespread road construction in many roadless areas that would be incompatible with the [Roadless Rule's] stated purpose and need." (AR, Doc. 4609, at p. 2-22). The Forest Service's cavalier dismissal of such forest management activities, which have been the environmental status quo for decades, compels the Court to find that the Forest Service did not give each reasonable alternative substantial treatment in the EIS or take a hard look at the environmental consequences of its actions.   40 C.F.R. § 1502.14(a)-(b).

The Forest Service's inadequate alternative analysis was the result of the agency narrowly defining the scope of its project to satisfy a predetermined directive by Chief Dombeck, which eliminated competing alternatives out of consideration and existence.   The Court recognizes that the Forest Service did not have a duty to evaluate alternatives inconsistent with the purpose of the Roadless Rule or unreasonable alternatives; however, the Forest Service cannot circumvent NEPA's alternatives requirement by so narrowly defining its purpose as to eliminate consideration of such alternatives.

Moreover, there is nothing unreasonable about studying in detail an alternative that would permit the construction of a road into a roadless area to protect the forest through active forest management. In this case, the Forest Service's preordained conception of what a roadless area would be, and its schedule for implementing the final rule, caused the Forest Service to drive the Roadless Rule through the administrative process without weighing the pros and cons of reasonable alternatives to the Roadless Rule. At no time did the Forest Service stop to consider whether Roadless Rule was the best idea for the greatest number of people. Rather, President Clinton issued his directive on October 13, 1999, and by the next day, Chief Dombeck had eliminated road construction as an alternative in inventoried roadless areas.

iv. Conclusion.

The alternatives section of the Roadless Rule EIS was implemented to justify the Forest Service's predetermined decision to prohibit all road construction and timber harvest in roadless areas, even if such activity was beneficial to the forest. The Forest Service's haste in this regard violated NEPA and its implementing regulations. See 40 C.F.R. § 1502.2(g). As a result, the Forest Service's promulgation of the Roadless Rule was not in

60

accordance with law because the agency failed to rigorously explore and objectively evaluate all reasonable alternatives.   5 U.S.C. § 706(2)(A); <u>Dubois</u>, 102 F.3d at 1289-90.

> d.   The Forest Service's Failure to Conduct a Site-Specific Analysis.

Wyoming argues that the Forest Service failed to perform the required site-specific analysis for the Roadless Rule.   (Pl.'s Opening Br., at pp. 55-59).   Federal Defendants respond that the Forest Service fulfilled its duty to conduct a site-specific analysis under NEPA.   (Fed. Defs.' Resp. Br., at pp. 57-60). Defendant-Intervenors assert that Wyoming's site-specific analysis argument is without merit because if a site-specific analysis was mandated, it would be practically impossible for a national land agency to make any type of large scale regulations.   (Def.- Intervenors' Opp. Br., at p. 40).

> i.   Site-Specific   Analysis   in   an Environmental Impact Statement.

Three Circuit Courts of Appeal have concluded that NEPA requires a federal agency to conduct a site-specific analysis of its proposed action.   <u>Conservation Law Found. of New England v. General Serv. Admin.</u>, 707 F.2d 626, 630-31 (1st Cir. 1983); <u>Sierra Club v. Peterson</u>,   717 F.2d 1409, 1414-15 (D.C. Cir. 1983);

California v. Block, 690 F.2d 753, 763-64 (9th Cir. 1982). These
courts have reasoned that a federal agency's duty to conduct a
site-specific analysis is a component of its larger duty under NEPA
to provide a sufficiently "detailed statement" on which the
agency's decisionmakers and the public can base their conclusions.
42  U.S.C.  §  4332(c);   40  C.F.R.  §§  1501.2(b),  1502.16;
Conservation Law Found., 707 F.2d at 631.   The Tenth Circuit has
never held that NEPA requires a federal agency to undertake a
detailed site-specific analysis.

### ii. Application.

Neither the Supreme Court nor the Tenth Circuit has ascribed
to the Ninth Circuit's view that an agency must conduct a
"reasonably thorough" site-specific analysis under NEPA.   See
California v. Block, 690 F.2d 753, 765 (9th Cir. 1982).   Wyoming
has made a compelling argument that under California v. Block, the
Forest Service was required to conduct a detailed and thorough
site-specific analysis as part of the Roadless Rule NEPA process.[28]

### iii. Conclusion.

In the absence of a clear statutory or regulatory directive,
and a binding decision on point, this Court will not impose

---

[28] However, a strong argument could be made that Kootenai Tribe, 313
F.3d at 1113-1125, impliedly overruled Block.

additional NEPA duties on federal agencies. The Forest Service was not required to conduct a detailed site-specific analysis of every forest affected by the Roadless Rule. Therefore, the Court finds that the Forest Service's failure to conduct a site-specific analysis did not violate NEPA.

          e.   The Forest Service's Failure to Conduct an Adequate Cumulative Impacts Analysis.

Wyoming argues that the Forest Service violated NEPA when it promulgated the Roadless Rule because it failed to adequately consider the cumulative impacts of the Roadless Rule, Planning Regulations, Road Management Rule, and Transportation Policy. (Pl.'s Opening Br., at pp. 59-63). Federal Defendants argue that the three challenged rules are not so interdependent that the Forest Service was irrational in implementing the Roadless Rule without considering the impacts of the Planning Regulations, Road Management Rule, and Transportation Policy. (Fed. Defs.' Resp. Br., at pp. 60-64). Defendant-Intervenors argue that the Forest Service examined the cumulative impacts of the three rules and that this was not even needed as each rule had "independent utility". (Def.-Intervenors' Opp. Br., at p. 20).

          i.   Cumulative Impacts Analysis.

NEPA regulations require an agency to discuss the cumulative

impacts of its proposed action in the EIS.    40 C.F.R. §
1508.25(a)(2); Custer County Action Ass'n v. Garvey, 256 F.3d 1024,
1035 (10th Cir. 2001).    In turn, NEPA regulations define a
cumulative impact as "the impact on the environment which results
from the incremental impact of the action when added to other past,
present, and reasonably foreseeable future actions regardless of
what agency . . . or person undertakes such other actions."    40
C.F.R. § 1508.7.    The agency must consider the cumulative
ecological, aesthetic, historical, cultural, economic, social, or
health effects of its action.  40 C.F.R. § 1508.8(b).

The Tenth Circuit uses an independent utility test to
determine whether particular actions can be considered cumulative
impacts of the proposed action.    Utahns for Better Transp., 305
F.3d at 1173.  Under the independent utility test, an agency must
consider the cumulative impacts of other reasonably foreseeable
agency actions if they are so interdependent with the proposed
action that it would be unwise or irrational to complete one
without the others.  Id.  The district court's duty in reviewing
the agency's cumulative impacts analysis is to examine the
administrative record, as a whole, to determine whether the agency
made a reasonable, good faith, objective presentation of those

64

cumulative impacts sufficient to foster public participation and informed decisionmaking. Colo. Envtl. Coalition, 185 F.3d at 1177.

ii. Application.

The Forest Service's final EIS does not provide an adequate discussion of the cumulative impacts of the Roadless Rule, Planning Regulations, Road Management Rule, and Transportation Policy on the human environment. The Court finds the Forest Service failed to make a reasonable, good faith, and objective presentation of the cumulative impacts of these rules on the environment.

The Forest Service's final EIS generally analyzes the Roadless Rule and its alternative effects on the human environment. (AR, Doc. 4609, at pp. 3-34 to 3-39, 3-69 to 3-72, 3-111 to 3-117, 3-122 to 3-123, 3-204 to 3-207, 3-227, 3-237, 3-240 to 3-242, 3-251 to 3-252, 3-263 to 3-264). However, the final EIS is completely devoid of any substantive discussion on the Roadless Rule's, Planning Regulations', Road Management Rule's, and Transportation Policy's cumulative effects on the environment. (See AR, Doc. 4609, at pp. 3-38 to 3-39, 3-113, 3-396 to 398). In substance, the Forest Service stated that it "recognizes that the Roadless Rule together with other proposed and finalized rules and policies could have cumulative effects." (AR, Doc. 4609, at p. 3-396). The Forest

65

Service then limited its analysis to the single statement that the combined effect of these rules would be to "create additional acres of unroaded areas." (AR, Doc. 4609, at p. 3-113; see also AR, Doc. 4609, at p. 3-397). One need not be an expert in silviculture to draw that general, predictable, and unhelpful conclusion.

The Court's finding that the Forest Service did not make a reasonable, good faith, and objective presentation of the cumulative impacts of these rules in the final EIS is based on the fact that these rules were part of the Forest Service's "comprehensive strategy for accomplishing long-term sustainability of [the national] forests and grasslands." (AR, Doc. 2890, at p. 2). This comprehensive strategy was in place even before President Clinton directed the Forest Service to implement the Roadless Rule. (See AR, Doc. 4153, at p. 2). According to the Forest Service, the interrelated rules would work as follows: (1) the Roadless Rule would permanently halt road construction in unroaded portions of inventoried roadless areas identified by RARE II and other inventories; and (2) the Planning Regulations and Road Management Rule would then provide the process to evaluate extending limitations to uninventoried roadless areas. (AR, Doc. 4153, at p. 2).

The Forest Service's strategy for implementing these rules proceeded on a coordinated basis with separate teams working on each rule, yet routinely communicating with each other to make the rules more cohesive.  (See AR, Doc. 77; Doc. 104, at p. 2; Doc. 3310; Doc. 4901; Doc. 5106; Doc. 4997; Doc. 5095; and Doc. 5594). As part of the Forest Service's coordinated proactive strategy to implement the rules in a relatively short period of time, it would conduct day-long meetings on the cumulative effects of these rules and policies.  (AR, Doc. 4803, at p. 1; AR, Doc. 4153, at p. 2). Additionally, congressional hearings were held on the potential cumulative effects of these three rules and the Transportation Policy.  (AR, Doc. 2815).  At one of those hearings, the Forest Service was criticized because "the roadless area [draft] EIS does not provide a comprehensive analysis of these potential [cumulative] effects.  Instead, [the draft EIS] includes a two-and-one-half-page general discussion of the provisions of the three proposals with broad, non-specific statements of potential effects without analysis."  (AR, Doc. 2815, at p. 7).  The final EIS actually provided less analysis on the cumulative impacts of the rules than the draft EIS.  (Compare AR, Doc. 1362, at pp. 3-240 to 3-242 with AR, Doc. 4609, at pp. 3-392 to 3-394).

The Roadless Rule, Planning Regulations, Road Management Rule, and Transportation Policy affect land use and transportation in every national forest in the United States.  Cumulatively, those rules establish a two-step procedure by which current inventoried roadless areas are permanently protected and then provide the procedural mechanism for further protecting uninventoried roadless areas.    More troubling, however, is the fact that the Forest Service had devised this "comprehensive strategy" even before President Clinton directed it to implement the Roadless Rule. Notwithstanding that it was the Forest Service's strategy to promulgate three interrelated rules in close proximity, it never informed the American public of the cumulative effects of these rules, or even how the rules operated together.

For example, the Roadless Rule provides four limited exceptions for constructing roads in roadless areas.  36 C.F.R. § 294.12(b).  However, even if one of those exceptions applied, the road could only be built if the proposal met the requirements of the Road Management Rule.  36 C.F.R. § 212.5(b)(1).

### iii. Conclusion.

The reasonableness or unreasonableness of the Forest Service's road management strategy is of no concern to the Court; however,

68

the Forest Service had a duty under NEPA to disclose this information to the public. NEPA regulations require a federal agency to conduct a cumulative impacts analysis of its proposed action in the EIS when that action is so interrelated with other actions that it would be irrational to complete one without the other. It was irrational for the Forest Service to develop a comprehensive strategy for implementing interrelated rules and policies, carry out that strategy, and never consider the cumulative effects of its actions or explain them to the public. On the administrative record before this Court, the cumulative impacts analysis was woefully inadequate because those impacts are potentially significant. The Forest Service's contrary conclusion represents a clear error in judgment. 5 U.S.C. § 706(A)(2); see also Davis v. Mineta, 302 F.3d 1104, 1126 (10th Cir. 2002).

> f.  The Forest Service's Failure to Prepare a Supplemental EIS.

Wyoming argues that the Forest Service improperly failed to issue a supplemental EIS. (Pl.'s Opening Br., at pp. 62-63; Pl.'s Reply Br., at pp. 27-30). Federal Defendants respond that the Forest Service was not arbitrary and capricious in failing to prepare a supplemental EIS because none of the changes between the draft EIS and final Roadless Rule affected the environment in a

69

significant manner that had not already been considered. (Fed. Defs.' Resp. Br., at pp. 64-66). Defendant-Intervenors argue that the Forest Service's duty to prepare a supplemental EIS was never triggered by the changes it made to the final Roadless Rule. (Def.-Intervenors' Opp. Br., at p. 27).

                i.    An   Agency's   Duty   to   Prepare   a
                    Supplemental EIS.

NEPA regulations require a federal agency to prepare a supplemental EIS if: (1) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (2) there are significant new circumstances or information relevant to environmental concerns that relate to the proposed action or its impacts. 40 C.F.R. § 1502.9(c)(1)(i)-(ii). The federal agency's duty to prepare a supplemental EIS is mandatory if either of these two situations arise. Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1291-92 (1st Cir. 1996). This duty arises from NEPA's emphasis on public and informed decision making. Southern Utah Wilderness Alliance v. Norton, 301 F.3d 1217, 1238 (10th Cir. 2002). In sum, the "point of a supplemental EIS . . . is to foster informed and thoughtful agency decisions and to promote public involvement in actions affecting [the] environment." Holy Cross Wilderness Fund v. Madigan, 960 F.2d 1515, 1527 (10th Cir. 1992).

The Tenth Circuit utilizes a two-prong test in evaluating an agency's decision not to develop a supplemental EIS.  Southern Utah Wilderness Alliance, 301 F.3d at 1238.  First, the court must determine whether the agency took a "hard look" at the new information to determine whether a supplemental EIS was necessary. Id.;  See also Marsh v. Oregon Natural Resource Council, 490 U.S. 360, 378-85 (1989)  Under this "hard look" prong, the court may consider whether the agency:  (1) obtained opinions from its own experts; (2) obtained opinions from experts outside the agency; (3) gave careful scientific scrutiny to the new information; (4) responded to all legitimate concerns raised by the new information; or (5) otherwise provided a reasoned explanation for the new information's lack of significance.  Second, the court must determine whether the decision not to issue the supplemental EIS was arbitrary and capricious under the APA.  Id.  Under this prong, an agency acts arbitrarily and/or capriciously when it adopts substantial changes that are relevant to environmental concerns in the final EIS and never presents those changes to the public for review and comment.  Dubois, 102 F.3d at 1293.

ii.   Application.

The Court finds that the Forest Service's decision not to

71

develop a supplemental EIS when it promulgated the Roadless Rule violated NEPA regulations.  See 40 C.F.R. § 1502.9(c)(1)(i)-(ii). The Forest Service made four substantial changes between the draft EIS and the final EIS and did not prepare a supplemental EIS.

First, the final EIS eliminated all of the "procedural aspects" of the Roadless Rule by incorporating those rules into the Planning Regulations.  (AR, Doc. 4609, at p. xi; see also 65 Fed. Reg. 67,529-30).  Second, the Forest Service broadened the scope of the Roadless Rule to include areas with classified roads within inventoried roadless areas.  (AR, Doc. 4609, at pp. xi, 2-5 & n.3). Third, the Forest Service identified an additional 4.2 million acres of roadless areas that would be subject to the Roadless Rule. Fourth, the Forest Service made a substantial change to the type of timber harvesting that would be allowed; specifically, the Forest Service limited the "stewardship exception" in the final Roadless Rule to harvesting only "small diameter timber."   36 C.F.R. § 294.13(b)(1).  The Forest Service did not define what constitutes "small diameter timber," see 36 C.F.R. § 294.11, nor did it explain its reasoning for this change.

From the beginning, the Forest Service had planned to update the geographic scope of the Roadless Rule between the draft EIS and

the final EIS because it did not have time to update the inventoried roadless areas.   (See, e.g., AR, Doc. 2115, Doc. 2610). The Forest Service then expanded the geographic scope of the rule by 4.2 million acres of land and more severely limited timber harvest exceptions within inventoried roadless areas.   All this was done without giving the public notice or an opportunity to comment on the changes and, in some instances, without describing these changes in the final EIS's "summary of changes."

Thus, the Forest Service had new information available to it before it started the draft EIS but intentionally waited to update its twenty-year-old roadless inventories until it issued the final EIS, because it "did not have time" to consider the new information.   This "mad rush" turned the NEPA process on its head. A careful, objective consideration of the cumulative impacts of the Forest Service's actions indicates to the Court that it was only giving pro forma compliance to the NEPA procedures.

### iii. Conclusion.

The Court finds that the changes described above were all substantial because they directly affected the purpose and scope of the Roadless Rule.   Neither the Federal Defendants nor Defendant-Intervenors have directed the Court to any discussion in the final

73

EIS that demonstrates that the Forest Service took a "hard look" at the environmental consequences of these changes. Additionally, the Forest Service did not provide a reasoned explanation for the new information's lack of significance. Rather, the Forest Service found that the addition of 4.2 million acres to the Roadless Rule and the changes in the exceptions for timber harvest did not even warrant mentioning in its summary of changes. Such a summary dismissal of these substantial changes is evidence of *pro forma* compliance in the early stages of the NEPA process. Therefore, the Court concludes that the Forest Service failed to take a "hard look" at the new information that it had gathered and substantially changed the final Roadless Rule without considering the environmental consequences of its actions or giving the public an opportunity to comment on those changes.

The Court recognizes that a federal agency does not have to issue a supplemental EIS every time new information comes to light. Marsh v. Oregon Natural Resource Council, 409 U.S. 360, 373 (1989). However, in this case, the Forest Service had new, relevant, and important information but failed to include that information in the draft EIS simply in order to meet a predetermined schedule that was set for political reasons. Then, the Forest Service utilized

74

"updated" information without informing the public that it was using this information that it had all along.  However, rather than use the new information to update the roadless area inventories, the Forest Service simply eliminated any "confusion" by broadening the scope of the Roadless Rule beyond that which it even contemplated in its notice of intent to undertake rulemaking.  This blatant disregard for the NEPA process and regulations rendered the Forest Service's decision not to issue a supplemental EIS arbitrary and capricious.

   3. Conclusion on Wyoming's NEPA Claims.

  The Court, as it did in <u>Roadless I</u>, **FINDS** that: (1) the Forest Service's decision not to  extend the scoping comment period was arbitrary and capricious; (2) the Forest Service's denial of cooperating agency status without explanation was arbitrary and capricious; (3) the Forest Service's failure to rigorously explore and objectively evaluate all reasonable alternatives was contrary to law; (4) the Forest Service's conclusion that its cumulative impacts analysis in the Roadless Rule Final EIS satisfied its NEPA duties was a clear error in judgment; and (5) the Forest Service's decision not to issue a supplemental EIS was arbitrary, capricious, and contrary to law.

In its rush to give President Clinton lasting notoriety in the annals of environmentalism, the Forest Service's shortcuts and bypassing of the procedural requirements of NEPA has done lasting damage to our very laws designed to protect the environment. What was meant to be a rigorous and objective evaluation of alternatives to the proposed action was given only a once-over lightly. In sum, there is no gainsaying the fact that the Roadless Rule was driven through the administrative process and adopted by the Forest Service for the political capital of the Clinton administration without taking the "hard look" that NEPA required.

B.   Wyoming's Wilderness Act Claims.

Wyoming argues that the Roadless Rule constitutes a de facto designation of "wilderness" in contravention of the process established by the Wilderness Act of 1964. (Pl.'s Opening Br., at p. 72; Pl.'s Reply Br., at pp. 35-36). Federal Defendants respond that the Roadless Rule does not constitute a de facto designation of wilderness because it permits the continuation of multiple uses in inventoried roadless areas that do not require the construction of new roads – uses such as motorized travel, grazing, and oil and gas development.   (Fed. Defs.' Resp. Br., at pp. 69-70). Defendant-Intervenors contend that the Roadless Rule does not

76

designate or attempt to designate any wilderness areas.   (Def.-
Intervenors' Opp. Br. at p. 45).

The narrow issue before the Court is whether the Forest
Service has usurped Congress' power regarding access to, and
management of, public lands by a de facto designation of
"wilderness" in violation of the Wilderness Act of 1964.

1.   The Wilderness Act of 1964.

The Property Clause in the United States Constitution provides
Congress with the power to enact all necessary rules and
regulations respecting the federal government's property.   U.S.
Const. art. IV, § 3.   Pursuant to this authority, Congress passed
the Wilderness Act in August of 1964.[29]   Conf. Rep. No. 88-1829;
H.R. Rep. No. 88-1538.   President Lyndon Johnson signed the
Wilderness Act into law on September 4, 1964.   The Wilderness Act
has been described as "the most far-reaching land preservation
statute ever enacted." Robert Glicksman & George Cameron Coggins,
Wilderness in Context, 76 Den. Univ. L. Rev. 383, 387 (1999).

a.   The Policy and Purpose of the Wilderness Act.

---

[29] The passage of the Wilderness Act by Congress was the result of
a nine-year political struggle.   See Michael McCloskey, The
Wilderness Act of 1964: Its Background and Meaning, 45 Or. L. Rev.
288, 295-301 (1966) (detailing the legislative history of the
Wilderness Act).

The Wilderness Act declared it the policy of Congress to "secure for the American people of present and future generations the benefits of an enduring resource of wilderness." 16 U.S.C. § 1131(a). To effectuate this policy, Congress established the National Wilderness Preservation System ("NWPS"), which would be composed of congressionally designated "wilderness areas." Id. The Wilderness Act also immediately designated certain areas as wilderness, id. § 1132(a), and provided the procedure for future designation of wilderness areas, id. § 1132(b). In establishing the NWPS, Congress unambiguously provided that "no Federal lands shall be designated as 'wilderness areas' except as provided for in [the Wilderness Act] or by a subsequent Act." Id. § 1131(a).

Therefore, Congress has the sole power to create and set aside federally designated wilderness areas pursuant to the Wilderness Act. Parker v. United States, 309 F. Supp. 593, 597 (D. Colo. 1970), aff'd, 448 F.2d 793 (10th Cir. 1971). In fact, the primary purpose of the Wilderness Act was to provide:

> [a] statutory framework for the preservation of wilderness [that] would permit long-range planning and assure that no further administrator could arbitrarily or capriciously either abolish wilderness areas that should be retained or make wholesale designations of additional areas in which use would be limited.

Id. (quoting H.R. Rep. No. 88-1538). To this end, the Wilderness

Act removed the Secretary of Agriculture's and the Forest Service's discretion to establish de facto administrative wilderness areas, a practice the executive branch had engaged in for over forty years.[30]   Parker, 309 F. Supp. at 597, aff'd, 448 F.2d at 797. Instead, the Wilderness Act places the ultimate responsibility for wilderness designation on Congress.  Id.; 16 U.S.C. § 1131(a).   In this regard, the Wilderness Act functions as a "proceed slowly order" until Congress – through the democratic process rather than by administrative fiat - can strike the proper balance between multiple uses and preservation.   Parker, 448 F.2d at 795.   This statutory framework necessarily acts as a limitation on agency action.  Id. at 797.

Through this statutory procedure, the Wilderness Act provides the mechanism for preserving wilderness in its natural and unmodified condition without human settlement for the enjoyment of

---

[30]   In 1924, the Forest Service designated a "roadless" or "institutional wilderness" area for the first time in New Mexico. See Glicksman, Wilderness in Context, 76 Den. Univ. L. Rev. at 385; McCloskey, The Wilderness Act of 1964:  Its Background and Meaning, 45 Or. L. Rev., at 296. From 1924 until the passage of the Wilderness Act, the Forest Service exercised broad discretion in designating areas as "roadless" or "wilderness."  Id. at pp. 296-301.   Congress specifically mentioned that the Secretary of Agriculture and the Forest Service had exercised this broad discretion by setting aside "88 wilderness type" areas in the National Forests.   H.R. Rep. No. 88-1538.

present and future generations. 16 U.S.C. § 1131(a). As the Tenth
Circuit explained, this general purpose of the Wilderness Act is
simply a recognition by Congress of the necessity of preserving one
factor of our natural environment from the "hasty inroads of man."
Parker, 448 F.2d at 795.

    b. The Definition of Wilderness.

  The Federal Government owns approximately 660 million acres of
land. Glicksman, Wilderness in Context, 76 Den. Univ. L. Rev. at
389. Since 1964, Congress has designated roughly a 100 million
acres of that land as wilderness. Id. at 389-90. The Wilderness
Act defines "wilderness" as: (1) "an area where the earth and its
community of life are untrammeled by man, where man himself is a
visitor who does not remain"; or (2) "an area of undeveloped
Federal land retaining its primeval character and influence,
without permanent improvements or human habitation, which is
protected and managed so as to preserve its natural conditions."
16 U.S.C. § 1131(c). Congress further provided that a wilderness
area should: (1) generally appear to have been primarily affected
by the forces of nature; (2) have outstanding opportunities for
solitude or a primitive and unconfined type of recreation; (3) have
at least 5,000 acres of land or be of a sufficient size to make

practicable its preservation and use in an unimpaired condition; and (4) contain ecological, geological, or other features of scientific, educational, scenic, or historic value. Id.

Congress' definition of "wilderness" contains both objective and subjective components. The objective components are that an area must be roadless and at least 5,000 acres in size. Glicksman, Wilderness in Context, 76 Den. Univ. L. Rev. at 390. The subjective components, which must be determined by Congress, are whether the area has outstanding opportunity for solitude or primitive recreation. Id. As the Wilderness Act's legislative history makes clear, Congress elevated substance over form through its definition of "wilderness." H.R. Rep. No. 88-1538. In explaining the need for a "legislatively authorized wilderness preservation system," the House committee classified "wild areas," "canoe areas," "roadless areas," and "primitive areas" as included within "wilderness-type areas." Id.

The ultimate test for whether an area is "wilderness" is the absence of human disturbance or activity. As one scholar has explained, roads, which necessarily facilitate human disturbance and activities, "are the coarse filter in identifying and defining wilderness." Michael J. Mortimer, The Delegation of Law-Making

Authority to the United States Forest Service: Implications in the Struggle for Nat'l Forest Mgmt., 54 Admin. L. Rev. 907, 959 (2002) [hereinafter "Delegation of Law-Making Authority"].

In fact, the Forest Service's procedures for identifying wilderness areas, and its rules for protecting wilderness areas in National Forests, emphasize the importance of the "roadless" nature of "wilderness areas." For example, the first step in the Forest Service's procedure for identifying and evaluating potential wilderness areas is to "identify and inventory all roadless, undeveloped areas that satisfy the definition of wilderness found in section 2(c) of the 1964 Wilderness Act." U.S. Dep't of Agric. Forest Serv. Manual, ch. 1909.12; U.S. Dep't of Agric. Forest Serv. Land and Res. Mgmt. Planning Handbook, FSH 1909.12, ch. 7, ¶ 7.1.[31] Similarly, the regulations implementing the Wilderness Act provide that there shall be "no temporary or permanent roads" in a congressionally designated wilderness area. 36 C.F.R. § 293.6. In short, it is "reasonable and supportable to equate roadless areas

---

[31] The Forest Service also recognizes an inverse relationship between human activity and the "purity" of a wilderness area. U.S. Dep't of Agric. Forest Serv. Manual, ch. 2320.6 (providing that "the more human influence, the lower the purity of a wilderness is; the less human influence on a wilderness, the higher, or purer, the wilderness area could be"). There is a direct correlation between the availability of roads and human activity.

with the concept of wilderness." Mortimer, The Delegation of Law-Making Authority, 54 Admin. L. Rev. at 958. The Ninth Circuit also recognized that the areas subject to the Roadless Rule were "pristine wilderness," Kootenai Tribe, 313 F.3d at 1106, and some of the "last unspoiled wilderness in our country." Id. at 1121.

           c.    The Uses Permitted in Wilderness Areas.

The Wilderness Act supplements the Organic Act of 1897, 16 U.S.C. § 475, and the MUSYA, id. §§ 528-531. 16 U.S.C. § 1133(a)(1). The Wilderness Act provides protection for a use of the National Forests that was not contemplated by either the Organic Act or the MUSYA - preservation of the National Forests for use and enjoyment of present and future generations. Id. §§ 1131(a), 1133(a).

To this end, the Wilderness Act prohibits commercial enterprise, permanent and temporary roads, aircraft and other forms of mechanical transportation, and structures or installations within congressionally designated Wilderness Areas. 16 U.S.C. § 1133(c). The Wilderness Act directs federal agencies with jurisdiction over congressionally designated wilderness areas to preserve the wilderness character of the area. Id. § 1133(b). For example, the Secretary of Agriculture and the Forest Service are

charged with preserving the "wilderness character" of wilderness areas in the National Forests. 36 C.F.R. §§ 293.1 to 293.17.

The Wilderness Act then provides seven "special provisions," or exceptions to the general use prohibitions, in congressionally designated wilderness areas. 16 U.S.C. § 1133(d)(1)-(7). Those exceptions allow, among other things: (1) the Forest Service to take such measures as necessary to control fire, insects, and diseases; (2) mining uses pursuant to valid existing rights; (3) grazing uses in wilderness areas; and (4) commercial services to the extent they are proper for realizing the recreational or other wilderness purposes of the area. Id. § 1133(d)(1)-(3),(5). The Wilderness Act also provides provisions for allowing a private land owner to gain access to his land if it is surrounded by wilderness areas. Id. § 1134. Finally, the Wilderness Act respects state rights by providing that the federal government is not exempt from state water laws and that the Act does not affect the jurisdiction of states with respect to wildlife and fish in the National Forests. Id. § 1133(d)(6),(7).

2. Application.

On October 13, 1999, President Clinton directed the Forest Service to develop regulations for long-term protection of most or

84

all currently inventoried roadless areas. (AR, Doc. 1535). The "currently inventoried roadless areas" to which the President was referring were the RARE I and RARE II inventories. These inventories were initiated for the purpose of identifying those roadless and underdeveloped areas within the National Forest System that should be further evaluated for addition to the NWPS established by the Wilderness Act. Mountain States Legal Found. v. Andrus, 499 F. Supp. 383, 387-88 (D. Wyo. 1980). As the President correctly described, these inventoried roadless areas were generally parcels of 5,000 acres or more and are some of the last "unprotected wildlands in America" and the remnants of "untrammeled wilderness." (AR, Doc. 1535, at p. 2); see also Kootenai Tribe, 313 F.3d at 1106 (describing areas subject to the Roadless Rule as "pristine wilderness").

This rulemaking procedure marked a significant departure from the statutory framework established by the Wilderness Act in which the President, the Forest Service, and Congress interacted for the protection of wilderness. This was a change because the administrative rulemaking would remove Congress – the only body with the sole power to designate wilderness areas - from the process.

Nevertheless, the Forest Service proceeded with the rulemaking process.  The 58.5 million acres of National Forest subject to the Roadless Rule are the result of the RARE II inventory and other unidentified assessments.    (AR, Doc. 4609, at p. 1-5).    The Roadless Rule prohibits all road construction in the inventoried roadless areas.  36 C.F.R. § 294.12(a).  The Roadless Rule does, however, permit construction of roads in roadless areas in four limited circumstances:  (1) to protect public health and safety in cases of an "imminent" threat of flood, fire, or other "catastrophic event" that, without intervention, would cause loss of life or property; (2) to conduct an environmental clean up pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, the Clean Water Act, or the Oil Pollution Act; (3) when a road is needed pursuant to reserved or outstanding rights or provided for by statute or treaty; and (4) when a road is needed in conjunction with the continuation, extension, or renewal of a mineral lease on lands that were under lease when the Roadless Rule was published.    36 C.F.R. § 294.12(b)(1)-(3),(7).    The Roadless Rule also bans all commercial timber harvest subject to four limited exceptions.  36 C.F.R. § 294.13(a)-(b).

The Forest Service, through the promulgation of the Roadless

Rule, designated 58.5 million acres of National Forest land as a de facto wilderness area in violation of the Wilderness Act. The Court makes this finding for three main reasons.

First, as the Forest Service itself seems to acknowledge, a roadless forest is synonymous with the Wilderness Act's definition of "wilderness." The reason is that roads facilitate human disturbance and activity in degradation of wilderness characteristics.

Second, a comparison of the uses permitted in wilderness areas and those permitted in inventoried roadless areas leads inescapably to the conclusion that the two types of areas are essentially the same. Compare 16 U.S.C. § 1133(d) with 36 C.F.R. §§ 294.12, 294.13. In fact, uses in inventoried roadless areas are even more restricted than those permitted in congressionally designated wilderness areas. For example, a road could be constructed in a wilderness area to "control fire, insects, and diseases," whereas a road could only be constructed in a roadless area in the "case of an imminent flood, fire, or other catastrophic event that, without intervention, would cause the loss of life or property." Compare 16 U.S.C. § 1133(d)(1) with 36 C.F.R. § 294.12(b)(1).

Third, the fact that most, if not all, of the inventoried

roadless areas were based on the RARE II inventories, which were designed to recommend wilderness areas to Congress, further evidences that the Forest Service usurped congressional authority. One of the stated purposes of the Wilderness Act was to assure that no future administrator could make wholesale designations of additional wilderness areas in which use could be limited. Chief Dombeck, acting at the behest of President Clinton, acted directly contrary to this fundamental purpose of the Wilderness Act.

The Federal Defendants argue that the Forest Service did not create a de facto wilderness area because the Roadless Rule, unlike a wilderness designation, permits the continuation of multiple uses including motorized uses, grazing, and oil and gas development that do not require the construction of new roads. (Fed. Defs.' Resp. Br., at p. 70). This argument fails because all of those uses would, in fact, require the construction or use of a road. For example, one could not meaningfully set cattle out to pasture in a roadless area with no way of rounding those cattle back up or trucking them in and out of the forest allotment (cattle drives now days are just performed for tourists); or, one could not meaningfully explore or drill for oil and gas without access by road into the roadless areas.

88

Congress unambiguously established in the Wilderness Act that it had the sole authority to designate areas within the National Forest System as "wilderness."   To allow the Secretary of Agriculture and the Forest Service to establish their own system of de facto administrative wilderness through administrative rulemaking negates the system of wilderness designation established by Congress.  <u>Mountain States Legal Found. v. Andrus</u>, 499 F. Supp. 383, 394 (D. Wyo. 1980).

       3.   Conclusion.

For the aforementioned reasons, the Court, as it did in <u>Roadless I</u>, **FINDS** the Roadless Rule was promulgated in violation of the Wilderness Act of 1964.   Accordingly, the Court must set the Roadless Rule aside because it was promulgated in excess of Forest Service's statutory jurisdiction and authority.   5 U.S.C. § 706(2)(c).

      C.   <u>Wyoming's Challenge to the Roadless Rule Under Other Federal Statutes</u>

Wyoming also argues that the Roadless Rule violates the Wyoming Wilderness Act ("WWA"), the Multiple-Use and Sustained Yield Act ("MUSYA"), and the National Forest Management Act ("NFMA").   Wyoming seeks declaratory and injunctive relief.

The Court believes that an analysis of the WWA, MUSYA and NFMA

is unnecessary. As the Court has already found that the Roadless Rule was promulgated in violation of NEPA and the Wilderness Act, the Court will refrain from deciding at this time whether the Roadless Rule also violates these other statutes.

Accordingly, Wyoming's request for declaratory and injunctive Relief under the, NFMA, WWA and MUSYA is **DENIED**.

## III. Remedy

In Roadless I, this Court permanently enjoined the 2001 Roadless Rule, as a result of the Forest Service's disregard for NEPA and the Wilderness Act in ramming through an outgoing President's legacy building directive. 277 F.Supp. 2d at 1239. Since this Court's decision in Roadless I, the roadless initiative landscape has changed considerably. Two days after the Tenth Circuit heard oral argument regarding Roadless I, the Forest Service instituted the State Petitions Rule, effectively taking the 2001 Roadless Rule "off-the-books." As a result, on July 11, 2005, the Tenth Circuit vacated this Court's decision in Roadless I and directed this Court to dismiss the case as moot. Roadless II, 414 F.3d at 1213. In doing so, the Tenth Circuit, however, did not reverse this Court's ruling on the merits. See id.

Not surprisingly, the State Petitions Rule soon came under

fire, and was challenged in the Northern District of California. On October 11, 2006, the California court's Magistrate Judge held the State Petitions Rule to be promulgated in violation of NEPA and the ESA. Lockyer, 459 F. Supp. 2d at 919. The Magistrate Judge found the appropriate remedy for the Forest Service's violations was to "set aside" the State Petitions Rule and to "reinstate" the Roadless Rule, including the Tongass Amendment. Id. Finally, the Magistrate Judge ordered that the Forest Service was "enjoined from taking any further action contrary to the Roadless Rule without undertaking environmental analysis consistent with [its] opinion." Id.

On June 15, 2007, Wyoming requested that the Tenth Circuit Court of Appeals recall the mandate it issued in Roadless II, where the Tenth Circuit instructed this Court to dismiss Roadless I, as moot. On July 5, 2007, the Tenth Circuit denied Wyoming's motion, and stated that this Court, in the present case, should address possible comity issues created by the California court's decision in Lockyer. (Tenth Circuit Order, 03-8058, July 5, 2007, at p. 3). The Tenth Circuit suggested that a Fifth Circuit case, West Gulf Maritime Ass'n v. ILA Deep Sea Local 24, 751 F.2d 721 (5th Cir. 1985) may be of some relevance to the issue of comity.

A.    Comity.

In West Gulf, the Fifth Circuit Court of Appeals examined
comity issues involving a case where a Texas district court assumed
jurisdiction over the exact same issue that was also pending in a
New York district court.   Id.   The Fifth Circuit noted that "the
federal courts have recognized that the principle of comity
requires federal district courts- courts of coordinate jurisdiction
and equal rank- to exercise care to avoid interference with each
other's affairs."   Id. at 728.   The court emphasized that the
purpose of comity is to avoid (1) duplicative litigation, (2)
piecemeal resolution of issues that need a uniform result, and (3)
rulings that may trench upon the authority of a sister court.   Id.
at 729   The West Gulf decision clearly establishes that issues of
comity are not present in the current case.

First, the substantive issues before both district courts in
the West Gulf case were substantially the same.   Both the district
court in New York and Texas were asked to review the same Emergency
Hearing Panel decision entered pursuant to a specific contract.
Id. at 728.   The substantive issues involved in the present case
are drastically different than those faced by the California court.
In Lockyer, the District Court in California was asked to review

the viability of the States Petitions Rule. 459 F. Supp. 2d 874
(N.D. Cal. 2006). Here, the Court is tasked with reviewing a
completely different Forest Service action, the promulgation of the
2001 Roadless Rule. In finding that the State Petitions Rule was
promulgated in violation of NEPA and the ESA, the California court
did not make any findings regarding the promulgation of the
Roadless Rule. See id. As the substantive issues are completely
and entirely different, the purposes of comity are upheld as there
is no fear of duplicative litigation, both the State Petitions Rule
and the Roadless Rule are being uniformly and separately resolved,
and therefore each court is not trenching on the other's
jurisdiction. See West Gulf, 751 F.2d at 728.

Second, principles of comity do not limit the availability of
remedies this Court may consider as a result of the California
court's holding. This Court believes that the California court's
Magistrate Judge was remiss in concluding that it could not "give
legal consequences" to this Court's findings in Roadless I. The
Court is disturbed, and frankly shocked at the fact that a
Magistrate Judge essentially re-instituted a policy that was not
properly before that Court, and especially in light of the fact
that an Article III judge had already ruled that the re-instituted

93

policy was promulgated in violation of law.

While the Court has serious reservations about the California court's actions, these actions are not the basis for which the Court concludes that it has all remedies at its disposal in the current case. Defendant-Intervenors argue that this Court is precluded from issuing an injunction because the California court enjoined the Forest Service "from taking any further action contrary to the Roadless Rule without undertaking environmental analysis consistent with [its] opinion." Lockyer, 459 F. Supp. 2d at 919. Even though the California Court re-instituted a policy that this Court found was promulgated in violation of law, the effect of the court's action was in line with established Ninth Circuit precedent. The Ninth Circuit has stated, "the effect of invalidating an agency rule is to reinstate the rule previously in force." Paulsen v. Daniels, 413 F.3d 999, 1008 (9th Cir. 2005). Essentially, the California court set aside and enjoined the States Petitions Rule, and re-instated the previous rule in force. As the 2001 Roadless Rule is properly before this Court, and is the only Court involved in reviewing the 2001 Roadless Rule on the merits, this Court has the full authority to grant any equitable remedy it deems proper and necessary without violating the principles of

comity. See generally West Gulf, 751 F.2d at 728.

B. Injunction.

Wyoming argues that this Court should permanently enjoin the 2001 Roadless Rule, as the Court did in Roadless I. Wyoming contends that a permanent injunction is warranted because the Roadless Rule was promulgated in violation of law and will present a continuing injury to the country's forest areas. Both Federal Defendants and Intervenor-Defendants argue that broad injunctive relief is not appropriate in the present case.

1. Standard for Granting a Permanent Injunction.

The Tenth Circuit has stated that a district court's decision to grant or deny injunctive relief is within the "sound discretion" of the district judge. Prows v. Fed. Bureau of Prisons, 981 F.2d 466, 468 (10th Cir. 1992). The district court may only issue a permanent injunction when the remedy at law is inadequate to compensate a party for the injury sustained. Tri-State Generation and Transmission Ass'n v. Shoshone River Power, Inc., 874 F.2d 1346, 1353 (10th Cir. 1989). The party seeking a permanent injunction has the burden of demonstrating several factors. Those factors include: (1) a violation of federal law; (2) irreparable harm unless the injunction is issued; (3) the harm from the

violation outweighs the harm that the injunction may cause the opposing party; and (4) the injunction is not adverse to the public interest. Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 546 n.12 (1987); Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1255 (10th Cir. 2003). Notwithstanding those factors, the most important factor in the district court's decision to grant an injunction is whether the facts indicate a danger of future violations of the law. Roe v. Cheyenne Mountain Conference, 124 F.3d 1221, 1230 (10th Cir. 1997). Finally, the right to relief must be unequivocal before a federal court may exercise its discretion to grant a permanent injunction because of the extraordinary nature of such a remedy. Shoshone River Power, Inc., 874 F.2d at 1354.

2.   Application.

While the Court carefully and diligently examined the proper course for tailoring an adequate and fair remedy in the present case, it cannot rightfully remand the case to the Forest Service without causing violence to the undersigned's conscience.   The Forest Service, in an attempt to bolster an outgoing President's environmental legacy, rammed through an environmental agenda that itself violated this country's well-established environmental laws.

96

While this Court realizes that a permanent injunction is an extraordinary remedy, it believes that a permanent injunction is the proper remedy in the present case. While it would be simple for this Court to simply remand this action to the Forest Service, to do so would be irresponsible. For every day the Roadless Rule is on the books, the opportunity exists for a continuing violation of the Wilderness Act. See Roe, 124 F.3d at 1230.

Additionally, a permanent injunction is proper as Wyoming has clearly established the requisite elements for issuing an injunction.

First, Wyoming must show a violation of federal law. Greater Yellowstone Coalition, 321 F.3d at 1255. As discussed previously, the Forest Service promulgated the Roadless Rule in violation of NEPA, and created de facto wilderness areas in violation of the Wilderness Act. As NEPA and the Wilderness Act were unequivocally violated, Wyoming has satisfied the first prong in favor of granting an injunction.

Second, Wyoming has the burden of showing that irreparable harm will be done if an injunction is not issued. Greater Yellowstone Coalition, 321 F.3d at 1255. The Tenth Circuit has notably remarked that harm to the environment throughout the

97

country may be presumed when an agency fails to follow NEPA's mandates. Davis v. Mineta, 302 F.3d 1104, 1114 (10th Cir. 2002). Furthermore, Wyoming has demonstrated that the Roadless Rule creates a greater risk for beetle infestation and catastrophic wildfire. (Aff. of William Haagenson at p. 2-14). As Wyoming has clearly demonstrated, and it can be presumed that substantial harm will occur with the Roadless Rule in place, the second prong for implementation of a permanent injunction has been satisfied.

Third, Wyoming must show that the harm from the violation outweighs the harm that the injunction may cause the opposing party. Greater Yellowstone Coalition, 321 F.3d at 1255. As previously stated, the Roadless Rule as it stands today, creates a grave risk of harm for our nations forests. As the proper agencies are without the ability to properly fight beetle infestation and wildfire outbreaks, our forests are at-risk of being severely devastated. On the other hand, the Forest Service will simply be prevented from carrying out the initiatives of the Roadless Rule, and will be able to re-evaluate its roadless policy and implement an appropriate initiative and regulation once it follows NEPA's mandates. While the Forest Service may argue that a temporary injunction would be more appropriate so that it has time to cure

the Roadless Rule's NEPA defects, that remedy is not appropriate in
the present case. A temporary injunction is only proper when it
allows an agency time to cure the procedural defects. This case,
however, was marred from the word "go." The Forest Service
unreasonably limited the time period from which to implement the
Roadless Rule, effectively curtailing and hindering every process
mandated by NEPA. Furthermore, the Forest Service effectively
trampled Congress' sole authority for designating wilderness areas
when it solely created over 58 million acres of de facto wilderness
area when enacting the Roadless Rule. As the violation's harm
greatly outweighs any mere inconvenience imposed on the Forest
Service, the third prong of the test for granting a permanent
injunction is satisfied.

Fourth, Wyoming has the burden of demonstrating that the
granting of a permanent injunction is not adverse to the public
interest. This Court is of the opinion that the Forest Service
violated the public interest when it flagrantly and cavalierly
railroaded this country's present environmental laws in an attempt
to build an outgoing President's enduring fame. It is in the best
interests of the public to make sure federal agencies comply with
NEPA and the Wilderness Act when promulgating environmental

regulation. As this Court stated in Roadless I, the Forest Service lost sight of its mission – "to provide the greatest amount of good for the greatest amount of people in the long run." Meaningful participation is the heart of NEPA.    The public interest is enhanced when all parties whether individuals, companies, states, and federal agencies can come to the table and discuss significant environmental initiatives.    That was not done in the present case.

Finally, the Federal-Defendants have gone to great lengths to convince this Court that the Roadless Rule is no longer the Forest Service's current forest plan policy. The Court finds this highly unlikely, due to the California court's re-issuance of this rule. Without enjoining the Roadless Rule, the Forest Service would be free to follow the California court's mandate, even if this Court found that the rule was promulgated in violation of NEPA and the Wilderness Act.    The potential exists for the Forest Service to shun this Court's authority under the guise of complicity with the decision of the California court.  This Court will not provide the Forest Service such an opportunity, in light of its previous disregard for the law.  For these reasons the Forest Service must again start from square one.

#### CONCLUSION

As this Court found in Roadless I, the Forest Service promulgated the Roadless Rule in violation of NEPA and the Wilderness Act.

With respect to the former, NEPA's purpose is to prescribe the process for the public to meaningfully participate in a federal agency's major federal action that significantly affects the quality of the human environment. In a case as important as this, where the agency action was driven by political haste and evidenced *pro forma* compliance with NEPA, it is the province of the Court under NEPA to safeguard the public by telling the government that more study is needed.

With respect to the latter, the Wilderness Act's purpose is to prescribe the procedure for designation of wilderness areas and to divest the Department of Agriculture of such authority. While it "must be admitted that it is difficult to define the line which separates legislative power to make laws, from administrative authority to make regulations[,]" one thing is clear:    "The Secretary of Agriculture [cannot] make regulations for any and every purpose." United States v. Grimaud, 220 U.S. 506, 517, 522 (1911).    In this case, the Forest Service's designation of 58.5

million acres as "roadless areas" was a thinly veiled attempt to designate "wilderness areas" in violation of the clear and unambiguous process established by the Wilderness Act for such designation.   It is the duty of this Court to enforce the laws as written by Congress.

For all the aforementioned reasons, the Court **FINDS** that: (1) Wyoming has standing to challenge the Roadless Rule; and (2) the Roadless Rule was promulgated in violation of the National Environmental Policy Act and the Wilderness Act.   As a result, the Roadless Rule must be set aside.   5 U.S.C. § 706(2)(A),(C).

Therefore, the Court **ORDERS** that the Roadless Rule, 36 C.F.R. §§ 294.10 to 294.14, be permanently enjoined, for the second time. All other outstanding motions are denied as moot.

Dated this _____ day of August, 2008.

Clarence A. Brimmer
United States District Judge